**ATTACHMENT "11"**



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

Ms. Cheryl Riley
1562 W. 15th Street
Yuma, AZ 85364

Dear Ms. Riley:

This is to acknowledge receipt of your complaint of discrimination, which was received in the Office of Civil Rights, on March 2, 2005. Your complaint has been forwarded to the Bureau of Reclamation for review to determine acceptability for processing.

If your complaint is accepted, it will be processed in accordance with Title 29, Code of Federal Regulations, Part 1614 which governs the processing of Federal Sector discrimination complaints. In the near future, you will be advised of the claims identified in your complaint that will be investigated. You will also be provided with further information on the administrative process at that time.

If you obtain a representative or have already done so, you must provide written notice to the Bureau of your designation of a representative. Your representative may act on your behalf in all matters pertaining to your complaint. However, in the event that you withdraw your complaint or reach a settlement agreement, you must personally sign a notice of withdrawal or agreement.

Should you have any further questions, please contact the Equal Employment Opportunity Manager, in the Bureau of Reclamation, on (303) 445-3680.

Sincerely,

Alton W. Jordan
Complaints Manager
Office of the Secretary

cc: EEO Manager, Bureau of Reclamation

COPY

**Riley 0392**

# ATTACHMENT "12"



# United States Department of the Interior

BUREAU OF RECLAMATION
PO Box 25007
Denver, Colorado 80225-0007



IN REPLY REFER TO:

D-7320
ADM-14.00

MAR 2 3

*Rec'd 3/23/05*

<u>CERTIFIED - RETURN RECEIPT REQUESTED</u>

Ms. Cheryl Riley
1562 W. 15th Street
Yuma, AZ 85364

Dear Ms. Riley:

The discrimination complaint identified in your February 18, 2005, memorandum to the Department of the Interior, Office for Civil Rights, has not been brought to the attention of an EEO counselor. The regulations for processing complaints of discrimination, 29 CFR 1614, require that an aggrieved person who believes that he or she was discriminated against because of race, color, religion, sex, national origin. age. reprisal. and physical or mental disability consult with an Equal Employment Opportunity (EEO) Counselor to try to resolve the matter. You may file a formal EEO complaint after completion of the counseling process if a satisfactory resolution has not been reached.

The Equal Employment Opportunity Officer has agreed to provide you pre-complaint counseling services. The EEO Counselor assigned to your pre-complaint is Sonya Johnson who will be conducting an inquiry into your claims of discrimination. Ms. Johnson can be reached at (770) 599-3677.

A copy of your written complaint is enclosed. If your concern is not resolved during the counseling period, the counselor will provide the appropriate forms and instructions for filing a formal complaint.

Sincerely,

for *Jacqueline Martinez Wells*

Karen Megorden
Acting Civil Rights and
Equal Opportunity Manager

WBR:LBobian:lb:3/23/05:2537:ADM.14.00
J Drive: CLARFI File – Title: Riley.LC

Riley 0387





# United States Department of the Interior

BUREAU OF RECLAMATION
PO Box 25007
Denver, Colorado 80225-0007

IN REPLY REFER TO

D-7320
ADM-14.00

8 2005

CERTIFIED - RETURN RECEIPT REQUESTED

Ms. Cheryl J. Riley
1562 W.15th Street
Yuma, AZ  85364

Dear Ms. Riley:

Your letter dated December 31, 2004, to the Department of the Interior, Office for Civil Rights, is being forwarded to the Bureau of Reclamation's Lower Colorado Region for further processing. The regulations for processing complaints of discrimination, 29 CFR 1614, require that an aggrieved person who believes that he or she was discriminated against because of race, color, religion, sex, national origin, age, reprisal, and physical or mental disability consult with an Equal Employment Opportunity (EEO) Counselor to seek resolution.  If your concern is not resolved during the counseling period, the counselor will provide the appropriate forms and instructions for filing a formal complaint after completion of the counseling process.

The Lower Colorado Region Equal Opportunity Manager, Janel Potucek, has agreed to provide you pre-complaint counseling services.  Ms. Potucek can be contacted at 702-293-8182.

Sincerely,

Karen Megorden
Acting Division Manager,
Diversity & Equal Opportunity

COPY

Riley 0378

ATTACHMENT "13"

# Cheryl J. Riley

(928) 329-6100

1562 W. 15th Street  ◊  Yuma, Arizona 85364

Certified USPS Return Receipt No. 7005 0390 0002 8237 7900

June 11, 2005

Lorraine Bobian
Division of Equal Opportunity
Bureau of Reclamation
PO Box 25007
Denver, CO 80225-0007

Re:    Complaint of Retaliation By Cynthia Hoeft and Thayer Broili for Prior EEO Activity

Ms. Bobian:

I am herein filing with you a complaint against Thayer Broili and Cynthia Hoeft for taking action against me that I believe is retaliation for my having previously filed EEO complaints against each of them.

On March 27, 2005, I received a letter from Mr. Broili informing me that he was requesting that Ms. Hoeft terminate me from my position as Natural Resource Specialist for the Bureau of Reclamation Yuma Area Office in Yuma, Arizona and have me removed from Federal service because I had been injured on the job on December 3, 2004, and was unable to work.

On April 27, 2005, I received a letter from Ms. Hoeft informing me that she had taken action to have me terminated from my position and removed from Federal service effective April 29, 2005. On April 29, 2005, I was removed from Federal service.

Although Mr. Broili and Ms. Hoeft are claiming that they took this action against me because I became temporarily disabled due to the work injury, it is my belief that they took this action in retaliation for my prior EEO claims against them for harassment and retaliation. Ms. Hoeft had tried on another occasion to manipulate both the EEO process and personnel system to remove me from my job, which I described my previous EEO complaint.

Enclosed are copies of the letters informing me of the personnel actions taken against me.

Please note, my home telephone number has changed to (928) 329-6100.

Thank you for your attention to this matter.

Sincerely,

Cheryl J. Riley

Attachments

COPY

Riley 0400

**ATTACHMENT "14"**



# United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470



IN REPLY REFER TO:

LC-1700
ADM-14.00

SEP 0 9 2005

CERTIFIED MAIL-RETURN RECEIPT REQUESTED

Cheryl J. Riley
1562 W. 15th Street
Yuma, Arizona 85364

RE: Your letter of June 11, 2005

We have received your letter of June 11, 2005, regarding your claim of Retaliation for Prior EEO Activity.

Twenty-nine Code of Federal Regulations, §1614.105(a) states, "Aggrieved persons who believe they have been discrimination against on the basis of race, color, religion, sex, national origin, age, or disability must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter;" and 29 C.F.R., §1614.105(1) states, "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action."

Your letter of June 11, 2005, is considered an initial contact with the EEO Office, and not a formal complaint. As stated above you must make contact with an EEO Counselor, in order to begin the informal stage of your complaint.

Jadin Allmen of my staff is available for counseling. If you elect to go into counseling, please call Ms. Allmen at (702) 293-8174.

For your information, enclosed please find a copy of Procedures for Processing Individual Complaints of Discrimination.

If you have questions regarding this letter, I can be reached at (702) 293-8182.

Sincerely,

Marcella F. Guerra
EEO Manager

Enclosure

**Riley 0396**



**ATTACHMENT "15"**

Cheryl Riley Appeal Docket No. 01A61936  Feb. 17, 2006

# Cheryl J. Riley

928-329-6100

1562 W. 15ᵗʰ Street  ◊  Yuma, Arizona  85364

February 17, 2006

## SENT TO EEOC VIA FAX No: 202-663-7022

Robert J. Barnhart, Director
Compliance and Control Division
Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

**REF:  Docket #:  01A61936**
**        Riley v. Interior, Dept. of**

Dear Director Barnhart:

Your letter dated February 6, 2006, and postmarked February 13, 2006, was delivered today in
the late afternoon mail.  Your letter informed me that your office had approved my having appeal
status with the EEOC regarding my complaint against my former agency.

Your letter also stated that my appeal information was due within 30 days of the date of my
appeal filing, which I had faxed to Ms. Thais Mootz of your office on January 19, 2006.  I am
herein providing information in support of my appeal as required.

On October 25, 2005, I received your letter dated October 19, 2005, in which the Equal
Employment Opportunity Commission (EEOC) had vacated provision 1 of the October 7, 2004,
Settlement Agreement (Agreement) between myself and the Bureau of Reclamation.  Your
decision remanded the matter back to the Agency with the contingency that they provide to the
EEOC additional written documentation to substantiate their claim that they in fact did comply
with provision 1 of the Agreement of the above cited case.  DOI was given 30 days to comply
with this request counting from 5 days of the letter's date as provided by the EEOC.  DOI was
required to respond and provide their documentation no later than November 23, 2005.

On December 20, 2005, I received from the Department of the Interior (DOI) a letter dated
December 13, 2005, the DOI also provided to the EEOC a copy of their letter.  In their letter the
Agency simply stated that it did comply with Provision 1 of the Agreement.  They cited some
anecdotal information but did not provide any written documentation corroborating their claims.

I hereby dispute and totally disagree with their response and claims that the Agency complied
with the Agreement.

1

08-08-2006 19:47   C. RILE   28-329-6100                                    PAGE9

Cheryl Riley Appeal Docket No. 01A61936  Feb. 17, 2006

For all of the reasons that I stated in my initial appeal to the EEOC, I am herein again asserting that the Agency did not fulfill the requirements of provision 1 of the Agreement and allow me to be detailed away from Team Leader A (Rex Wahl) to Team Leader B (Ron Curiel) for the agreed upon 60 days. In my initial appeal to the EEOC, I provided written documentation substantiating all of my claims that the Agency did not comply with said Agreement. Please see my Statement and Section 1D, 2F, 2G, and 2H in my appeal information dated March 30, 2005.

In the following I provide information in rebuttal of each of the Agency's statements:

1.  The Agency's response did not provide any substantive written proof of their claim to have complied with provision 1 of the Agreement. I completely refute their statement that I requested to do assignments inherently part of Team Leader A. It is absolutely not true. I wanted to get away from his harassment, if even for just a little while. And he was to have no contact with me for the 60-day detail. This did not happen.

     a)  I did not agree to do any work for, or under the direction of, Team Leader A. I logged in my journal the numerous occasions I requested my superiors to not make me work under the direction of Team Leader A. I specifically wanted Team Leader A to stay away from me, stop harassing me, and for his emails to me to stop. Supervisor (Thayer Broili) and Team Leader A made up the list of tasks for me to complete AFTER I signed the Agreement. I immediately protested this to the Agency's Resource Management Office Director, the Supervisor, and Team Leader B making them aware of this situation and that it was against the terms of the Agreement. I also notified Regional EEO officer Tess Yiamarelos that I was being forced to work for Team Leader A against the terms of the Agreement. I provided written documentation to support this at Section 2G.

         All I requested was 60 days away from Team Leader A and for his harassment to stop. The terms of provision 1 of the Agreement were to allow me a 60 day reprieve from Team Leader A's harassing me. The 60 day detail began on October 11, 2004 and was to end on December 13, 2004. I did not get the 60 days as guaranteed to me by the Agreement. If you notice the dates of the emails sent to me by Team Leader A you will see he continued to contact me and had control over several assignments of my work during the 60-day detail during which I was supposed to be assigned to work for Team Leader B (I provided copies of these emails in my initial appeal but am including copies here also).

     b)  The Agency's claim that I was performing 80-85% of my time on the Salvinia Project is not true. All pesticide spraying of this noxious weed had ended by September 30, 2004. By the time of the Agreement, only approximately 30-35% of my time was needed for this project, if that much. After the Agreement's inception, and during the 60-day detail provision, I was ordered to perform several types of work under the direction of Team Leader A against my objections. These assignments required the majority, approximately 60%, of my time. The work I was assigned by/under Team Leader A included, but is not limited to: attend training for the

2

Riley 0055

08-08-2006 19:48   C. RILEY   8-329-6100                                                    PAGE10

endangered species desert tortoise; complete NEPA investigations, research, and compliance document writing, mapping, and compilation; attend meetings with Team Leader A, perform as a team member doing field work investigations for the desert tortoise.  These are a few of the work assignments I was required to perform, all of which were directly under the purview of Team Leader A.

Further, Team Leader A was allowed to berate me in front of my supervisor on or about November 7, 2004.  When I looked to my supervisor for support he did nothing.  When I objected again to my Supervisor on or about November 10, 2004, about being forced to endure the mistreatment by Team Leader A and required to do work under the direction of Team Leader A, my Supervisor threatened me that he would charge me with insubordination if I refused to do the work assigned by Team Leader A.

On December 3, 2004, 10 days before the end of the 60-day detail to Team Leader B, I was again required to do work under Team Leader A.  This work required me to do desert tortoise (an endangered species) field work, which was under his direction (Section 1D).  It had nothing whatsoever to do with Team Leader B's hazardous materials team.  I was unfit for field work due to a previous, and management acknowledged, right arm injury.  I did not want to do the work assigned by Team Leader A but I was afraid to refuse to do the work and suffer a charge of insubordination from my supervisor with possible loss of my job.  It was during this desert tortoise field work that I fell and sustained a new injury to my left arm, shoulder, and knee.  This injury now left me two injured arms and unable to work.  Because I was temporarily disabled due to this injury the Agency terminated me from my job and removed me from government service.  I was not supposed to be working for Team Leader A on December 3.  I should have been allowed the 60 day detail they agreed to give me.  If I had been allowed to have my detail as the Agreement guaranteed me I might still have a job with an income and able to transfer to a new position if I wanted.

c) Because of the numerous demands that I continue to do work for Team Leader A, I was unable to complete the hazardous waste permitting work assigned by Team Leader B.

2. The Agency did not respond within the time limit as stated by the EEOC and in accordance with the requirements of 29 C.F.R. ∍ 1614.405.  The EEOC Order, dated October 19, 2005, which vacated and remanded the Agency's final decision, provided the Agency 30 days in which to respond.  This required that the Agency provide written documentation in support of their final decision of January 27, 2005, no later than November 23, 2005.

3. The Agency did not comply with the Order of the EEOC to provide to the EEOC, with a copy to me, written documentation supporting their decision.  The Agency's letter dated December 13, 2005, simply restates their initial decision without providing any written facts or documentation to establish their conclusion.

3

Cheryl Riley Appeal Docket No. 01A61936  Feb. 17, 2006

The Agency did not provide written documentation to the EEOC proving that they fulfilled provision 1 of the Agreement, and, further, the Agency failed to respond within the requisite 30 days. I am therefore respectfully requesting that the EEOC permanently vacate the Agency's decision regarding this matter.

Thank you for your consideration.

Sincerely,

Cheryl J. Riley

Attachments:   Copies of emails from Team Leader A during dates of detail
               Copy of accident report when I should not have been working for Team Leader A
               Copy of letter terminating me from my government job due to injury while
               working under Team Leader A when I was supposed to be on detail to Team
               Leader B under terms of Agreement.


CC:    Sharon D. Eller, Director    USPS RETURN RECEIPT CERTIFIED MAIL 7005 3110 0001 3772 4054
       Office for Equal Opportunity
       Department of the Interior
       Office of the Secretary
       Washington, D.C. 20240

4

12 pgs

Cheryl Riley Appeal Docket # 01A52759

Complainant Statement in Support of Appeal

Herein is my statement providing specific information in support of my Appeal of the Final Decision by the Department of the Interior, that the Bureau of Reclamation did breach the Resolution Agreement reached between the Agency and myself through Alternate Dispute Resolution (ADR) dated October 7, 2004.

The following background information is provided in an effort to assist the reader with understanding some of the events that occurred.

On October 5, 6, & 7, 2004, I entered into confidential mediation with Environment Team Leader Rex Wahl, Supervisor Thayer Broili, and Office Director Cynthia Hoeft against whom I had filed EEO complaints on August 4, 2004, alleging gender discrimination and hostile workplace. This mediation was conducted as Alternate Dispute Resolution (ADR) as part of the informal complaint process. A separate mediation session was conducted between myself and each of the parties named in my complaint. At the beginning of each session the mediator explained to each participant the unequivocal requirement for maintaining absolute confidentiality of everything discussed during the mediation proceedings. All participants were then required to sign individual confidentiality agreements (Attachment 1-A).

My primary request for relief of my complaint was for permanent reassignment away from Rex Wahl, Team Leader of the Environment Team. On October 7, 2004, during resolution negotiations, Management offered me permanent reassignment to Ron Curiel's HazMat team. At that time, I asked what the consequences would be for a female coworker currently on Mr. Curiel's team if I were moved to that team. I was concerned for her well-being as she had told me that she was afraid of how Mr. Wahl would treat her. Ms. Hoeft informed me that this coworker would be moved to Mr. Wahl's team due to my reassignment. To prevent displacing this individual, I requested to do a 60-day detail reassignment instead but with the absolute stipulation that Mr. Wahl change his behavior and stop degrading me, treating me to gender discrimination, and causing a hostile workplace. The EEO counselor told me I could not ask for this as this was my civil right and as such could not be included in my request for relief so my wording was exchanged with "a cooling-off period." The meaning of this term was stated to me to be that Management would ensure that no more discriminatory actions would be made against me (Attachment 1-B copies of the original working papers citing issues and the offers made to me by Management during negotiations).

To assist with distinguishing between the individual answers I have formatted the Items of the Settlement Agreement in bold text; the Department/Agency answers to me are identified by the initials D/A Complied Compliance Statement, which is underlined with text in italics; and my answers are identified as My Responses, which is underlined and in standard text.

The Resolution Agreement between the Bureau of Reclamation and myself stated that the Agency agreed to the following items:

**Item 1:  Detail the Complainant from her current position, Natural Resource Specialist, GS-0401-09-01, to the HAZMAT Team under Ron Curiel, Team Leader, for a 60-day period, beginning October 11, 2004, to allow the parties a cooling-off period.**

*D/A Complied Compliance Statement:  We have received documentation from the BOR that you were detailed from your position of Natural Resource Specialist to Unclassified Duties on the Hazardous Material (HAZMAT) Team from October 11, 2004, to December 9, 2004.  (Attachment B).  The BOR has complied with term 1 of the Agreement.*

**Riley 0059**

Cheryl Riley Appeal Docket # 01A52759

My Response: I disagree. The end date should be December 10, 2004. I also disagree as to the Agency's compliance with the intent of the detail to provide for me to be working away from and out of the control of Mr. Wahl to allow the "cooling-off period" to take place.

Before I signed the Resolution Agreement, I asked Ms. Hoeft, what projects I would work on during the detail. Ms. Hoeft told me that, as primary POC, I would continue working on the Giant Salvinia project and on the HazMat Team, I would be working on water and sewer permit issues and whatever else Mr. Curiel assigned me to do (more detail in my response to Item 2). I specifically asked for, and received confirmation from Ms. Hoeft, that I would not have any project or working contact with Rex Wahl. Ms. Hoeft stated to me that these were the only assignments I would be doing, and none of them required that I perform work for or on the Environment Team and/or Rex Wahl. All of the discussions and negotiations were done in the presence of the mediator, Ms. Jean Lovesmith (See Witness List). On October 11, I began the detail to the HazMat Team under Team Leader Ron Curiel. (Attachment 1-C copy of Resolution Agreement)

On October 8, 2004, the day after I signed the Agreement, Mr. Broili gave me a list of Environmental Team assignments written by Mr. Wahl that were in addition to what Ms. Hoeft had promised during negotiations. Initially, these assignments were directed by Mr. Wahl by way of Mr. Broili or Mr. Curiel. However, after a short period of time Mr. Wahl began emailing me himself and the assignments inevitably required me to have direct contact with Mr. Wahl and to do work under his direction. On October 12-14, 2004, Mr. Curiel also gave me the list of assignments by Mr. Wahl. On October 22, 2004, Mr. Curiel emailed Mr. Wahl's instructions to me. On October 25, 2004, Mr. Wahl began emailing me himself. This was directly in conflict with what were the actual terms and intent of the Resolution and what I was offered prior to signing the Agreement. Also On October 25, 2004, Mr. Broili required me to be in a meeting with both Mr. Wahl and himself. When I objected to having contact with Mr. Wahl, Mr. Broili just blew me off saying that he knew what the Agreement said but there was no other way since Ron (Curiel) was not there. During the meeting he allowed Mr. Wahl to interrupt me when I tried to speak, ridicule me, my knowledge and skills, and my opinions, make faces at me, and refuse to answer my questions so I could complete the project he had assigned me to do. This was extremely embarrassing and degrading to me. I looked to Mr. Broili to stop Mr. Wahl, but he did not. I told Mr. Broili that this was exactly the behavior I was not to be subjected to, he didn't respond but sat there letting Mr. Wahl verbally abuse me. As my Supervisor, Mr. Broili had the authority, the obligation, and the requirement to protect me from Mr. Wahl. On October 29, 2004, I met separately with Mr. Broili. At this time he agreed with me that Mr. Wahl's behavior had been inappropriate. He asked me if Mr. Wahl had given me the information I had requested so I could complete any of the 4 other projects he had assigned me. I told him that Mr. Wahl had not and that this was exactly the same methods Mr. Wahl used Since May 25, 2004, so that I couldn't complete work he assigned to me, and one of the reasons I had filed my EEO complaint against him in the first place. On October 26, I informed EEO counselor Tess Yiamarelos of what was occurring and objected to how the terms of the Resolution Agreement were not being followed. I requested her assistance with how to proceed with filing that Management was not upholding the Agreement. From October 22 - November 4, Management required me to work on a project directed by Mr. Wahl. During this time Mr. Wahl repeatedly refused to provide information I needed for project completion (Attachment 1-D substantiating emails).

On November 22, I received a new SF-52 detailing me to "Unclassified Duties" with a list of duties attached that I had never seen before. The duties listed included several more than what I was told would be my duties at the time I signed the Resolution Agreement. Of the duties listed, I had agreed to 1, 4, 5, 6. 7, and 8. Numbers 2 and 3 would require me to work under Mr. Wahl's direction in some way and was not acceptable to me according to what I had been promised. I called Ms. Yiamarelos and told her that this was not correct, she requested I Fax her a copy (Attachment 1-E, copy of the SF-52 and list of duties).

**Item 2: Supervisor, Thayer Broili, and Team Leader, Ron Curiel, will discuss with the Complainant her role and responsibilities on the HAZMAT Team, while on detail, within the week of October 11, 2004.**

*D/A Complied Compliance Statement: On October 12, 2004, the Supervisor, HAZMAT Team Leader, and the Complainant met to discuss work assignments. On October 13, 2004, the HAZMAT Team and the Complainant met to discuss specific work assignments. The Team discussed HAZMAT Team work typically performed by the Team and those tasks that would be assigned to the Complainant. The Complainant also stated she wanted to keep some previously assigned Environmental Team work to include the Alternative (this word should be American) Reservoir Project (Flat Tailed Horned Lizard monitoring and a categorical exclusion), Desert Tortoise training, giant salvinia spraying and monitoring, and boat operation training. On October 18 and 19, 2004 the Complainant provided feedback, listing the assignments and the estimate of hours required on the specific work assignments.*

My Response: This is basically true except for the part claiming that I stated I wanted to keep some previously assigned Environmental Team work. On Thursday October 7, 2004, when I signed the Resolution Agreement, the only duties Ms. Hoeft told me I would be doing during the detail was the Giant Salvinia project including APAP permit compliance and monitoring as I had been doing as primary POC since April 26, 2004. She said I would also be doing the work related to the HazMat team and assigned by Team Leader Ron Curiel. This would include: the A-22 permit, Septic APP permit, learning hazardous waste management and HazMat team support and assistance. I never requested or agreed to any other assignments beyond these. On Friday October 8, 2004, one day after signing, I was handed a list of duties I was required to fulfill for the Environmental Team under Rex Wahl (Attachment 2-F). I informed EEO Counselor Tess Yiamarelos that these duties were not part of the Resolution Agreement negotiations and in my email to Ms. Yiamarelos on October 26, 2004, I expressed my belief that the terms of the Resolution Agreement were not being upheld (Attachment 2-G). I did not receive a response on this subject from Ms. Yiamarelos. On November 22, 2004, I received my SF-52 for the detail with a different list of "Unclassified Duties,"(Attachment 1-E). The categorical exclusion for the All American Reservoir Categorical Exclusion (CE) project was one of the projects assigned after the signing of the Resolution Agreement. I did not want to do this CE because it would require me to be in contact with Mr. Wahl. In fact, I was surprised it was assigned to me as this is NEPA work and I had not done any NEPA work since I began working at the Yuma Area Office and up to this point all CE's had been assigned to another employee. Mr. Curiel asked me if I would do this CE so I agreed even though I was uncomfortable with being required to do work within Mr. Wahl's domain when the whole point of the detail was to allow me to get away from him. Approximately one week after I signed the Resolution Agreement, Mr. Curiel requested that I give him a write-up of how much time I would need to complete the tasks I was assigned to do. On October 18, I gave Mr. Curiel the time estimate as requested and noted on this that I still had not received the information necessary to do projects that Mr. Wahl had assigned me to do (Attachment 2-H). I continued working on the All American Reservoir (Geotech Drilling ) CE without complete information. It took about two more weeks for Mr. Wahl to give me the majority of the information I needed to complete the project. This is the project that I described in Item 1 above, that put me in direct contact with Mr. Wahl during which time he continued his behavior of manipulating, harassing, and verbally abusing me. I had not been involved at all with the flat tailed horned lizard project, which had been assigned to Kim Garvey. This project was also under the Environmental Team and Mr. Wahl. Mr. Wahl had Ms. Garvey assign me to research this project. The desert tortoise training wasn't mentioned until mid-October. I never brought up boat training, in terms of the Resolution Agreement. I am already a certified boat operator. I overheard discussion on Boat training for YAO staff in September and then not again until mid to late-November.

**Item 3: Supervisor Thayer Broili will develop an Individual Development Plan for the Complainant for her current position of Natural Resource Specialist, GS-0404-09/01 within 60 days of the execution of this agreement.**

*Please Note: For easier comparative association, I have inserted numbers at the beginning of each issue in the following statement of background information provided by the Department/Agency.  I have then numbered my corresponding replies in matching numerical order so that I may address each issue separately. *D/A Complied Compliance Statement*: The HAZMAT Team Leader, in coordination with Supervisor Broili and Office Director Cindy Hoeft, drafted an IDP for the Complainant focusing on development as a member of the HAZMAT Team (Attachment D). **1).** On December 7, 2004 Cindy Hoeft, Office Director, presented this IDP to the complainant.  On December 8, 2004, Cindy Hoeft, Office Director, provided the complainant with materials related to developing an IDP.  On December 16, 2004, Supervisor Broili requested the Complainant to draft an IDP that would focus on development as a member of the Environmental Team.  On December 17, 2004, Supervisor Broili provided the Complainant with a draft IDP focusing on Environmental Team work (Attachment E).*

*A statement of background information is necessary to describe the events that led the parties to issue two different IDP's.*

*__2)__ Beginning on November 22, 2004, the Complainant brought to the attention of the Office Director, concerns of 1) a possible breach in confidentiality of the mediation agreement by Rex Wahl Environmental Team Leader; 2) not being provided HAZMAT work during the detail, and 3) having to continue working with the Environmental Team Leader even if it were through the Supervisor or HAZMAT Team Leader.  The Office Director determined that the Complainant was assigned HAZMAT work at the start of the detail.  However, the HAZMAT work was not even started until almost the end of the detail because of how the Complainant divided and managed her time and work.  __3)__ The parties agreed that the Complainant would carryover some Environmental work that needed to be accomplished during the detail.  __4)__ When the Environmental work required specific direction, the direction was provided by Supervisor Broili or HAZMAT Team Leader Curiel.  __5)__ On one occasion, Environmental Team Leader Rex Wahl met with the Complainant accompanied by Supervisor Broili because the HAZMAT Team Leader was out of the office.  The purpose of this meeting was to give specific directions on the assignment only, with respect to the breach of confidentiality.  __6)__ The Office Director determined that Environmental Team Leader Rex Wahl had talked with another member of his team to let her know that information she was providing the Complainant as a friend or co-worker was being used against her by the Complainant. No mention was made by him to the team member on where he obtained this information.  __7)__ The Office Director counseled Environmental Team Leader Rex Wahl not to talk with any team member about other team members.*

*__8)__ During the October mediation between the Office Director and the Complainant, the parties discussed permanently reassigning the Complainant to the HAZMAT Team.  Because of a concern raised by the Complainant over the effect the reassignment would have on another employee, the parties agreed to a detail only.  __9)__ In late November 2004, given the presenting issues, the Office Director and the Complainant again discussed the possibility of a permanent reassignment because it appeared that the Complainant was moving in this direction.  __10)__ On December 7, 2004, the Office Director offered to the Complainant an extension of the detail for 30 days leading to a permanent reassignment to the HAZMAT Team and an IDP focusing on HAZMAT.  __11)__ The extension of the detail would allow the proper position description to be written and classified.  It could not be determined at that time what the classification*

Cheryl Riley Appeal Docket # 01A52759

series would be - i.e., Natural Resource Specialist, Environmental Specialist, or other. The Office Director made this offer in a draft formal resolution agreement using boilerplate language contained in the DOI template. The Complainant declined the offer. Therefore, the Office Director informed the Complainant that she would return to her previous position on the Environmental Team at the end of the detail on December 10, 2004. **12)** On December 8, 2004, the Office Director provided Complainant with materials related to developing an IDP and advised her that when Supervisor Broili returned to the office the following week, they would complete qn IDP focusing on Environmental work.

**14)** On December 16, 2004, Supervisor Broili requested by e-mail the Complainant draft an IDP for work on the Environmental Team. On December 17, 2004, Supervisor Broili provided a draft IDP for the Complainant's review with a note that they could discuss on December 20, 2004. No feedback from Complainant was received and no discussion was held, in part, because Complainant was in the process of discussing OWCP issues and going to the Doctor for a claimed work related injury. After receiving a Doctor's excuse for absence, the Complainant is currently absent from work for an undetermined period. To date, the Complainant has not provided feedback on the IDP developed by Supervisor Broili nor has she been available to sign and implement the IDP.

<u>My Response</u>: I disagree. Some Background: On May 3, 2004, and June 15, 2004, I initiated meetings with Mr. Broili during which I spoke to him of my desire to develop an Individual Development Plan (IDP) that would help me attain some of my career goals. I told Mr. Broili that with his approval some components that I wanted in my IDP would include participation in the LC Region Leadership Development Training offered by Reclamation and that I wanted to start work on my masters degree by applying to participate in the SMARTT program offered by the LC Region for employees to go to school. At the time Mr. Broili was very positive and said he was all for it. He asked me to draft these ideas in a memo to him and he would look it over and very likely approve it as long as I didn't slack off on my work and continued to work my 40 hour week. I provided him with the memo as he requested but I never heard anything more from Mr. Broili on this subject. I did not pursue as EEO issues began occurring. I requested that the development of an IDP be included in the Resolution Agreement as I still had hope of advancing my career at YAO as well as other opportunities in government.

In regards to Management achieving compliance with the terms of Item 3 of the Resolution Agreement, requiring Mr. Broili to develop an Individual Development Plan (IDP) for me in my current position of Natural Resource Specialist, GS-0401-09-01, within 60 days. This did not occur for four reasons, all of them within the control of Management. Therefore, they did not comply with Item 3.

<u>First</u>: In accordance with the Bureau of Reclamation, Lower Colorado Region Individual Development Plan Guidebook and in conjunction with Reclamation's guide for Career Planning, an IDP is developed jointly between a supervisor and employee incorporating, as much as possible, all components available for career development including: on-the-job-training, formal education or training, seminars, correspondence and computer based on-line training (Attachment 3-I). The IDP is usually initiated by the employee, which I had done in May and June, but the Supervisor can also. The guide clearly states that the employee is required to have input into their career development. On November 30, 2004, I stopped in Mr. Broili's office and let him know I was interested in taking a class in plant sciences to help develop my abilities and asked him how he felt about it. He said it was okay with him but then dropped the subject. I was never once included in, or solicited to have input, in the development of the HazMat IDP, or any other IDP created by Mr. Broili until after the Resolution Agreement term limits had expired. And the Draft IDP that Mr. Broili emailed me did not include any of my thoughts or choices of my career development.

Second: When I was detailed to the HazMat Team, the SF-52 created for my detail described my title as "Unclassified Duties." When I questioned the removal of my title as Natural Resource Specialist, Ms. Hoeft told me that I could not keep my title as Human Resources could not classify me with the job duties I would be doing. The terms of Item 3 of the Resolution Agreement required that the IDP be developed for my current position of Natural Resource Specialist not HazMat. This was because, presuming that all went well with the detail's "cooling-off period," the 60-day detail would end and I would be returning to the Environment Team. The plan that was shown to me on December 7, 2004, was for HazMat duties not Natural Resources Specialist so was not consistent with the terms of the Resolution Agreement.

Third: The terms of the Resolution Agreement required that the IDP be completed within 60 days from the signing of the Agreement. By this, there is clearly implied intent that the IDP would be provided to me at the expiration of the 60 days. According to the Resolution Agreement, the IDP plan for my Natural Resource Specialist position was due to be completed no later than Monday December 6, 2004.

Fourth: I never received a copy of any IDP until, on December 17, 2004, Mr. Broili emailed me a draft copy to look over. (I will address IDP issues further at Nos. 1 and 14).

1). This is partly false: The word "presented" implies that the HazMat IDP was given to me. In fact, Ms. Hoeft showed me what appeared to be a form of some kind but I was not permitted to look at it. Ms. Hoeft held the paper up in the air about 3 feet from me and told me it was an IDP for HazMat duties that wouldn't be necessary any more as I would be returning to the Environmental team.

Some background information: On December 3, 2004, I was injured while working and suffered a severe injury to my left arm. My right arm had been injured previously and since November 4, I had been scheduled to undergo shoulder surgery on my right shoulder on January 6, 2005. After the injury to my left arm I was in severe pain and taking large doses of pain drugs. I was having difficulty at work with simple duties like typing or carrying a file and concentrating. Mr. Broili was aware of this and had my CA-1 and SMIS Accident Report forms containing all the details of my injuries to my left arm, left knee, neck, and back due to a fall in the field performing Environment Team duties before the end of my detail. On December 20, 2004, my doctor put me on no-work status and I have been on OWCP medical leave since.

On December 16, 2004, at 8:33 a.m. I emailed Mr. Broili requesting sick leave because I had a doctor's appointment that day and needed to leave at 12:30 for most or all of that day. Mr. Broili gave me permission (Attachment 3-J). At 9:32 a.m. that same morning of December 16, 2004, (10 days past the term limit) Mr. Broili emailed me sending me the guidance for IDPs requesting that I "take a crack at drafting up" what I thought should go in the IDP by close of business that day or by the next morning, Friday, December 17. Before I left on sick leave, I stopped by Mr. Broili's office and told him I had jotted down some training I'd like in my IDP like botany, Integrated Pest Management Restoration, Leadership training, and GIS Arc9 training but they were just on a post-a-note, I was in too much pain to type and I would not be able to get an IDP completed in the time frame he requested. I asked if I could stop by his office the next day to discuss and he said yes. On December 17, 2004, I went to Mr. Broili's office in late morning and asked what time we could meet. He told me 1:30. When I went to Mr. Broili's office at 1:30 he instead had Nancy DeCenso on conference call for the three of us regarding my injuries and OWCP claim. After the call, Mr. Broili instructed me to get some of the OWCP forms completed and said he had to go to a meeting. I did not see him again that day. When I arrived at work on Monday, December 20, 2004, Mr. Broili had sent me an email saying I hadn't completed what he had requested, that he had filled one out for me. NOTE* what Mr. Broili partially created reads more like a listing of job assignments rather than a career development plan. Nothing I had spoken of previously had been included (Attachment 3-K).

**Riley 0064**

The OWCP representative in LC Region had arranged for me to see another doctor for my injuries at 10:00 a.m. December 20, 2004. I attended my appointment, at which time I was placed on no-work status. I returned to work to apprise Mr. Broili and others of my injury status, fill out appropriate forms to begin Continuation of Pay benefits, and passed my work on to a coworker who was appointed by Mr. Broili. At 2:30 p.m. I left YAO to begin medical leave. On several occasions since I started on medical leave I have offered to help with work issues that might come up and made myself available to answer questions just to help. I have also requested the use of a loaner laptop computer, which is often provided by YAO to employees on medical leave. I requested the laptop so it could be placed in a comfortable reach so as to not cause pain for my injured arms but allow me to stay aware of employment issues that might affect me. Mr. Broili denied my requests and I deferred to his authority. It is entirely unfair and inappropriate to claim I have not responded during the time I am on medical leave. Mr. Broili has repeatedly insisted that no-work means no-work (Attachment 3-L).

It was Mr. Broili's responsibility to abide by the 60 day time limit to complete the terms for my IDP. He chose not to do this, waiting until after the 60 days time limit had expired and now is trying to blame me for it not being completed. I do not accept his blame. This item was important to me and he failed to fulfill it.

2). (1) Yes. On November 22, 2004, I did inform Ms. Hoeft that Mr. Wahl had broken the Confidentiality Agreement signed during mediation on October 5, 2004. At that meeting I told Ms. Hoeft what Kim had told me and she proceeded to blame me for what Mr. Wahl had done saying "what do you expect after filing complaints against him"? Ms. Hoeft also told me at this time that she fully supports Mr. Wahl in everything he does. She had presumed I had been talking about Kim M., a contract employee. (2) No. I did not say anything about not being provided HazMat work during the detail. I had plenty of work from both sides and accomplished quite a bit during the detail. (3) Yes. I did say that, contrary to the terms of the Resolution Agreement, I had been required to continue doing a great deal of work on the Environmental side during the past 6-1/2 weeks of the detail , so I had not realized a true detail to the HazMat side.

As to the claim by Ms. Hoeft that I did not start the HazMat work until near the end of the detail because of how I divided and managed my time, this statement is absolutely False! The second week of October and first week of November, I studied the A-22 permit including updates. In November I did a tour of the HazMat facilities, and attended meetings pertaining to the septic and A-22 discharges. But I kept being taken off of these assignments to work on Environmental work, this included the Geotech CE for the All American Reservoir project requiring GIS maps, research into endangered species, confirmation of cultural studies, and all other NEPA applications required by law; desert tortoise training; studying flat tailed horned lizard mitigation materials; desert tortoise field work; teaching NEPA requirements to a coworker as assigned by Mr. Wahl; and, as primary POC for the Giant Salvinia project, a large percentage of my time was allocated to work necessary for a successful program. This included all monitoring of ongoing pesticide spraying, communication and coordination with Fish and Wildlife Service (FWS) pesticide applicators, coordination with FWS headquarters on budget issues and BLM officials to arrange 2005 work, oversight of and computation of laboratory chemical analyses, coordination of water sample collection, shipment, and analysis to monitor pesticide limitations in the Colorado River and all other program monitoring as required by the State of California National Pollutant Discharge Elimination System(NPDES) permitting for the control of invasive noxious weed Giant Salvinia; communication with state monitors, writing SOPs for water sampling, pesticide spraying, boat handling during spray operations; I coordinated several individuals from other agencies in joint effort for the Salvinia project; compilation of materials necessary to formulate a Job Hazards Analysis; and oversight of planning developments for FY'05; continual research of all available applicable data pertinent to studying Best Management Practices as required for close out of FY'04 permitting, and formulation of the upcoming monitoring report due to California in March; preparation of

"05 NPDES permit monitoring plan; completing agenda tasks and providing action item information as needed. The salvinia project is a GPRA Goal set by the Regional Director of LC Region. As such, I was constantly told it was to be treated as high priority over everything else. I was often required to provide information for a meeting at a moment's notice and dropped everything else to provide it. So by and large the majority of the work I did was Environmental in nature. Additionally, in November I was considered capable and trusted by Ms. Hoeft and Mr. Broili who required me to be interviewed by an Associated Press reporter, and in November I was appointed to be Reclamation's Representative to the Sonoran Desert Invasive Species Council. (Attachments 3-M are samples of some of my work and day planner calendars) (See Witness list).

3). In an effort to help get the workplace atmosphere better, I agreed to the duties shown to me on October 8, 2004. I did not agree to the other duties listed on the attachment of the SF-52 that I did not receive until November 22, 2004. I did register a complaint with Ms. Yiamarelos and Ms. Hoeft, but did not pursue as I did not want to be accused of insubordination.

4). This is partly false. The Resolution Agreement was to provide me with relief from having any contact with Mr. Wahl. However, the Resolution was disregarded as I was being forced to work directly with Mr. Wahl and he was also giving me instructions. (Attachments 1-D).

5). This is partly false. Please see My Response at the second paragraph in Item 1 above.

6). The allegation made by the Office Director is false. I believe it is an attempt to cover up the actions of Mr. Wahl.

It is noticeable that Management's statement does not include the interview the Office Director had with Ms. Garvey. Nor do they present or discuss any actions I committed in which I supposedly used information against Ms. Garvey as they allege. This is because I did not. The truth is that during conversation Ms. Garvey disclosed to me information that could have come from only one source, Mr. Wahl. By doing so he had broken the Confidentiality Agreement he signed.

November 5-8, 2004, Ms. Garvey and I were on a training assignment in Ridgecrest, CA. On November 7, 2004, Ms. Garvey and I were talking and she said she wanted to ask me why I had said what I did about her. She was angry and wanted to find out if what Mr. Wahl had told her that I had said about her was true. She used specific words that Mr. Wahl told her I had used to put her down. The exact words she restated to me were used by me only once. And that was during the mediation session between Mr. Wahl and myself on October 5, 2004. Mr. Wahl took my words and twisted them out of context to make them seem like I had degraded and disrespected Ms. Garvey. Mr. Wahl used words I specifically stated during the Resolution Agreement in reference to Ms. Garvey's resume. When Ms. Garvey told me what Mr. Wahl had said, I knew immediately what he had discussed with her and told her that he had relayed confidential information to her. Ms. Garvey went on to tell me that while they drove to a BLM meeting in El Centro (a 3-1/2 hour drive) Mr. Wahl had constantly put me down to her and spoke badly about me during the entire trip. That he "talked himself hoarse" denigrating me as a person, my knowledge, my education, my work abilities, and was trying to "cause problems between us."

Not only had he broken the Confidentiality Agreement to intentionally hurt and slander me and my professional reputation and career, but he went out of his way to destroy a new friendship between Ms. Garvey and myself. This was fostering a hostile workplace against me due to my having filed an EEO complaint against him. As I stated above, on November 22, I reported this problem to Ms. Hoeft and spoke

with her again on November 24, 2004, I emailed Ms. Yiamarelos the I information on November 22, 2004, (Attachments 3-N).

On or about November 29, 2004, Ms. Garvey told me that she had been interviewed by Ms. Hoeft. She said she told Ms. Hoeft the things Rex had said. Ms. Garvey also told me that she told Ms. Hoeft that she believed he had done it "purposely to create a rift between me and Cheryl."

I never said or did anything to cause harm to Ms. Garvey. This is Ms. Garvey's first permanent Federal job. I hoped Ms. Garvey could just enjoy her new job. I offered Ms. Garvey my knowledge, expertise, and some written material of NEPA projects I had done to help her with assignments because she had never done NEPA before and didn't want to look bad to Management. Ms. Garvey was the one who told me she witnessed Mr. Wahl disrespecting me and treating me badly in our work area and wondered what was going on (See Witness List). By November 13, Ms. Garvey had become very aware of the Gender Bias in our Group. And brought the subject up during Team Building Training November 13 - 14, 2004 with Mac MacIntire (See Witness List).

7). Controlling Mr. Wahl's actions was guaranteed to me by Management signing the Resolution Agreement. From the moment I brought my complaint to the attention of Management they were responsible for protecting my civil rights and required to counsel Mr. Wahl to stop his discriminatory and hostile behavior against me. On numerous dates from August 4, 2004 through December 14, 2004, I repeatedly requested Management to stop Mr. Wahl's discriminatory and hostile behavior toward me and protect me from Mr. Wahl. This was especially and specifically true after signing the Resolution Agreement and Management was responsible for ensuring Mr. Wahl complying with the Agreement. Mr. Wahl deliberately chose to disregard his fiduciary responsibility when he broke the Confidentiality Agreement. Clearly, Mr. Wahl either committed an insubordinate act by disregarding the warning Management was responsible to give him at the time the Resolution Agreement was signed, or they never gave him the warning. Mr. Wahl's slanderous action caused me, and is continuing to cause me, extreme pain and suffering and has harmed my career. I also do not know who else has been on the receiving end of Mr. Wahl's slandering me. Counseling Mr. Wahl, after the fact, with what amounts to a mild advice to not speak with team members about other team members does not in any way address that Management ever counseled Mr. Wahl to not commit discriminatory and hostile actions against me. There is no mention of Mr. Wahl being disciplined for what he did to me or any accountability for his actions against me.

8). It is not true that "the parties agreed." It is because I requested a 60-day detail.

9). After what Mr. Wahl did to me, I was not moving in that direction, I was there.

**Please Note:** On December 4, 2004, I attended a Reclamation Employee holiday party held at a hall on the Marine Corps Air Station base. At approximately 9:30 p.m. Mr. Wahl walked behind the chair where I was seated and hit the back of my chair with what seemed to be his fist and muttered a vulgar name at me. I reported this incident to my employer and filed a police report against Mr. Wahl (Attachment 3-O).

10). Yes, I met with Ms. Hoeft on December 7, 2004, at which time she offered me the detail extension (not necessarily 30 days, just until the paperwork could be completed) and permanent reassignment to the HazMat Team under Team Leader Ron Curiel. But she only showed me a HazMat IDP on this date (see Item 3 No. 1 above). I did not have any opportunity to look it over.

11).  During the meeting on December 7, 2004, Ms. Hoeft did state that the 30 day detail would allow time for a position description to be written and classified.  However, reclassifying my position was not necessary. I had my position description and position classification paperwork and told Ms. Hoeft that the classification for my Natural Resource Specialist position had already incorporated OPM standards for both the GS - 0401series and the Environmental Protection Specialist GS-0028 series in the classification process when Human Resources first created my position.  My current job description also included and described duties consistent with duties required by Environmental Protection Specialist and the HazMat Team.  This document was signed by Mr. Broili on August 8, 2003, and Ms. Hoeft on August 14, 2003 (Attachment 3-P).  Additionally, Ms. Hoeft had informed me that I would be continuing with the Giant Salvinia high priority project no matter which team I was on.  There was similarity between the groups and latitude to carryover work between the two teams without reclassification.  In fact, this was occurring with another co-worker, Janice Hellen, who Management had me train to do NEPA/Environmental work so she could perform Categorical Exclusions but they did not need to reclassify her from her current position as Environmental Protection Assistant, GS-0029 to a Biological Technician, GS- 0404.  It is possible that my job description would need a little tweaking, but there was no need to perform a reclassification of my position.  Thus, their claim that they could not determine what my classification would be as a reason for using a "boilerplate" DOI template is not correct.  And by their own statement, Ms. Hoeft was extending the time limit of the detail an additional 30 days just for any classification issues needed for transitioning permanently to the HazMat Team.  The document I was being required to sign was specifically designed to remove me from my position if I took the reassignment.

12).  On December 7, 2004, Office Director Cynthia Hoeft offered me permanent reassignment away from Team Leader Rex Wahl if I would sign a new resolution agreement whereby I would release Reclamation, its employees, designees, etc., from any and all EEO, criminal, civil lawsuits in the past, present, and future.  In exchange I would be reassigned to the HazMat Team under Team Leader Ron Curiel with my position described in the document as GS-XXXX-XX-XX.

The new resolution agreement that Ms. Hoeft offered me was not identified in any way as "DRAFT," as required for ALL incomplete documents in accordance with DOI and Reclamation policy.  Anyone who is given a legal document for signing understands that what is offered for signature constitutes full disclosure and that once signed, the requirements stated in the signed document are considered binding.  The new resolution agreement presented to me was just such a legal and binding document, which Ms. Hoeft assured me it was.

But, just for the sake of considering Management's claim that the document language was only "boilerplate" in a "draft" form and, therefore not, a serious issue that I could consider to be an act of reprisal I offer this exercise in thought.  1) I question why they would offer a "template" with "boilerplate" language to me for signature?  In all other aspects, this document had everything spelled out exactly as to what I would be required to do. 2) What prevented Management from including the information that a reclassification of position was pending?  The new resolution agreement Ms. Hoeft offered me could easily have stated that either GS-0401 or GS-0028 would be my pay plan series.  It did not.  And Management could surely have identified in this new agreement that my GS-9 level would remain the same.  It did not.  Also, why did Management create and want me to sign a document requiring me to give away my civil rights?  Why did Ms. Hoeft try to coerce me to sign right-away when a 30-day extension would suffice until the "boilerplate" language could be corrected?  Why go to so much trouble except because Ms. Hoeft knew Mr. Wahl had truly committed the breach of confidentiality and breach of Resolution Agreement and she was trying to forestall my filing a complaint of retaliatory action against him, and Breach of Resolution against the Agency.

. Cheryl Riley Appeal Docket # 01A52759

If the language allowing me to keep my GS series and level had been incorporated into the document, and the section requiring me to hold them harmless for any possible future incidents had been removed, I would have signed so that I could have the reassignment I wanted.

However, this is not what happened. There was intentional ambiguity in the resolution agreement that Ms. Hoeft presented to me expressly meant to be harmful to me had I signed. There was a hidden agenda behind Ms. Hoeft's saying she wanted me to "sign now if [I] wanted the reassignment or there was no deal." I asked her what was to stop her from changing my current position designation from GS-0401-09-01 to a GS-1 file clerk? Ms. Hoeft shrugged her shoulders and said "nothing." I told her that this was wrong, that she was victimizing me the victim and that I wouldn't give up my job and all I've worked for. I asked Ms. Hoeft what would happen if I didn't sign? Ms. Hoeft responded that I would go back to Rex's team.

It was clear to me that the choices Ms. Hoeft offered me in her new resolution agreement required me to either sign away my job permanently along with my legal right to filing future complaints or be assigned back under the person who would not stop harassing me and in fact was escalating his forms of attacking me to physical intimidation and assault. It was equally clear to me that Ms. Hoeft meant to punish me for filing EEO complaints. It was intentional that no matter which way I chose, I would be hurt. Under the circumstances, I refused to sign. Ms. Hoeft immediately pulled the document out of my hand refused my request for a copy saying "sign it and you can have a copy" and ordered me to return to work on the Environmental Team beginning December 13, 2004. I emailed Ms. Yiamarelos what had occurred (Attachment 3-Q). Two weeks later I received a new SF-52 assigning me back to the Environmental Team (also in Attachment 3-Q).

I considered Ms. Hoeft's act to be reprisal for prior EEO activity and filed the appropriate complaint accordingly. When I contacted the DOI EEO office in Washington, D.C. the EEO counselor confirmed for me that, had I signed, I would have definitely signed away my job. I have since spoken with 3 government EEO Counselors, 1 contractor EEO counselor, and 2 civil rights attorneys who all feel that this was a true act of reprisal against me by Ms. Hoeft. I was congratulated by all for not signing that document.

**Item 4: To improve communication, the Complainant and Supervisor Thayer Broili will meet weekly for a period of at least six months, unless either party is on leave, travel, or involved in work exigency/emergencies.**

*D/A Complied Compliance Statement: On-going, however, on several occasions (possibly as many as 5), absence of the Complainant or Supervisor prevented a weekly meeting. When Supervisor Broili expected to be absent, he either apologized to the Complainant for not being available or told the Complainant in advance and offered to discuss any issues at that time. No responses were remembered or documented by the Supervisor. The Supervisor has documentation of meetings held on October 22, October 27, and November 24, 2004, and no meetings were held because of absence during the week of November 15, and December 6, 2004.*

My Response: True. Except Mr. Broili missed one date. We also met on November 9, 2004

**Item 5: Provide team-building training for the Environmental and HAZMAT Group of the Resource Management Office, beginning November 2004.**

*D/A Complied Compliance Statement: Based on availability of a qualified trainer, team building training was held on December 13 and 14, 2004. It should be noted that Complainant made a statement at the*

*beginning of the second day of the team building training that she could not fully participate or reveal her opinions or attitudes based on a current legal situation.*

<u>My Response</u>: This is partly true. In regards to the statement I made: I did not say that I could not reveal my opinions or attitudes based on a current legal situation. I did say that I could not respond to some of the discussion because of confidentiality issues. The conversation was very hot and loaded during this Team Building training. In consideration of ongoing EEO complaints, I was being careful to not disclose anything that could be construed by Mr. Broili, Mr. Wahl, or myself to be confidential in nature. I simply didn't want the team or facilitator to think I wasn't willing to participate in team building.

As it turned out, the subject of gender bias was brought up by other coworkers. When the facilitator, Mac MacIntire, canvassed the group except me, the majority of the two groups, including two men, feel very strongly that gender bias does exist in the group as a whole. Mr. MacIntire told Mr. Broili that "this isn't a team issue it's a Management issue." "And you need to fix it!" (See Witness List)

**Riley 0070**

**ATTACHMENT "16"**

3 pg
Returned 7/11/06



## United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470

IN REPLY REFER TO

**RECEIVED**

<u>Certified Mail Return Receipt Requested</u>

JUN 2 6 2006

Cheryl J. Riley
1562 W. 15th Street
Yuma, AZ 85364

RE: **FINAL NOTICE OF INTERVIEW AND RIGHT TO FILE A FORMAL
COMPLAINT OF DISCRIMINATION**

Dear Ms. Riley:

This memorandum is to inform you that the counseling of your informal complaint on your claim
of discrimination has been completed.  Because the matter you brought to counseling was not
resolved, you are now entitled to file a formal complaint of discrimination.  If you wish to pursue
this matter further, and file a formal complaint of discrimination, it must be in writing, signed,
and filed, in person or by mail within **15 CALENDAR DAYS AFTER RECEIPT OF THIS
NOTICE.**

The formal complaint must contain a signed statement that describes what incident(s) occurred,
when they occurred, and why you believe you were treated in a discriminatory manner.   An
incident is a personnel matter or action such as a non-selection, suspension, denied training
opportunity, etc.  The complaint must  encompass only matters raised during EEO counseling.  In
addition, it must contain the telephone number and address where you may be contacted.  The
complaint must state whether you filed a grievance under a negotiated grievance procedure or an
appeal to the Merit Systems Protection Board on the same matter(s).

For your convenience, the Department's Individual Complaint Form (DI-1892) is attached.  Your
complaint must be filed with:

Marcella F. Guerra
EEO Manager
Bureau of Reclamation
P.O. Box 61470, LC-1700
Boulder City, NV  89006-1470
702-293-8182 Office

1

Riley 0048

Or
Secretary of the Interior
1849 C Street, NW, MS-MIB-6217
Washington, DC 20240

Or
Director, Office of Civil Rights
Department of the Interior
1849 C Street, NW, MS-MIB-5221
Washington, DC  20240

Or

Keith Kirkpatrick, Director, Equal Employment Opportunity Group
Bureau of Reclamation, Department of the Interior
Denver Federal Center, 84-23200, Building 67
Denver, CO 80225

If you file your complaint with one of the listed officials outside the Bureau, please provide a copy of your complaint to the EEO Manager to ensure prompt processing of your complaint.

If you retain an attorney or any other person to represent you, you or your representative must immediately notify the EEO Manager listed above in writing (Designation of Representative form attached). If you designate a representative unless you state otherwise, in writing, all official correspondence from the Agency will be sent to your representative with copies to you. If you designate an attorney to represent you, all documents and decisions will be sent to your attorney, not to you, and the time frames for receipt of materials by you will be computed from the time of receipt by your attorney.

Upon receipt of this Notice, please date and sign the original in the space provided below and return it to me. Please retain the enclosed duplicate copy for your files.

Sincerely,

Tess Yiamarelos
EEO Counselor

Attachments:
Notice of Final Interview (duplicate)
Form DI-1892
Designation of Representative Form

2

I have read and understand all of the above information.

Aggrieved Person's Signature                    Date    07/14/06

3

08-26-2006 15:25   C. RILEY   3-329-6100                                      PAGE1

# DESIGNATION OF REPRESENTATIVE

I, _CHERYL J. RILEY_ , hereby designate _Atty: JOHN CONLEY_  _8/28/06_, to
   (Name of Aggrieved Person)       (Name)      (Date)
act as my Representative in the matters pertaining to my complaint of discrimination filed
with _BUREAU OF RECLAMATION, LOWER COLORADO REGION_
     (Bureau)

I understand that the authority and responsibilities granted to the above-named person by virtue
of this designation may be terminated by me at any time. Should this occur, I will notify, in
writing, the Equal Employment Opportunity Officer of my action.

Check one:

[ ]    By designating _____ as my representative, I understand that all official
    correspondence will be sent to my representative with copies to me unless I state
    otherwise. Therefore, I am requesting that all correspondence be sent to
    _____.

[X]    By designating _JOHN CONLEY_ as my attorney, I understand that all documents
    and decisions will be sent to him/her, not to me, and that the time frames for receipt of
    materials by me will be computed from the time of receipt by my attorney.

Although the person named above may act as my Representative in matters pertaining to the
discrimination complaint, I understand that in the event I withdraw my complaint of
discrimination, I must personally sign any such notice of withdrawal.


_Cheryl Riley_                                    _08/28/06_
SIGNATURE OF AGGRIEVED                            DATE


_____                       _602-307-0780_
SIGNATURE OF REPRESENTATIVE                        TELEPHONE NO.


_382 E. PALM LANE_
ADDRESS


_PHOENIX,   AZ    85004_
CITY       STATE       ZIP CODE

Designation of Representative Form: March 1998

Riley 0051

08-16-2006 20:12   C. RILEY   329-6100                                    PAGE3



# United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470



IN REPLY REFER TO:
LC-1700
WBR-06-028

AUG 1 6 2006

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Cheryl J. Riley
1562 W. 15ᵗʰ Street
Yuma, Arizona 85364

Re: Acknowledgment of Receipt of Your Formal Complaint of Discrimination –
    Docket Number WBR-06-028

Dear Ms. Riley:

This letter acknowledges receipt of your discrimination complaint filed against the Department
of the Interior on July 14, 2006. Your complaint has been assigned docket number WBR-06-
028. Please refer to this docket number in any future correspondence regarding your complaint.

If your complaint is accepted, it will be processed in accordance with Title 29, Code of Federal
Regulations (CFR), Section 1614, which governs the processing of Federal sector discrimination
complaints. You will be advised, in writing, in the near future of the claims identified in your
complaint that will be investigated and provided further information on the administrative
process.

If you obtain a representative and have not already done so, you must notify this Office, in
writing, of your designation of a representative. Your representative may act on your behalf in
all matters pertaining to your complaint. However, in the event that you withdraw your
complaint or enter into a Settlement Agreement, you must personally sign a notice of withdrawal
or agreement.

Should you have any further questions, please contact this office at 702-293-8182.

                              Sincerely,

                              Marcella F. Guerra
                              EEO Manager

Enclosure:     Agency's Obligations and Complainants Rights

08-16-2006 20:12   C. RILEY ( )-329-6100                                              PAGE4

## AGENCY'S OBLIGATIONS AND COMPLAINANT'S RIGHTS

### A. AGENCY'S OBLIGATIONS

TO INVESTIGATE IN A TIMELY MANNER - The agency is obligated to investigate complaints in a timely manner. The investigation must be factually complete, impartial, and finished within 180 days of filing the complaint, or within the time period contained in an order from the Office of Federal Operations, Equal Opportunity Commission (EEOC) on an appeal from a dismissal pursuant to Title 29 Code of Federal Regulations Section 1614.107. By written agreement the agency and the Complainant may voluntarily extend the time period for not more than an additional ninety (90) days.
See Section 1614.108 (e).

The agency may, after providing notice to the Complainant, extend the time period or any period of extension for no more than 30 days where it must sanitize a complaint file that may contain information classified pursuant to Executive Order 12356, or successor order, as secret in the interest of national defense or foreign policy.

### B. COMPLAINANT'S RIGHTS

THE RIGHT TO APPEAL - The complainant has the right to appeal the final decision or dismissal of all or a portion of the complaint.

1   The Complainant may appeal within thirty (30) days of receiving the final decision or notice of dismissal to:

> Director, Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036

2   The Complainant shall furnish a copy of the appeal to the Director, Office for Equal Opportunity, U.S. Department of the Interior, at the same time the appeal is filed with EEOC. In or attached to the appeal to the EEOC, the Complainant must certify the date and method by which service was made to the agency.

3   Any statement of brief in support of the appeal must be submitted to the Director, Office of Federal Operations, and to the Department of the Interior within thirty (30) day of the filing date. See Section 1614.403

THE RIGHT TO A CIVIL ACTION - The Complainant has the right to file a civil action in Federal district court on matters raised in the administrative process:

1   Within ninety (90) days of receipt of any agency final decision if no appeal has been filed;

2   After one hundred and eighty (180) days from the date of filing a complaint if an appeal has not been filed and a final decision has not been issued;

3   Within ninety (90) days of receipt of the EEOC's final decision on an appeal, or;

4   After one hundred and eighty (180) days of filing an appeal with the EEOC if there has been no final decision by the EEOC.

2

Riley 0053

**ATTACHMENT "17"**

# Cheryl J. Riley

928-329-6100

1562 W. 15th Street   ◊   Yuma, Arizona 85364

**USPS Certified Mail Return Receipt 7005 3110 0001 3772 7611**

August 6, 2006

Marcella F. Guerra
EEO Manager
Bureau of Reclamation
P.O. Box 61470, LC-1700
Boulder City, NV 89006-1470

Dear Ms. Guerra:

Thank you for allowing me a fifteen-day extension and the opportunity to correct the D-1892 I submitted.   The D-1892 with pertinent documentation is enclosed with this letter.

Attached to the D-1892 are copies of documents substantiating my claims of sex discrimination and harassment, hostile workplace, and retaliation for filing a prior EEO complaint.  Some of the documents are: copies of letters I sent to EEO offices in DOI and BOR in Denver and Washington when it became necessary that I do so; copies of email communications that I had with EEO counselor Tess Yiamarelas; copies of the police complaint I had to file against Mr. Wahl after he committed a physical assault against me; and a witness list.

As I am required to keep your office fully informed, I am herein making you aware that I am in the process of retaining legal counsel in order to file an EEO lawsuit in District Court against BOR and the individuals I have named: Cynthia Hoeft, Thayer Broili, and Rex Wahl for their actions against me.  I will also be filing a separate lawsuit in District Court for the damages caused to me by Cynthia Hoeft, Thayer Broili, Rex Wahl, former EEO manager Janel Potuchek, and EEO officer Tess Yiamarelos for their roles in breaching the Resolution Agreement or allowing the Resolution Agreement to be breached.  Through their collective malfeasance, I have suffered irreparable damage: physically, mentally, emotionally, and professionally, directly due to their decision/s and action/s in breaching the Resolution Agreement contract they made with me on October 7, 2004, forcing me to work under the direction of Rex Wahl.

I will notify you as soon as I have formally retained my attorney as it is my understanding that the EEO process will end at that point.  Please advise me if I am wrong in how I am interpreting the information provided to me.

Sincerely,

*Cheryl J. Riley*
Cheryl J. Riley

Enclosures:   D-1892 with supporting documents

Riley 0248

| Form DI-1892<br>REV. 3/98 | U. S. Department of the Interior<br>Complaint of Discrimination |
|---|---|

. Complainant's Name: CHERYL J. RILEY

Place of Employment: BUREAU OF RECLAMATION
YUMA AREA OFFICE

Street Address: 1562 W. 15th ST

Address: 730, CALLE AGUA SALADA

City, State, Zip Code: YUMA, AZ 85364

City, State, Zip Code: YUMA, AZ 85364

Home Phone: (928) 329-6100

Work Phone: NO LONGER EMPLOYED

2. DOI Office which you believe discriminated against you?

Bureau: RECLAMATION

Division/Office: YUMA AREA OFFICE

Address: 7301 CALLE AGUA SALADA

Region LOWER COLORADO

City/State: YUMA AZ 85364

3. Basis(es) for believing you were discriminated against? (Check one or more, and provide the specific Information.)

| | | | | |
|---|---|---|---|---|
| X | Race AMERICAN INDIAN | | _____ | Age (Date of Birth) |
| _____ | Color | | _____ | Physical Handicap |
| _____ | Region | | _____ | Mental Handicap |
| X | Sex FEMALE | | X | Reprisal |
| _____ | National Origin | | | (Date of previous EEO activity) JUNE 2004 OCT. 2004 NOV. 2004 DEC. 2004 |

4. Allegation(s) of discrimination? (For each allegation, state the date and the specific incident causing you to believe that you have been discriminated against. FOR EXAMPLE: I was discriminated against on January 1, 1992, when I was not selected for the position of Analyst. Use additional pages as necessary.) attached

THIS INFORMATION IS EXTENSIVE, I AM REQUESTING A EXTENSION OF TIME TO PROVIDE IT DUE TO MY ARMS BEING DISABLED FROM WORK INJURIES AND THE DOCUMENTS BEING HEAVY AND HARD TO COMPILE (SEE LETTER 7/14/06)

5. Have you discussed your complaint with an EEO Counselor? Yes X No _____ (If yes, name of Counselor):
TESS YIAMARELOS Date you first contacted the
Counselor: JUNE 2004

6. Are you agreeable to using the Alternative Dispute Resolution (ADR) process? Yes _____ No

7. Have you presented these allegations to any other forum? If so, please indicate:

_____ Negotiated Grievance Procedure _____ Merit Systems Protection Board _____ Court (Civil Action)

8. List the remedies which you believe will resolve your complaint: (Use additional pages, as necessary.)
TO BE DETERMINED

9. Complainant's Signature: *Cheryl J Riley*

Date: 07/14/06

10. For Agency Use:
Complaint Docket Number: WBR-06-028   Date Received of Postmarked: 7/14/06

RECEIVED

JUL 17 2006

7/24/06

Riley 0249

Attachment to U.S. Department of Interior Complaint of Discrimination Form DI-1892

Re:    Formal Complaint EEO Discrimination (Reprisal) Prior EEO Activity 10/07/04, Cynthia Hoeft

Section 4. Allegation(s) of Discrimination:

**Background:** On August 4, 2004, I filed an EEO complaint against Team Leader Rex Wahl and Supervisor Thayer Broili charging them both with gender discrimination and creating a hostile workplace for me. As Office Director Cynthia Hoeft was named as the responsible management official. In September I agreed to participate in mediation through Alternate Dispute Resolution (ADR). ADR was held separately between each individual and myself from October 5-7, 2004. At the beginning of each session, Confidentiality Agreements were signed by all parties including Mr. Wahl, Mr. Broili, Cynthia Hoeft, and myself. ADR resulted in a signed Resolution Agreement with terms by which I was assigned to Ron Curiel HazMat Team Leader for a 60-day detail until December 10, 2004. My purpose for reassignment was to get away from Mr. Wahl harassing me and creating workplace hostility. Therefore, a condition was included in the Resolution Agreement, referenced as a "cooling-off" period requiring Mr. Wahl to stop his discriminatory activities. During the "cooling-off period" term of the detail, I was to be relieved from working for/with Mr. Wahl and he was not to have contact with me. After this date, if Mr. Wahl proved he had stopped the discrimination, I would return to the Environment Team with Mr. Wahl as Team Leader. Mr. Broili and Ms. Hoeft were responsible for ensuring that the terms of the Resolution Agreement were complied with. As Management Official Ms. Hoeft signed the Resolution Agreement. It was signed by both Ms. Hoeft and I on October 7, 2004.

On November 7 and 8, 2004, Coworker and peer, Ms. Kim Garvey, and I were talking. During our conversation she questioned me about something she had heard I said. Ms. Garvey then repeated to me precise words that I recognized immediately as being something that I had spoken only once and in one place - when talking to Mr. Wahl during the ADR mediation (See Witness List). I questioned Ms. Garvey where she heard these details and she told me that in mid-October, she and Mr. Wahl attended a BLM meeting in El Centro, CA. During their trip Mr. Wahl informed Ms. Garvey of specific details that transpired only during the confidential EEO mediation that had taken place between Mr. Wahl and myself on October 5, 2004. By his actions Mr. Wahl breached the signed Confidentiality Agreement.

At this same time Mr. Wahl also committed actions that breached the Resolution Agreement and my civil rights. Ms. Garvey told me that "Rex talked himself hoarse" to her making denigrating statements about me and slandering my professional abilities, my character, and me in general for the length of the trip, approximately 3-1/2 hours. Mr. Wahl also discussed with Ms. Garvey that I had filed an EEO complaint against him and wanted her to hear his side of the situation. Ms. Garvey told me she felt he did this on purpose to get even with me and to cause problems between her and I (See Witness List). On the return trip, Ms. Garvey stated that she changed the subject because she was tired of listening to him put me down.

On November 9, 2004, I informed EEO Counselor, Tess Yiamarelos, by phone what had occurred. She advised that I talk with Ms. Hoeft. On November 22, 2004, when Ms. Hoeft returned from out of the office, I reported Mr. Wahl's behavior to her and that, by doing what he had done, Mr. Wahl had committed an act of retaliation against me, breached the Resolution Agreement, and convinced me that he would not change his behavior. Ms. Hoeft responded by blaming me saying "what do you expect after you filed complaints against him." At this time, Ms. Hoeft also told me once again, as she had on several occasions, that she fully supports Rex in everything he does. I asked if she really supports Rex in everything. Ms. Hoeft said "yes." Ms. Hoeft told me she would check into what I had told her. On November 22, 2004, I emailed Ms.

Yiamarelos the information concerning Mr. Wahl's retaliation and my conversation with Ms. Hoeft

On November 29, 2004, Ms. Garvey told me she had been interviewed by Ms. Hoeft and told her what had happened during their drive to El Centro. She also told me that she told Ms. Hoeft that she personally felt that Mr. Wahl's reason for what he did "was definitely hostile to purposely create a rift between us."

On December 1, 2004, Ms. Hoeft called me into her office where she told me that she had talked to Mr. Broili, Mr. Wahl, and Ms. Garvey. She told me that my complaints to her had been corroborated Ms. Garvey and Mr. Wahl. At this time, I requested permanent reassignment away from Mr. Wahl.

On December 7, 2004, Office Director Cynthia Hoeft offered me permanent reassignment away from Team Leader Rex Wahl if I would sign a new resolution agreement, whereby, I would release Reclamation, all its employees, and designees, etc., from any and all EEO, criminal, civil lawsuits in the past, present, and future. In exchange I would be reassigned to the HazMat Team under Team Leader Ron Curiel with my position described in the document as GS-XXXX-XX-XX. The document I was being required to sign in order to receive a reassignment away from the man who was harassing me was specifically designed to remove me from my position. Ms. Hoeft assured me this new resolution agreement was a legal and binding document. I asked her what was to stop her from changing my current position designation from GS-0401-09-01 to a GS-1 file clerk? Ms. Hoeft shrugged her shoulders and said "nothing." I asked Ms. Hoeft what would happen if I didn't sign? Ms. Hoeft answered that I would go back to Rex's team. I told Ms. Hoeft that this was wrong, that she was victimizing me the victim and that I wouldn't give up my job and all I've worked for. I refused to sign and was ordered to return to work for Mr. Wahl effective Monday December 13, 2004. I emailed to Ms. Yiamarelos a description of what transpired. I believe that Ms. Hoeft's action was an act of retaliation against me so filed an EEO complaint of retaliation against Ms. Hoeft. (Attachment: Referenced email/s)

*Note: On December 31, 2004, I filed a complaint of Breach of Resolution against Ms. Hoeft. I received a Final Decision from DOI, which I have appealed to the EEOC. Information pertaining to this particular action by Ms. Hoeft was included in the investigation by the Bureau of Reclamation, and to which I replied. I am including excerpts of that information here for understanding and worthy of evaluation as part of this complaint. I submit:

Department/Agency answer to my complaint that Ms. Hoeft committed a retaliatory action:

> On December 7, 2004, the Office Director offered to the Complainant an extension of the detail for 30 days leading to a permanent reassignment to the HAZMAT Team and an IDP focusing on HAZMAT. The extension of the detail would allow the proper position description to be written and classified. It could not be determined at that time what the classification series would be - i.e., Natural Resource Specialist, Environmental Specialist, or other. The Office Director made this offer in a draft formal resolution agreement using boilerplate language contained in the DOI template. The Complainant declined the offer. Therefore, the Office Director informed the Complainant that she would return to her previous position on the Environmental Team at the end of the detail on December 10, 2004.

> My Response to reasons provided by agency

> On December 7, 2004, Office Director Cynthia Hoeft offered me permanent reassignment

Cheryl Riley Formal EEO Complaint Filing Statement-R-CHoeft

*away from Team Leader Rex Wahl if I would sign a new resolution agreement whereby I would release Reclamation, its employees, designees, etc., from any and all EEO, criminal, civil lawsuits in the past, present, and future. In exchange I would be reassigned to the HazMat Team under Team Leader Ron Curiel with my position described in the document as GS-XXXX-XX-XX.*

*During the meeting on December 7, 2004, Ms. Hoeft did state that the 30 day detail would allow time for a position description to be written and classified. However, reclassifying my position was not necessary. I had my position description and position classification paperwork and told Ms. Hoeft that the classification for my Natural Resource Specialist position had already incorporated OPM standards for both the GS - 0401 series and the Environmental Protection Specialist GS-0028 series in the classification process when Human Resources first created my position. My current job description also included and described duties consistent with duties required by Environmental Protection Specialist and the HazMat Team. This document was signed by Mr. Broili on August 8, 2003, and Ms. Hoeft on August 14, 2003 (Attachment 3-P). Additionally, Ms. Hoeft had informed me that I would be continuing with the Giant Salvinia high priority project no matter which team I was on. There was similarity between the groups and latitude to carry over work between the two teams without reclassification. In fact, this was occurring with another co-worker, Janice Hellen, who Management had me train to do NEPA/Environmental work so she could perform Categorical Exclusions but they did not need to reclassify her from her current position as Environmental Protection Assistant, GS-0029 to a Biological Technician, GS-0404. It is possible that my job description would need a little tweaking, but there was no need to perform a reclassification of my position. Thus, their claim that they could not determine what my classification would be as a reason for using a "boilerplate" DOI template is not correct. And by their own statement, Ms. Hoeft was extending the time limit of the detail an additional 30 days just for any classification issues needed for transitioning permanently to the HazMat Team. The document I was being required to sign was specifically designed to remove me from my position if I took the reassignment.*

*The new resolution agreement that Ms. Hoeft offered me was not identified in any way as "DRAFT," as required for ALL incomplete documents in accordance with DOI and Reclamation policy. Anyone who is given a legal document for signing understands that what is offered for signature constitutes full disclosure and that once signed, the requirements stated in the signed document are considered binding. The new resolution agreement presented to me was just such a legal and binding document, which Ms. Hoeft assured me it was.*

*But, just for the sake of considering Management's claim that the document language was only "boilerplate" in a "draft" form and, therefore not, a serious issue that I could consider to be an act of reprisal, I offer this exercise in thought. 1) I question why they would offer a "template" with "boilerplate" language to me for signature? In all other aspects, this document had everything spelled out exactly as to what I would be required to do. 2) What prevented Management from including the information that a reclassification of position was pending? The new resolution agreement Ms. Hoeft offered me could easily have stated that either GS-0401 or GS-0028 would be my pay plan series. It did not. And Management could surely have identified in this new agreement that my GS-9 level would remain the same. It did not. Also, why did Management create and want me to sign a document requiring me to*

Cheryl Riley Formal EEO Complaint Filing Statement-R-CHoeft

*give away my civil rights? Why did Ms. Hoeft try to coerce me to sign right away when a 30-day extension would suffice until the "boilerplate" language could be corrected? Why go to so much trouble except because Ms. Hoeft knew Mr. Wahl had truly committed the breach of confidentiality and breach of Resolution Agreement and she was trying to forestall my filing a complaint of retaliatory action against him, and Breach of Resolution against the Agency.*

I went to Ms. Hoeft with a new complaint that Mr. Wahl had committed an act of reprisal against me by following the advice of EEO Counselor, Tess Yiamarelos. From this Ms. Hoeft proceeded to take it upon herself to take the place of the EEO counselor. She then created a Resolution Agreement for me to sign without my being allowed the Rights of an Aggrieved Person to file a complaint. I was denied the right to representation. I was denied the right to choose between the alternative dispute resolution (ADR) process or EEO counseling. I was denied the right to receive notice of my rights as an EEO counselor would have ensured. I was denied my right to formulate my own request for relief. Ms. Hoeft, not only stepped outside her authority by taking the place of an EEO counselor, she also assumed the position of a mediator without my agreeing to mediation as allowed to me under 29 CFR 1614.105. Ms. Hoeft moved immediately to create a new Resolution Agreement before I could have the opportunity to go through the normal channels of the EEO process and avail myself of EEO procedural oversight.

It is my belief and claim that Ms. Hoeft obtained evidence that Mr. Wahl did indeed breach both the Confidentiality Agreement and the Resolution Agreement. In an attempt to protect herself and Mr. Wahl from my filing a complaint of Retaliation and Breach of Resolution, Ms. Hoeft circumvented the entire EEO process and created a Resolution Agreement potentially to remove me from my position. Ms. Hoeft thereby, committed an act of retaliation and denied me my right to EEO counseling under 29CFR1614.102(a)(2),(b)(6),(c)(4)(5); 1614.105(a)(b) (and others applicable but not cited here).

It was clear to me that the choices Ms. Hoeft offered me in her new resolution agreement required me to either sign away my job permanently along with my legal right to filing future complaints or be assigned back under the person who would not stop harassing me and in fact was escalating his forms of attacking me to physical intimidation and assault. It was equally clear to me that Ms. Hoeft meant to punish me for filing EEO complaints. It was intentional that no matter which way I chose, I would be hurt. Under the circumstances, I refused to sign. Ms. Hoeft immediately pulled the document out of my hand refused my request for a copy saying "sign it and you can have a copy" and ordered me to return to work on the Environmental Team beginning December 13, 2004. I emailed Ms. Yiamarelos what had occurred (Attachment 3). Two weeks later I received a new SF-52 assigning me back to the Environmental Team (also in Attachment 3).

I assert and claim that Ms. Hoeft interfered with the EEO process. And thereby, denied me my civil rights.

I assert and claim that Ms. Hoeft's efforts to coerce me into signing away my position as a civilian employee in Federal service as a requirement in order for me to gain safety in the workplace from Team Leader Wahl's acts of discrimination and hostile workplace was an illegal act of reprisal to punish me for filing a prior EEO complaint filed 08/04/04, Resolution Agreement 10/07/04.

Cheryl Riley Formal EEO Complaint Filing Statement-R-CHoeft

I assert and claim that Ms. Hoeft's efforts to coerce me into signing away my civil rights protecting me from future actions was an act of reprisal for prior EEO activity filed 08/04/04, Resolution Agreement 10/07/04. This was also an illegal act to interfere with my future civil rights.

(Witness List Attached)
(YAO Policy Letters Attached)

Cheryl J. Riley     04/01/05
_____   _____
Cheryl J. Riley     Date

Cheryl Riley Formal EEO Complaint Filing Statement-CHoeft

Attachment to U.S. Department of Interior Complaint of Discrimination Form DI-1892

Re:      Formal Complaint EEO Discrimination Cynthia Hoeft

Section 4. Allegation(s) of Discrimination:

Background: On July 22, 2004, I brought discrimination issues I was experiencing in the workplace to the attention of Resource Management Office Director, Cynthia Hoeft. On that date, we spoke by phone wherein I described to her actions I believed were discriminatory that were being committed toward me by Environmental Team Leader Rex Wahl and my Supervisor Thayer Broili. At that time I told Ms. Hoeft that I had spoken with an EEO counselor in Region and was considering filing an EEO complaint against these individuals. The discrimination did not stop and problems in the workplace did not improve, but in fact worsened. On July 9, 2004, Ms. Hoeft did not honor my request to have a representative neutral third person present during a meeting at which Ms. Hoeft, Mr. Broili, and Mr. Wahl confronted me verbally with threats. I reported this threatening behavior by Management to EEO Counselor Tess Yiamarelos. On August 4, 2004, I filed an EEO complaint against Team Leader Rex Wahl and Supervisor Thayer Broili charging them both with gender discrimination and creating a hostile workplace for me. As Office Director, Cynthia Hoeft was named as the responsible management official. Ms. Hoeft was named in my complaint as the responsible Management official. In mid-September I agreed to participate in mediation through Alternate Dispute Resolution (ADR). ADR was held separately between each individual named in my complaint and myself from October 5-7, 2004, with contracted Mediator Ms. Jean Lovesmith present. At the beginning of each session the mediator explained to each participant the unequivocal requirement for maintaining absolute confidentiality of everything discussed during the mediation proceedings. Ms. Lovesmith presided over the signing of the Confidentiality Agreements, which were signed by all parties including Mr. Wahl, Mr. Broili, Ms. Hoeft, and myself. In mid-September a signed Resolution Agreement with terms by which I was assigned to Ron Curiel HazMat Team Leader for a 60-day detail from October 11,2002, until December 10, 2004. My purpose for reassignment was to get away from Mr. Wahl harassing me and creating workplace hostility . Therefore, a condition was included in the Resolution Agreement, referenced as a "cooling-off" period requiring Mr. Wahl to stop his discriminatory activities. During the "cooling-off period" term of the detail, I was to be relieved from working for/with Mr. Wahl and he was not to have contact with me. After this date, if Mr. Wahl proved he had stopped the discrimination, I would return to the Environment Team with Mr. Wahl as Team Leader. Mr. Broili and Ms. Hoeft were responsible for ensuring that the terms of the Resolution Agreement were complied with. (Attachment-1: Confidentiality Agreements, Resolution Agreement)

On October 8, 2004, the day after I signed the Resolution Agreement, Mr. Broili gave me a list of Environmental Team assignments written by Mr. Wahl. These assignments were in addition to what Ms. Hoeft had promised me during Resolution Agreement negotiations. I felt trapped into doing these extra assignments as I did not want to commit an act of insubordination by refusing to do them. I did inform Lower Colorado Region EEO Counselor Ms. Tess Yiamarelos of what was transpiring. Initially, these assignments, while directed by Mr. Wahl, were presented or discussed through my Supervisor, Mr. Broili, or HazMat Team Leader Mr. Curiel. However, on October 25, 2004, Mr. Wahl began to email me directly. This was in conflict with the terms and intent of the Resolution Agreement and condition of my request for relief. Also on October 25, 2004, Mr. Broili required me to be in a meeting with both Mr. Wahl and himself. During this meeting in the presence of Mr. Broili, I was degraded and subjected to additional harassment and hostile behavior by Mr. Wahl (*Note: I have filed a complaint of discrimination against Mr. Broili and addressed issues concerning this in a separate statement). On October 26, I informed EEO Counselor Tess Yiamarelos of what was occurring and made a complaint to her that the terms of the Resolution Agreement

Cheryl Riley Formal EEO Complaint Filing Statement-CHoeft

were not being followed. I requested her assistance with how to proceed with filing that Management was not upholding the Agreement.

On November 7 and 8, 2004, Coworker and peer, Ms. Kim Garvey, and I were talking. During our conversation she questioned me about something she had heard I said. Ms. Garvey then repeated to me precise words that I recognized immediately as being something that I had spoken only once and in one place - when talking to Mr. Wahl during the ADR mediation (See Witness List). I questioned Ms. Garvey where she heard these details and she told me that in mid-October, she and Mr. Wahl attended a BLM meeting in El Centro, CA. During their trip Mr. Wahl informed Ms. Garvey of specific details that transpired only during the confidential EEO mediation that had taken place between Mr. Wahl and myself on October 5, 2004. By his actions Mr. Wahl breached the signed Confidentiality Agreement.

At this same time Mr. Wahl also committed actions that breached the Resolution Agreement and my civil rights. Ms. Garvey told me that "Rex talked himself hoarse" to her making denigrating statements about me and slandering my professional abilities, my character, and me in general for the length of the trip, approximately 3-1/2 hours. Mr. Wahl also discussed with Ms. Garvey that I had filed an EEO complaint against him and wanted her to hear his side of the situation. Ms. Garvey told me she felt he did this on purpose to get even with me and to cause problems between her and I (See Witness List). On the return trip, Ms. Garvey stated that she changed the subject because she was tired of listening to him put me down.

On November 9, 2004, I informed EEO Counselor, Tess Yiamarelos, by phone what had occurred. She advised that I talk with Ms. Hoeft. On November 22, 2004, Ms. Hoeft returned from out of the office, I reported Mr. Wahl's behavior to her and that, by doing what he had done, Mr. Wahl had committed an act of retaliation against me, breached the Resolution Agreement, and convinced me that he would not change his behavior. Ms. Hoeft responded by blaming me saying "what do you expect after you filed complaints against him." At this time, Ms. Hoeft also told me once again, as she had on several occasions, that she fully supports Rex in everything he does. I asked if she really supports Rex in everything. Ms. Hoeft said "yes." Ms. Hoeft told me she would check into what I had told her. On November 22, 2004, I emailed Ms. Yiamarelos the information concerning Mr. Wahl's retaliation and my conversation with Ms. Hoeft

On or about November 29, 2004, Ms. Garvey told me that she had been interviewed by Ms. Hoeft. She said she told Ms. Hoeft the things Rex had said. Ms. Garvey also told me that she told Ms. Hoeft that she believed he had done it "purposely to create a rift between me and Cheryl."

On December 1, 2004, Ms. Hoeft called me into her office where she told me that she had talked to Mr. Broili, Mr. Wahl, and Ms. Garvey. She told me that my complaints to her had been corroborated by Ms. Garvey and Mr. Wahl. At this time, I requested permanent reassignment away from Mr. Wahl.

On December 7, 2004, Office Director Cynthia Hoeft offered me permanent reassignment away from Team Leader Rex Wahl if I would sign a new resolution agreement whereby I would release Reclamation, its employees, designees, etc., from any and all EEO, criminal, civil lawsuits in the past, present, and future. In exchange I would be reassigned to the HazMat Team under Team Leader Ron Curiel with my position described in the document as GS-XXXX-XX-XX. The document I was being required to sign to receive a reassignment was specifically designed to remove me from my position. I refused to sign and was ordered to return to work on the Environmental Team under Mr. Wahl. The person who had been harassing me and causing a hostile workplace toward me for over 6 months. (*Note: I filed a complaint of retaliation for prior EEO activity against Ms. Hoeft and addressed this more explicitly in a separate statement.)

Cheryl Riley Formal EEO Complaint Filing Statement-CHoeft

Since July of 2004, Ms. Hoeft disregarded my numerous complaints that I was being subjected to harassment and hostile workplace by Mr. Wahl. My requests for protection from Mr. Wahl's hostile and harassing behavior were denied.

In her Managerial position as Office Director, Ms. Hoeft continually and intentionally disregarded my right to protection from discrimination as required under the Civil Rights Laws of 1964, as amended; the Code of Federal Regulations, 29 C.F.R. 1614 et al; the Department of the Interior Policies against EEO Discrimination and Hostile Workplace; Bureau of Reclamation EEO and Zero Tolerance Policies; and the Yuma Area Office Anti-Discrimination, Anti-Gossip, and Zero Tolerance Policies.

Through Ms. Hoeft's disregard for these laws and policies, through Ms. Hoeft's continually stated and implied support of Mr. Wahl's actions, and through Ms. Hoeft failure utilize the disciplinary process to force Mr. Wahl to stop his discrimination and hostile actions against me. Ms. Hoeft enabled and through tacit consent encouraged Mr. Wahl to abuse me by his discrimination, his harassment, and his hostile behavior toward me. Through Ms. Hoeft, Mr. Wahl was allowed to cause me to experience severe stress to my emotional and mental well-being, and irreparable harm to my professional career.

I herein assert and claim that Ms. Hoeft's action(s) and/or inaction(s) in allowing Mr. Wahl to continue to discriminate against me that Ms. Hoeft neglected to correctly perform her fiduciary duties to protect a subordinate female employee from being discriminated against within the workplace arena by a male employee in an authority position. That I made Ms. Hoeft aware of Mr. Wahl's behavior for the first time on June 22, 2004 and on numerous subsequent dates, but Ms. Hoeft never once supported me or took seriously my claims of discrimination and requests for help. That, although Ms. Hoeft had the fiduciary duty and responsibility to do so, she chose to not assert her authority over Mr. Wahl. And, by this, encouraged Mr. Wahl to continue and increase his abusive behavior toward me. That by Ms. Hoeft's direct action(s) and/or inaction(s), Ms. Hoeft has caused me to suffer severe stress to my emotional and mental well-being, and irreparable harm to my professional career *and my physical well being.* *CJR*

(Witness List Attached)
(Referenced Policy Letters Attached)

_Cheryl J. Riley_        04/01/05        *CJR 8/3/06*
Cheryl J. Riley          Date

Attachment to U.S. Department of Interior Complaint of Discrimination Form DI-1892

Re:     Formal Complaint EEO Discrimination, Thayer Broili     and Retaliation

Section 4. Allegation(s) of Discrimination:

Background:  June 23, 2004, was the first date I told My Supervisor, Thayer Broili of Environmental Team Leader Rex Wahl's inappropriate and discriminating behavior toward me. At that meeting with Mr. Broili, Mr. Wahl, and myself, Mr. Broili did tell Mr. Wahl that he was talking to me in a demeaning way. Mr. Wahl's behavior did not improve and Mr. Broili began acting angrily toward me. On August 4, 2004, I filed an EEO complaint against Mr. Wahl and Mr. Broili charging them both with gender discrimination and creating a hostile workplace for me. I brought the problems to the attention of Resource Management Office Director, Cynthia Hoeft, July 22, 2004.  The discrimination did not stop and problems in the workplace did not improve, but worsened. Ms. Hoeft was named in my complaint as the responsible Management official. In mid-September I agreed to participate in mediation through Alternate Dispute Resolution (ADR). ADR was held separately between each individual named in my complaint and myself from October 5-7, 2004, with contracted Mediator Ms. Jean Lovesmith present.  At the beginning of each session the mediator explained to each participant the unequivocal requirement for maintaining absolute confidentiality of everything discussed during the mediation proceedings. Ms. Lovesmith presided over the signing of the Confidentiality Agreements, which were signed by all parties including Mr. Wahl, Mr. Broili, Ms. Hoeft, and myself. ADR resulted in a signed Resolution Agreement with terms by which I was assigned to Ron Curiel HazMat Team Leader for a 60-day detail from October 11,2002, until December 10, 2004. My purpose for reassignment was to get away from Mr. Wahl harassing me and creating workplace hostility. Therefore, a condition was included in the Resolution Agreement, referenced as a "cooling-off" period requiring Mr. Wahl to stop his discriminatory activities.  During the "cooling-off period" term of the detail, I was to be relieved from working for/with Mr. Wahl and he was not to have contact with me. After this date, if Mr. Wahl proved he had stopped the discrimination, I would return to the Environment Team with Mr. Wahl as Team Leader.  Mr. Broili and Ms. Hoeft were responsible for ensuring that the terms of the Resolution Agreement were complied with. As Management Official Ms. Hoeft signed the Resolution Agreement. It was signed by both Ms. Hoeft and myself on October 7, 2004. (Attachment-1: Confidentiality Agreements, Resolution Agreement)

On October 8, 2004, the day after I signed the Resolution Agreement, Mr. Broili gave me a list of Environmental Team assignments written by Mr. Wahl. These assignments were in addition to what Ms. Hoeft had promised me during Resolution Agreement negotiations.  I felt trapped into doing these extra assignments as I did not want to commit an act of insubordination. I did inform Lower Colorado Region EEO Counselor Ms. Tess Yiamarelos of what was transpiring. Initially, these assignments, while directed by Mr. Wahl, were presented or discussed through my Supervisor, Mr. Broili, or HazMat Team Leader Mr. Curiel. But on October 25, 2004, Mr. Wahl began directly emailing me himself. This was in conflict with the terms and intent of the Resolution Agreement and condition of my request for relief. Also on October 25, 2004, Mr. Broili required me to be in a meeting with both Mr. Wahl and himself.  When I objected to having contact with Mr. Wahl, Mr. Broili waved away my objections, saying that he knew what the Agreement said but there was no other way since Ron [Curiel] was not there. During the meeting Mr. Broili allowed Mr. Wahl to interrupt and speak over me when I tried to speak, ridicule me including my knowledge, skills, and opinions. Mr. Wahl also made rude facial grimaces at me, and refused to answer my questions so I could complete the project he had assigned me to do. This was extremely embarrassing and degrading to me.  I looked to Mr. Broili to stop Mr. Wahl, but he did not. I told Mr. Broili that this was exactly the behavior I was not to be subjected to, Mr. Broili did not respond but sat at his desk and allowed Mr. Wahl to

Cheryl Riley Formal EEO Complaint Filing Statement-Broili

continue abusing me. The project work requiring this meeting was not of such immediate importance as to justify an emergency meeting. In fact, it still took a week for Mr. Wahl to give me the information I had requested that Mr. Broili felt precipitated the meeting. I feel that this meeting could have waited for Mr. Curiel's return or Mr. Broili could have acted as an intermediary as he had been doing. On October 26, I informed EEO Counselor Tess Yiamarelos of what was occurring and made a complaint to her that the terms of the Resolution Agreement were not being followed. I requested her assistance with how to proceed with filing that Management was not upholding the Agreement. On October 29, 2004, I met separately with Mr. Broili, at this time he agreed with me that Mr. Wahl's behavior had been inappropriate. And yet, during the meeting, Mr. Broili did not exercise his authority as a supervisor to stop Mr. Wahl from verbally abusing me and harassing me.

On November 7 and 8, 2004, Coworker and peer, Ms. Kim Garvey, and I were talking. During our conversation she questioned me about something she had heard I said. Ms. Garvey then repeated to me precise words that I recognized immediately as being something that I had spoken only once and in one place - when talking to Mr. Wahl during the ADR mediation (See Witness List). I questioned Ms. Garvey where she heard these details and she told me that in mid-October, she and Mr. Wahl attended a BLM meeting in El Centro, CA. During their trip Mr. Wahl informed Ms. Garvey of specific details that transpired only during the confidential EEO mediation that had taken place between Mr. Wahl and myself on October 5, 2004. By his actions Mr. Wahl breached the signed Confidentiality Agreement.

‹ on November 9/10, Mr Broili told me if I refused to do work assigned by Rex he would file charges
against me for
At this same time Mr. Wahl also committed actions that breached the Resolution Agreement and my civil *insubordinate*
rights. Ms. Garvey told me that "Rex talked himself hoarse" to her making denigrating statements about me and slandering my professional abilities, my character, and me in general for the length of the trip, approximately 3-1/2 hours. Mr. Wahl also discussed with Ms. Garvey that I had filed an EEO complaint against him and wanted her to hear his side of the situation. Ms. Garvey told me she felt he did this on purpose to get even with me and to cause problems between her and I (See Witness List). On the return trip, Ms. Garvey stated that she changed the subject because she was tired of listening to him put me down.

On November 9, 2004, I informed EEO Counselor, Tess Yiamarelos, by phone what had occurred. She advised that I talk with Ms. Hoeft. On November 22, 2004, when Ms. Hoeft returned from out of the office, I reported Mr. Wahl's behavior to her and that, by doing what he had done, Mr. Wahl had committed an act of retaliation against me, breached the Resolution Agreement, and convinced me that he would not change his behavior. Ms. Hoeft responded by blaming me saying "what do you expect after you filed complaints against him." At this time, Ms. Hoeft also told me once again, as she had on several occasions, that she fully supports Rex in everything he does. I asked if she really supports Rex in everything. Ms. Hoeft said "yes." Ms. Hoeft told me she would check into what I had told her. On November 22, 2004, I emailed Ms. Yiamarelos the information concerning Mr. Wahl's retaliation and my conversation with Ms. Hoeft (Attachment-3: Referenced E-mails). (*Note: I have filed a complaint of discrimination for action(s)/inaction(s) by Ms. Hoeft in a separate statement).

On November 22, 2004, I emailed Ms. Yiamarelos the information concerning Mr. Wahl's retaliation and my conversation with Ms. Hoeft. On or about November 22, 2004, Ms. Hoeft informed Mr. Broili of Mr. Wahl's actions. Mr. Broili was fully aware of the retaliatory actions of Mr. Wahl. Though Mr. Broili and I met regularly, Mr. Broili never offered me any support or concern for my welfare or well-being.

– on Dec. 3. I was required to do field work under Rex Wahls direction. even though I
had a prior work injury of my Right shoulder/arm. During the field work I injured my left shoulder
in a fall.
On December 4, 2004, Ms. Garvey and I attended a Reclamation Employee holiday party held at a hall on the Marine Corps Air Station base. At approximately 9:30 p.m. I was sitting alone when Mr. Wahl walked behind the chair where I was seated and hit the back of my chair with what seemed to be his fist and

Cheryl Riley Formal EEO Complaint Filing Statement-Tbroili

muttered a vulgar name at me. After this occurred, another employee saw how upset I was and came to see if I was all right. I decided to leave the party with Ms. Garvey who I told of the incident. (See Witness List)

On December, 7, 2004, although I reported Mr. Wahl's continued harassment, Ms. Hoeft ordered me to return to Mr. Wahl's Environment Team and work under Mr. Wahl's direction.

I had just recently been injured in a work related accident, which required numerous forms, medical leave absences from work, and working with injured arms. This, along with Mr. Broil's 12-day absence, led me to delay reporting the incident of Mr. Wahl's assault to Mr. Broili. On December 17, 2004, I emailed Mr. Broili that Mr. Wahl had committed a physical assault against me, which I believed was specifically done to intimidate and hurt me because I had filed a new complaint of retaliation against him. I stated to Mr. Broili that I felt unsafe in the workplace as this incident showed that Mr. Wahl's hostile actions against me were now escalating to physical assault. Mr. Broili treated my concerns lightly by responding that I could file a police report, but he did not feel that I had anything to be afraid of and could continue to work for Mr. Wahl

On December, 20, 2004, I was placed on extended medical leave due to my work related injuries with expectation of needing two more operations on my shoulders. I am currently on OWCP medical disability resulting from the work injury.

On January 5, 2005, I filed a police report against Mr. Wahl with the Yuma City Police Department. The police advised me to file an Injunction Against Harassment or a Restraining Order against Mr. Wahl. I have not yet filed for these legal protective orders due to my being on medical leave. However, I believe I have the absolute right to be safe at work. If my Supervisor and the Office Director are not willing to protect me, it is necessary that I take whatever legal measures are available to me in order to be safe. Therefore, when I am released by my doctor to return to work at the Yuma Area Office, I will definitely file for an Injunction Against Harassment or a Restraining Order to protect myself from Mr. Wahl.

Mr. Broili and I had meetings after the Resolution Agreement was signed. During several of these meetings Mr. Broili stated to me that he supported Mr. Wahl. The dates Mr. Broili made these statements to me are October 13 and 29, 2004, (On October 13, Mr. Broili also stated to me that Mr. Wahl wasn't go to be the one leaving YAO) and November 24, 2004. And as noted above, on December 17, 2004, Mr. Broili disregarded my fears and indicated he supports Mr. Wahl even if Mr. Wahl physically hurts me.

Mr. Broili continually and intentionally disregarded the Civil Rights Laws of 1964 as amended, the Code of Federal Regulations 29 C.F.R. 1614, the Department of the Interior Policies against EEO Discrimination and Hostile Workplace, Bureau of Reclamation EEO and Zero Tolerance Policies, and the Yuma Area Office Anti-Discrimination and Zero Tolerance Policies. Through his disregard for these laws and policies, and his constant and continued support of Mr. Wahl, Mr. Broili allowed, approved, and gave his tacit consent to Mr. Wahl to continue to discriminate against me and continue abusing me. Mr. Broili allowed Mr. Wahl to cause me to experience severe stress to my emotional and mental well-being, and irreparable harm to my professional career. *I was injured on the job due to their breaching the Resolution agreement.*

I herein claim that Mr. Broili's action and/or inaction in allowing Mr. Wahl to continue discriminating against me that Mr. Broili neglected to correctly perform his fiduciary duties to protect a subordinate female employee from being discriminated against within the workplace arena by a male employee in an authority position. That I made Mr. Broili aware of Mr. Wahl's behavior for the first time on June 24, 2004 and on numerous subsequent dates, but Mr. Broili never once supported me or took seriously my claims of discrimination and requests for help. That, because of his prejudice against me, Mr. Broili chose not to

Cheryl Riley Formal EEO Complaint Filing Statement-Broili

assert his authority over Mr. Wahl and, by this lack of respect for me, encouraged Mr. Wahl to increase his abusive behavior toward me. As my Supervisor, and Mr. Wahl's Supervisor, Mr. Broili had the resources and the responsibility to appropriately protect me from Mr. Wahl's harassment and discriminatory behavior. It is obvious to me that Mr. Broili did not utilize Reclamation's disciplinary process to make Mr. Wahl stop his discrimination and hostile actions against me. Mr. Broili failure to protect me has made me suffer emotionally, mentally, and physically.

(Witness List Attached)
(Referenced Policy Letters Attached)


_Cheryl J. Riley_     _04/01/05_    CJR 8/2/04
Cheryl J. Riley        Date

Riley 0261

Cheryl Riley Formal EEO Complaint Filing Statement-Reprisal R Wahl

Attachment to U.S. Department of Interior Complaint of Discrimination Form DI-1892

Re:    Formal Complaint of EEO Discrimination, Reprisal-Prior EEO activity 10/07/04, Rex Wahl

Section 4. Allegation(s) of Discrimination:

April 26, 2004, I began working for the Environmental Group in the Resource Management Office, Supervisor, Thayer Broili, Office Director, Cynthia Hoeft. I was assigned the program lead for the Giant Salvinia Project, which was a program management type project, but I would eventually be working on NEPA projects.

On about May 25, 2004, I became aware that Mr. Rex Wahl treated me differently than the men. Our work areas were next to each other and connected. Nearly every day we would have need to talk and Mr. Wahl spoke to me in tones that were rude, paternalistic, and patronizing to me. This was very different than how he treated men in the workplace. Mr. Wahl withheld information from me but shared readily with men. He would tell me to go look something up but shortly give the information I requested to a male coworker.

On June 1, 2004, our Supervisor, Thayer Broili, assigned Mr. Wahl to be Team Leader in charge of NEPA projects. Although the project I was assigned to work on was not a NEPA project, Mr. Wahl began giving me orders. Often these orders were in conflict with orders given by my supervisor. For instance, in a group meeting including Mr. Wahl that was held on May 3, 2004, and again on May 10, 2004, Mr. Broili assigned me to work on the MSCP and be the agency liaison for this project. On June 23, Mr. Wahl told me I would not be working on this project, he would be.

On June 15, 2004, Mr. Wahl sent me an email insulting my race as an American Indian. Mr. Wahl criticized or questioned almost anything I did. I sent Mr. Wahl an email providing Mr. Wahl with an answer to one of his questions. Mr. Wahl replied on the email "So many chiefs, just one indian!" When I asked Mr. Wahl what he meant by sending me an email like that he said in a sneering voice "if it fits!" Mr. Wahl then made a rude face at me and walked away (Attachment-1 Email referenced).

*Note: The following is brief details of the workplace problems as most of the information was already included in my initial EEO complaint of sex discrimination-gender bias.

On or about June 17-20, 2004, Mr. Wahl assigned me a NEPA project. When I reminded Mr. Wahl that I was working on the Salvinia Project assigned as high priority by Mr. Broili and Office Director, Cynthia Hoeft, Mr. Wahl ridiculed and berated me for not being able to do more. On or about June 21, 2004, I spoke with Mr. Broili about my doing the new project and he asked me to work on it if I got the chance, otherwise Salvinia came first. He said he'd speak to Mr. Wahl about not assigning me other work at the present.

On June 23, 2004, Mr. Wahl sent emails to coworkers I was scheduled to work with and canceled my appointments. I learned of this from a cc email. I tried to tell Mr. Wahl he had no right to do this without discussing with me first. Out of the blue, Mr. Wahl began berating me in the work area with others listening. He accused me of working on the wrong projects, working overtime (approved). Mr. Wahl, threatened me saying he would be having input on my performance evaluation so I should watch how I speak to him. Told me he would be in charge of my assignments and overseeing my work. I objected to Mr. Wahl's tone and demeanor toward me, which was degrading. I notified Mr. Broili of the problems.

Cheryl Riley Formal EEO Complaint Filing Statement-Reprisal R Wahl

From then on Mr. Wahl became increasingly rude towards me and would often withhold information. I realized later that Mr. Wahl also gave me wrong information so that the Salvinia Project would fail, or not completed on time and I would be blamed.

By July 9, 2004, I was looking into filing an EEO complaint against Mr. Wahl. I spoke with Lower Colorado EEO Office Manager Ms. Janel Potucek. She treated my concerns lightly and suggested I was just experiencing newness in the Yuma Area Office. By July 17, 2004, the situation was worsening, with Mr. Wahl ridiculing me in front of others, calling meetings with the contractor on the Salvinia Project without including me, claiming to Mr. Broili that I wasn't up to doing the Salvinia job, providing information to me that was convoluted and obscure, and always speaking and acting toward me in a very sarcastic and demeaning manner. Mr. Wahl exhibited gender bias toward me in some way every single day. He would speak with deference and respect to men, allowing men to finish talking before he responded, looked men in the face when conversing. With me and other women it was the contrary. I noticed that Mr. Wahl spoke to me, and other women in a patronizing, doubting, and paternalistic manner that was particularly more rude to me. When speaking with lower graded women, Mr. Wahl consistently lowers his head down, looks over his glasses at them, speaking over them and/or interrupting them when they are talking, using doubtful tones of voice, chiding their opinions and constantly questioning or disagreeing with their information, thereby also devaluing women's opinions and abilities.

On July 17, 2004, I spoke with EEO Counselor, Tess Yiamarelos about filing an EEO complaint. Ms. Yiamarelos gave me some preliminary information. By this time Mr. Wahl was making my work day intolerable and I was having problems concentrating and getting work done. Mr. Wahl interrupted me numerous times through the day, dissecting and finding fault with whatever I did, performing extensive editing to my work but not to the male in the group causing me to work hours he told me I could not get paid but then commented disparagingly of me in front of others ridiculing my inability to get the work done if the work became backlogged. During meetings Mr. Wahl would interrupt, contradict, and ridicule my opinion in front of coworkers. Mr. Wahl also did this to another female coworker. Mr. Wahl never interrupted any males in any meetings. Mr. Wahl never ridiculed the opinions of any males in any meetings.

After I received the necessary EEO documents, I contacted Ms. Yiamarelos with questions about filing my complaint. I told her about the racial comments Mr. Wahl had made and wanted to file for racial discrimination as well as sex discrimination-gender bias. Ms. Yiamarelos asked me if I had something of substantial proof of his being racist like someone hearing him make the comment. At the time, I was influenced by Ms. Yiamarelos and thought I couldn't file for his being racist as i wasn't sure an email and his comment were enough. I am herein filing for racial discrimination at this time. Race was discussed with the EEO counselor in July 2004, listed in my information log filed in August 2004, and discussed recently with the EEO counselor during the pre-complaint stage of this complaint. The Notice of Final Interview attached to my cover letter lists race as part of my claim.

On August 4, 2004, I filed an EEO complaint against Mr. Wahl and Supervisor Thayer Broili charging them both with gender discrimination and creating a hostile workplace. As Office Director, Cynthia Hoeft was named as the responsible management official. In mid-September I agreed to participate in mediation through Alternate Dispute Resolution (ADR). ADR was held separately between each individual named in my complaint and myself from October 5-7, 2004, with contracted Mediator Ms. Jean Lovesmith present.. At the beginning of each session the mediator explained to each participant the unequivocal requirement for maintaining absolute confidentiality of everything discussed during the mediation proceedings. Ms. Lovesmith presided over the signing of the Confidentiality Agreements, which were signed by all parties including Mr. Wahl, Mr. Broili, Ms. Hoeft, and myself. ADR resulted in a signed Resolution Agreement

Cheryl Riley Formal EEO Complaint Filing Statement-Reprisal R Wahl

with terms by which I was assigned to Ron Curiel HazMat Team Leader for a 60-day detail from October 11,2002, until December 10, 2004. My purpose for reassignment was to get away from Mr. Wahl harassing me and creating workplace hostility. I had originally requested permanent reassignment, however, I learned this would negatively impact another female employee who was afraid of Mr. Wahl, so I requested the 60-day detail. A condition was included in the Resolution Agreement, referenced as a "cooling-off" period requiring Mr. Wahl to stop his discriminatory activities. During the "cooling-off period" term of the detail, I was to be relieved from working for/with Mr. Wahl and he was not to have contact with me. After this date, if Mr. Wahl proved he had stopped the discrimination, I would return to the Environment Team with Mr. Wahl as Team Leader. Mr. Broili and Ms. Hoeft were responsible for ensuring that the terms of the Resolution Agreement were complied with. As Management Official Ms. Hoeft signed the Resolution Agreement. It was signed by both Ms. Hoeft and I on October 7, 2004.

On October 25, 2004, Mr. Broili required me to be in a meeting with both Mr. Wahl and himself. When I objected to having contact with Mr. Wahl, Mr. Broili waved away my objections, saying that he knew what the Agreement said but there was no other way since Ron [Curiel] was not there. During the meeting Mr. Broili allowed Mr. Wahl to interrupt and speak over me when I tried to speak, ridicule me including my knowledge, skills, and opinions. Mr. Wahl also made rude facial grimaces at me, and refused to answer my questions so I could complete the project he had assigned me to do. This was extremely embarrassing and degrading to me. I looked to Mr. Broili to stop Mr. Wahl, but he did not. I told Mr. Broili that this was exactly the behavior I was not to be subjected to, Mr. Broili did not respond but sat at his desk and allowed Mr. Wahl to continue abusing me. In addition to this complaint against Mr. Wahl, I have filed an EEO complaint against Mr. Broili for not stopping Mr. Wahl or protecting me from Mr. Wahl's abuse.

Since filing my initial EEO complaint, On or about October 14, 2004, Mr. Wahl passed me in the hall at work and said "excuse me sir"! And on or about November 9, 2004, while I was standing near a doorway speaking with another female coworker, Mr. Wahl stepped past us saying "excuse me gentlemen."

On several occasions, specifically October 4, 2004, I observed Mr. Wahl turning his head as he passed a woman in the hall so he could watch her walking from behind.

On November 7 and 8, 2004, while on travel status, coworker and peer, Ms. Kim Garvey, and I were talking. During our conversation she questioned me about something she had heard I said. Ms. Garvey then repeated to me precise words that I recognized immediately as being something that I had spoken only once and in one place - when talking to Mr. Wahl during the ADR mediation (See Witness List). I questioned Ms. Garvey where she heard these details and she told me in mid-October, when she and Mr. Wahl attended a BLM meeting in El Centro, CA. During their trip Mr. Wahl informed Ms. Garvey of specific details that transpired only during the confidential EEO mediation that had taken place between Mr. Wahl and myself on October 5, 2004. By his actions Mr. Wahl breached the signed Confidentiality Agreement.

On November 9, 2004, Mr. Wahl was staring at my breasts ( I was wearing a turtleneck sweater).

Ms. Garvey told me that "Rex talked himself hoarse" to her making degrading statements about me to her and slandering my professional abilities, my character, and me in general for the length of the trip, approximately 3-1/2 hours. Mr. Wahl also discussed with Ms. Garvey that I had filed an EEO complaint against him and wanted her to hear his side of the situation. Ms. Garvey told me she felt he did this on purpose to get even with me and to cause problems between her and I (See Witness List). On the return trip, Ms. Garvey stated that she changed the subject because she was tired of listening to him put me down.

**Riley 0264**

Cheryl Riley Formal EEO Complaint Filing Statement-Reprisal R Wahl

On December 4, 2004, Ms. Garvey and I attended a Reclamation Employee holiday party held at a hall on the Marine Corps Air Station base. Ms. Garvey and I both observed Mr. Wahl leering and staring at another co-workers breasts.

On the same date, at the same party, at approximately 9:30 p.m. I was sitting alone at my table when Mr. Wahl walked behind the chair where I was seated and hit the back of my chair with what I believed to be his fist and muttered a vulgar name at me. After this occurred, another employee saw how upset I was and came to see if I was all right. I decided to leave the party with Ms. Garvey who I told of the incident. (See Witness List). I became more afraid of this incident because it signaled a change in Mr. Wahl's behavior. His attacks were no longer verbal and work related. Now Mr. Wahl escalated his attacks on me to the physical and outside of the work arena. I filed a police report with the Yuma City Police Department reporting Mr. Wahl assaulting me. When I my doctor releases me to return to work at YAO, I will take out an Injunction Against Harassment or a Restraining Order against Mr. Wahl as the Yuma Police have advised me to do.

On December 13 and 14, 2004, the Environmental Group attended Team Building Training. On the second day the subject of gender bias was raised by Ms. Garvey. The facilitator, Mac MacIntire, did a poll of the 7 permanent employees present. All three women and two of the four men stated that they experienced or witnessed gender bias in our group.

Mr. Wahl continually and intentionally disregarded the Civil Rights Laws of 1964 as amended, the Code of Federal Regulations 29 C.F.R. 1614, the Department of the Interior Policies against EEO Discrimination and Hostile Workplace, Bureau of Reclamation EEO and Zero Tolerance Policies, and the Yuma Area Office Anti-Discrimination and Zero Tolerance Policies. Through his disregard for these laws and policies, Mr. Wahl has caused me to experience severe stress to my emotional and mental well-being, and irreparable harm to my professional career.

I had only about three weeks to enjoy my new job before Mr. Wahl began harassing me. His harassment continued for eight months, until I went on medical leave. Mr. Wahl singled me out for harassment, discrimination, and hostility because I am an American Indian and because I am a woman. Mr. Wahl's harassment of me escalated into physical assault. Mr. Wahl did his best to destroy my working relationship with coworkers at the Yuma Area Office. So I have every reason to believe that Mr. Wahl has kept the threat he made to me on June 23, 2004, that he would tell people at other agencies what his opinion is of me.

Mr. Wahl has worked to assassinate my character and persecute me in the workplace and potentially in other areas. Mr. Wahl intentionally breached the Resolution Agreement and my civil rights to commit acts of reprisal against me. Mr. Wahl's actions have caused me severe stress emotionally, physically, and psychologically. Mr. Wahl has damaged my career at the Yuma Area Office, and my future career goals, some in ways I have not as yet evaluated.

Witness List Attached

_Cheryl A Riley_          _04/01/05_
Cheryl J Riley            Date

_7/31/04_

**Riley 0265**

<u>Date Log - Rex</u>

Rex exhibits gender bias and discrimination in several ways. He speaks to Julian, Ron, and Mike as equals allowing two-way communication showing appreciation for their comments and thoughts. Conversely, he talks to women in condescending, patronizing, paternalistic terms. When I offered an opinion I received criticism and have been chastised on several occasions by Rex in public forum. I have heard Rex speaking to other women in a similar manner wherein Rex reminds us of all his vast experience and knowledge. I have never heard him speak to men like this. Some of the tactics Rex uses to place himself superior to myself and other women include:

- responding negatively to my contributions;
- fabricates errors to claim work I performed was deficient
- provides partial or incomplete information preventing ability to perform assignment properly
- includes upper management in numerous emails some with derisive inferences
- frequent reminders of who is in charge and the level of his knowledge
- precluding other opinions than his own
- assigns or suggests work to me that is inappropriate and/or unsafe
- refuses to respond to emails
- disparate treatment by requiring me to complete a written form to be allowed 8 hours of sick leave, Julian was not required to do this and the policy requires written request only when asking for 24 hours or more
- threatens negative work evaluation
- prevented timely completion of high priority assignment by refusing help, offering conflicting information, and requiring other assignments be completed instead.

May:     Although I told Rex I ~~Rex took~~ me off of working on the Salvinia Project to do other work: *needed to finish a Salvinia project*

assigned me to edit Julian's Yuma East Wetlands EA/FONSI.

required I assist him in writing substantiation for GIS on our computers.

assigned me to work on reviewing ER-04/377.

June 15:   I ~~requested from~~ Thayer that as part of my role as IPM manager, I be the YAO rep member of Invasive Weed Mgmt Team for future involvement. Thayer passed my request to Rex who became angry and refused. *Ridiculed me for being Julian (See Emails)*

June 17:   Rex assigned me to work on LC Small Scale Well field Study project with review due by 6/25. He brought me a 2 inch thick EA binder with several emails to review. I tried to explain that I was working on the salvinia as high priority, but he insisted saying it would take me only 2 hours to read the old EA. *Needed at least 8 hrs*

June 21:   I emailed Rex some questions on Salvinia APAP (plan). He responded with vague unhelpful answers that merely asked more questions. No help.

Riley 0266

June 22:   I emailed Rex that to do the LC Well Field Study review I would not be able to work on the salvinia, which had a prior deadline. I requested taking it home over the weekend to have review by Mon if this was ok with him. He responded that "We all have to learn how to balance conflicting demands" and claimed that he

*  Rex gives conflicting orders
*  Rex allows input only from men ridicules women esp. me
*  Rex contradicts things I say anecdotally not eod

COPY