**EXHIBIT "B"**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Cheryl J. Riley,

    Plaintiff,

vs.

Dirk Kempthorne, Secretary,
United States Department of the
Interior,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No.
CV06-2160-PHX-
SRB

TELEPHONIC DEPOSITION OF ROBERT THAYER BROILI, JR.

Manteo, North Carolina

January 9, 2008

Prepared by:
Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)



Coash
& Coash

PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

602 258 1440

1    A.   My career goes back 30-plus years, so I've worked
2  in both the government and the private sector, but pretty
3  much in the same general disciplinary area.

4    Q.   And how would you describe that general
5  disciplinary area?

6    A.   Environmental planning and engineering and
7  environmental science.

8    Q.   What's your educational background?

9    A.   I have a master's in environmental management
10  from Duke University and all the course work for another
11  master's in plant ecology from North Carolina State
12  University.

13    Q.   Other than the Department of the Interior, what
14  other federal government agencies have you worked for in
15  the past?

16    A.   I worked on the --  That was the pager system
17  here.

18              I worked for the Tennessee Valley Authority
19  from 1980 to 1990.  They're a federal corporation.  And I
20  have also, in the private sector, done contract work for a
21  variety of federal agencies.

22    Q.   And did you say that you have done contract work
23  for the Department of the Interior in the past?

24    A.   No.

25    Q.   At one time, you were employed by the Bureau of

```
 1   Reclamation.  Is that correct?
 2       A.   Correct.
 3       Q.   Between April 2004 and May of 2005, were you
 4   employed by the Bureau of Reclamation?
 5       A.   Yes.  That is correct.
 6       Q.   And were you employed in their Yuma area office?
 7       A.   Yes.
 8       Q.   Between April 2004 and May 2005, what was your
 9   position at the Yuma area office?
10       A.   I'm trying to remember the exact title.
11            I think it was --  Basically, I was the
12   environmental group manager.  The actual title on paper
13   may have varied from that.
14       Q.   Were you a --  I'm sorry.
15       A.   We changed the name of the group at one point in
16   time to better reflect their function.  But essentially,
17   the main function of the group was the environmental
18   affairs of the office.
19       Q.   And were you a GS-12 at the time?
20       A.   No.
21       Q.   What grade were --
22       A.   GS-13.
23       Q.   What's your grade now?
24       A.   GS-13.
25       Q.   Do you know a woman named Cindy Heft, or Hoeft,
```

1   forth, because part of the reason that I went out was just

2   social, and she had mentioned the fact that she had been

3   deposed and indicated to me that someone may contact me to

4   depose me, but that was the full extent of that

5   conversation.  There was no discussion of the deposition

6   or any issues or anything like that.

7       Q.   Where did that discussion take place?

8       A.   It took place on the telephone.

9       Q.   Other than counsel for the government, have you

10  discussed today's deposition with anybody?

11      A.   My wife and my current supervisor, to let him

12  know that I had a situation with respect to needing to

13  come to give the deposition.

14      Q.   Did you leave the Yuma area office before

15  Mr. Wahl left or after?

16      A.   Before.

17      Q.   So he was still working there when you left?

18      A.   That's correct.

19      Q.   Do you know what his position was in Yuma between

20  April 2004 and May 2005?

21      A.   He was the environmental planning team leader.

22      Q.   So you were the environmental group manager,

23  correct?

24      A.   Right.  Correct.

25      Q.   And he was an environmental planning team leader,

1   correct?

2        A.    Correct.

3        Q.    How many teams made up your environmental group?

4        A.    Two.

5        Q.    Were they called team A and team B?

6        A.    As best as I can recall, they were called

7   planning team and the compliance team, but that

8   designation was relatively informal.  I don't even know

9   that it was even reflected in the organizational chart.

10  I'm not saying it wasn't.  I just can't recall.

11       Q.    Who was the compliance team leader in between

12  April 2004 and May 2005?

13       A.    Ron Curiel; as best as I can recall, he was there

14  that whole period.

15       Q.    Can you just generally describe for me what

16  Mr. Wahl's duties were as a team lead between 2004 and

17  2005?

18       A.    You know, we had actually written down the

19  functions of the team leaders, which I don't have and I

20  can't recall specifically.  But generally, the team

21  leaders were the submanagers.  They were the work product

22  managers.  They were the guys who directed the day-to-day

23  work, that gave out assignments and recommended

24  assignments.  At that point in time, I believe the entire

25  group was approximately eight or nine people plus a

1  Colorado River.  The Bureau of Reclamation had been

2  involved over a number of years, and their involvement

3  appeared to be growing in terms of trying to control the

4  water weed for a number of purposes.

5      Q.   Sir, when did you first come to know Cheryl

6  Riley?

7      A.   Let's see.  I think she was hired in late -- or

8  came on board late March or early April of 2004.  I don't

9  know the specific date, but I think that was the time

10  frame.  I had interviewed her.  She had come to Yuma to

11  interview probably in the vicinity of one to two months

12  before that.  I would say January or February.  I met her

13  during the interview and then when she came -- when she

14  reported for duty.

15      Q.   What was the position Ms. Riley was hired to

16  fill?

17      A.   Natural resource specialist, I believe.  Again, I

18  don't recall the specific title.

19      Q.   And you stated that you interviewed her.  Is that

20  correct?

21      A.   Yes.

22      Q.   Did anyone else participate in the interviewing

23  of Ms. Riley for that position?

24      A.   I believe that she talked with all the people

25  that were in the group at that time, which would have been

 1   Rex Wahl, Julian DeSantiago, and I think she also

 2   interviewed with Cindy Hoeft, but that's -- I can't swear

 3   by that, but I think that was the case.

 4        Q.   And who ultimately made the decision to hire her?

 5        A.   Myself and Cindy Hoeft.

 6        Q.   Were you the hiring authority, or was Cindy Hoeft

 7   the hiring authority?

 8        A.   I don't know.

 9        Q.   But you recall --

10        A.   The hiring -- As best as I can recall, the

11   hiring authority is the Department of Reclamation -- or

12   Bureau of Reclamation.  I don't know.  The process went

13   through --  The actual offer letter went out through the

14   human resources.  But the decision was made by myself and

15   Cindy Hoeft.

16        Q.   At the time you interviewed Ms. Riley, did you

17   explain to her the duties of the position she was

18   ultimately hired to perform?

19        A.   Yes.

20        Q.   And do you recall what those duties were?

21        A.   Basically, she was a natural resource specialist.

22   She would have had a broad array of activities across the

23   environmental planning and planning compliance, not the

24   other side of the house, such as doing analysis, doing

25   documentation under the environmental laws, coordinating

 1   programs and projects and activities, being the point of
 2   contact on a wide variety of different activities.  It
 3   wasn't a specific by-the-number function, because our
 4   range of activities was so broad.  It's not like hiring
 5   somebody to be a outgoing bill accountant and that's all
 6   they do.
 7       Q.   At the time she was hired, was that position an
 8   office job or did it require field work?
 9       A.   It was predominantly an office job.  There was
10   some field work involved -- or I think it was stated it
11   could potentially be involved.  But it was not a
12   preponderance of field work.  It was not considered really
13   to be a field activity.  It was more of an office
14   activity.
15       Q.   Did you communicate that to Ms. Riley when you
16   were interviewing her, that it was predominantly an office
17   job?
18       A.   As best as I can recall.
19       Q.   Why did you decide to hire her?
20       A.   She had a good resume -- or a resume that
21   indicated that she had sufficient technical experience and
22   educational background to be able to do the job.  Also she
23   was a current Bureau of Reclamation employee.  But
24   essentially, because her resume read good.
25       Q.   What was your opinion of her after you

1 | as Ms. Riley?

2 |     A.    Yes.

3 |     Q.    When Ms. Riley was hired in April 2004, was she

4 | assigned any responsibilities regarding the Salvinia

5 | project?

6 |     A.    Yes.

7 |     Q.    What were those responsibilities?

8 |     A.    Basically, she was the principal point of contact

9 | for all -- for all the activities associated with the

10 | Salvinia project.  And she was also responsible --  One of

11 | the major tasks had a -- had to be accomplished by --

12 | within several months was to prepare a permit application

13 | to the California department of environmental quality or

14 | whatever the name of the organization was that was the

15 | regulator to get a permit use herbicides to control the

16 | Salvinia.  So one of the major elements of this was to get

17 | the permit application prepared so it could be submitted

18 | and approved and we could take the action that was

19 | necessary that summer.

20 |           Now, I would say that was the major element.

21 | But there were other things that came up on the general

22 | subject that were also germane to her work.

23 |     Q.    Who assigned Ms. Riley to the Salvinia project in

24 | April 2005?

25 |     A.    As best as I can recall, it was me.

1   Q.   Do you recall if Cindy Hoeft had any direct

2   involvement in assigning Ms. Riley to that project?

3   A.   I don't recall.  Although I would say any

4   decisions like that were discussed with Cindy and would

5   also have been discussed with the team leader.  So the

6   decision would, most likely, have been kind of a group

7   judgment.  But I was the one ultimately -- I think I would

8   be the one that would have been considered ultimately

9   responsible for making the assignment.

10   Q.   Was Ms. Riley's role with respect to the Salvinia

11   project ever described as program manager?

12   A.   Project manager, I believe.

13   Q.   And who, to your recollection, provided her with

14   the title of project manager?

15   A.   Me.

16   Q.   Was Ms. Riley authorized overtime to work on the

17   Salvinia project?

18   A.   Yes.  I believe at certain times she was.

19   Q.   Who authorized that overtime?

20   A.   I did.  I was the only one that could approve

21   overtime other than Cindy.

22   Q.   Do you recall ever telling Ms. Riley that

23   Salvinia was a high priority project and she was to only

24   work on that project?

25   A.   I certainly --  I'm sure that I told her that was

1  a high priority project.  I don't know that I ever told
2  her that it was the only thing that she could work on.
3      Q.   But it was a high priority project?
4      A.   Yes.  Correct.
5      Q.   What is the Salvinia task force?
6      A.   As best as I can recall, it was a group of inner
7  agency -- it was an inner agency group made up of several
8  federal agencies, government agencies, local government
9  units, perhaps some of the water district folks, that all
10 kind of got together occasionally to discuss the problem
11 and see if they could come up with solutions or paths
12 forward to take care of the problem.
13     Q.   Was Ms. Riley the Bureau of Reclamation's
14 representative on the Salvinia task force?
15     A.   I don't recall.
16     Q.   As the project manager, would that be consistent
17 with her duties?
18     A.   Not necessarily.
19     Q.   Why not?
20     A.   Project manager was a generic term that basically
21 I gave her.  It had no status within the organization --
22 any formal status within the organization.  I could have
23 just as easily called her the principle point of contact
24 as the project manager.  The project manager did not
25 convey any particular authority other than to let her know

1  that I was relying on her to be the person to try to bring

2  all this together and get it done.

3     Q.   Who was the project manager of the Salvinia

4  project before Ms. Riley?

5     A.   There was none.

6     Q.   Were you ever told by Ms. Hoeft --

7     A.   Let me qualify that statement as I think about

8  it.

9              I don't know that we were putting as much

10  focus on it, because we didn't have the staff to do so.  I

11  mean, part of the reason we staffed up with people is we

12  had a lot of things that needed to get done that weren't

13  getting done, and the people were kind of taking care of

14  actions catch as catch can because of understaffing.  So

15  we didn't have, that I recall, any one specific person

16  putting as much time and effort into the program.  One

17  reason we needed to hire someone or some additional staff

18  was so we could put more effort into some of these -- into

19  this initiative as well as to others.  I don't know if

20  that makes it any clearer.  But --

21              So I don't recall anyone ever being

22  designated that.  But the functions were being done by

23  other people.

24     Q.   Did you ever assign anybody to assist Ms. Riley

25  with the Salvinia project?

1      A.    I assigned people to assist her in terms of

2   helping her understand some of the issues and science.  I

3   did not assign her anyone to be a subordinate to her.

4      Q.    Did Cindy Hoeft ever suggest to you that Kim

5   Maloney and Rex Wahl be assigned to assist Ms. Riley with

6   the project?

7      A.    Not that I recall.

8              Let me qualify that last statement.  Kim

9   Maloney, as a contractor, was helping prepare another

10  document that was regulatorily mandated on Salvinia, which

11  was the environmental assessment, and she and her company

12  were preparing that.  So there is interaction back and

13  forth between Kim Maloney and Cheryl with respect to some

14  of the technical information.  I may have asked Kim

15  Maloney to provide assistance to Cheryl in terms of some

16  of the input in what she knew.  And at various times

17  during the preparation of the document that Cheryl was

18  preparing, which was the permit application, I had both

19  Kim Maloney and Rex Wahl look at it and provide input and

20  so forth.  But as I said, this was a -- from my

21  perspective, a group effort.  It wasn't an effort where

22  Cheryl was assigned subordinates or other people to work

23  under her direction.

24      Q.    To your knowledge, did Ms. Riley ever request to

25  be appointed to be a member of the invasive weed

Robert Thayer Broili, Jr.        January 9, 2008

64

1  performance on the part of Ms. Riley?

2      A.   Yes.

3      Q.   When?

4      A.   It was really over a period of time.

5      Q.   What did he complain about?

6      A.   He complained about her lack of thoroughness, her

7  lack of willingness to take specific technical direction

8  on things that he had a high level of technical expertise

9  on.  He complained about her putting effort into one

10 element of the project or work effort and not into others

11 that were more important.

12     Q.   In response to his complaints, what, if anything,

13 did you do?

14     A.   My response varied.  In some cases, I would

15 suggest that Cheryl be allowed to go ahead and go along

16 the way she was and maybe he could cover this other area

17 if he thought it was so important.  In other situations, I

18 would suggest that he talk to her and get her to -- you

19 know, convince her that she needed -- or persuade her to

20 do things differently.  It all depended on the issue and

21 the importance of the issue.

22     Q.   Did you ever meet with Cheryl regarding his

23 allegations of poor work performance?

24     A.   Not prior to her filing the complaint.  And after

25 that, I almost felt it was a moot point.

1    Q.    You never spoke with Cheryl to get her side of

2  the story in response to Mr. Wahl's complaints.  That's

3  what you just testified to, correct?

4                    MS. HIRNEISEN:  Form.

5                    THE WITNESS:  I talked to Cheryl about the

6  product at times based on concerns that Rex brought to me.

7  But I did not say, "Rex Wahl said this.  What do you have

8  to say about it?"  Because I was trying to avoid

9  personalizing the issue.  My only concern was that the

10  product get done properly.  And I felt if I had brought --

11  gone to Cheryl and said, "Rex said this" or "Rex said

12  that," that all it would have done would have heightened

13  the -- any potential antagonism.

14                    So when I talked to Cheryl about issues,

15  generally I did not necessarily bring up the fact that Rex

16  said this or Rex said that.

17                    Now, on the other hand, I did have

18  meetings -- and I can't recall specifics, but there were

19  meetings where the three of us -- or three or more of us

20  would get together and talk about specific elements or

21  efforts, including the Salvinia effort, and talk about it

22  in a round-table manner, where everybody had input.  And

23  in those meetings, the attempt also was to foster people

24  bringing out their issues and getting those corrected.

25                    From my perspective, I was trying to keep

1  antagonism between specific individuals to a minimum -- or

2  alleviated.

3  BY MR. CONLEY:

4      Q.   And you thought the best way to do that was to

5  simply not talk about it with Ms. Riley?

6      A.   Well, again, when is the right time?  This was a

7  compressed situation.  I mean, by the time I started

8  sorting out what was going on, she filed a complaint.  She

9  comes on in April.  She files a complaint in July.  The

10 first two months she's getting up to speed.  That left

11 about two months of time where she's on this project and

12 getting into it, and we are trying to get a product done.

13          So am I negligent for not having corrected

14 that in time?  I thought that I would have some more time

15 to work with two of them to get things straightened out.

16     Q.   Let's look at Exhibit 1, which is the Resolution

17 Agreement that you have in front of you.

18     A.   Okay.

19     Q.   You -- if you turn to page 2, there's a -- on the

20 bottom third of the page, it says, "Accordingly, the

21 Agency Agrees to."  Do you see that?

22     A.   Right.

23     Q.   And the first thing that the agency agreed to do

24 is detail Ms. Riley to Ron Curiel's team for 60 days.  Do

25 you see that?

1    Q.    But Cheryl is not a person addressed on this

2  e-mail, correct?

3    A.    That's correct.

4    Q.    Do you recall Cheryl Riley ever informing you

5  that Rex Wahl would stare and the other -- at hers and

6  other women's breasts in the office?

7    A.    I remember -- I remember hearing that she -- I

8  don't know if she informed me or if she informed someone

9  else and someone else passed it on to me, but I had heard

10  that, yes.

11    Q.    And do you recall when that was?

12    A.    No.  Probably it was --  I really don't recall.

13    Q.    Do you know if it was before or after she filed

14  her first EEO complaint?

15    A.    I think it was after.

16    Q.    When you found out about it, what, if anything,

17  did you do?

18    A.    I didn't do anything.

19    Q.    Did any other employees ever make similar

20  complaints to you about Mr. Wahl?

21    A.    No.

22    Q.    Had you ever been involved in an EEO complaint

23  prior to Ms. Riley filing hers in July of 2004?

24    A.    No.

25    Q.    Other than Ms. Riley, has anybody ever filed an

1                    identification.)

2    BY MR. CONLEY:

3        Q.   This has been marked as No. 5 to your deposition,

4    and it's apparently an e-mail string between you and

5    Mr. Wahl, dated June 30, 2004 --

6        A.   Correct.

7        Q.   -- correct?

8        A.   Uh-huh.

9        Q.   Is that a yes?

10       A.   Yes.

11       Q.   Okay.  And there's an insertion at the top of the

12   e-mail which says "of June 28th."  Do you see that?

13       A.   Yes.

14       Q.   Is that your handwriting?

15       A.   Yes.

16       Q.   Okay.  And I don't want to -- Correct me if --

17   I don't want to put words in your mouth, but correct me if

18   I'm wrong here.  This is an e-mail string where Mr. Wahl

19   is bringing to your attention that he feels that Ms. Riley

20   may not be efficiently using her overtime.  Is that

21   correct?

22       A.   That's correct.

23       Q.   And in his first message, he told you that you

24   should be aware that Ms. Riley was going to come talk to

25   you about overtime for the Salvinia project, correct?

1    A.    Right.

2    Q.    And then a couple of hours later, he's telling

3  you that she -- that Ms. Riley is going to allege that she

4  has a blank check on overtime for the Salvinia project,

5  correct?

6    A.    Correct.

7    Q.    And then you respond to him, and in your last

8  line you state, "In any event, play it low key and we'll

9  see what she says when she comes to me and Cindy."  Do you

10  see that?

11    A.    Yes.

12    Q.    What did you mean by "play it low key"?

13    A.    I meant for him not to make an issue of it with

14  Cheryl, that it would be handled.  It would be handled by

15  myself and Cindy if we felt it was an issue.

16    Q.    Did you feel it was an issue?

17    A.    Yeah.  I felt it had started to become an issue.

18  When somebody is claiming 15, 20 hours of overtime a week

19  on a regular basis and you really can't see what product

20  you're getting plus you feel like -- again, going back to

21  the two factors, one -- or three factors, one, are you

22  getting the work for the money; two, is the person putting

23  themselves under stress which is not conducive to that

24  person's long-term well-being, and, three, are they

25  milking the system for money?  And it does occur.  And to

1   me, there's got to be -- there is some limits.  There is

2   not unlimited overtime in the government, at least for the

3   agencies that I've worked for.

4       Q.   Did you believe in June --  I'm sorry.  Go ahead.

5       A.   So the whole question was, how much was going to

6   be used and how much was really needed?  You know, what is

7   the benefit to the agency?

8              So yeah, there is -- there was some

9   questions about it, because Cheryl was claiming a lot more

10  overtime than anybody else in the group.  She wasn't the

11  only one that was claiming overtime for different things.

12  And basically, what was --  What my position was, was if

13  you take up to 10 percent overtime, which is 4 hours a

14  week, then I don't need much of an explanation for that.

15  You don't have to write me -- spend an hour writing me why

16  you're going to spend four hours doing it.  But if you're

17  going to spend over 10 percent -- or take over 10 percent

18  of overtime a week, then I want to know in advance, and I

19  want to know -- I want to see the product.

20             And again, it's just -- it's just basic

21  management.  It was not --  It may have been --  This

22  issue may have been created because Cheryl wasn't the one

23  that was taking all the overtime, but it certainly was not

24  a bias against Cheryl.  Anybody else who would have been

25  doing it would have been in the same -- under the same

1   scrutiny or I would have had the same concerns.

2       Q.   Let me ask you this.  Did you believe in June

3   2004 that Cheryl Riley was milking the system for

4   overtime?

5       A.   Yes.

6       Q.   Why?

7       A.   Because she --  I think she had a lot of expenses

8   from moving down.  And I saw her product, and I think she

9   was doing a credible job, but I did not think what she was

10  doing should be taking that many hours.  And government

11  employees do not normally work 15 to 20 hours a week

12  overtime every week.  I would say I had concerns that that

13  might be the case.  I wasn't convinced that that was the

14  case, but I had concerns that that might be the case, and

15  if I hadn't have been, I would have been a derelict

16  manager.

17      Q.   Did you ever bring it to Cindy Hoeft's attention?

18      A.   Yes.

19      Q.   And did Cindy Hoeft --  What, if anything, did

20  Cindy Hoeft tell you about Cheryl's use of overtime?

21      A.   Well, I think there may be another one of these

22  memos that refers to that conversation or to what happened

23  was --  But essentially, but before I could talk to

24  Cheryl, Cheryl went directly to Cindy and petitioned

25  her --  That's not true.  I talked to Cheryl, and I told

1  her that I had concerns about the overtime.  I did not

2  accuse her of milking the system.  I talked about

3  basically my concern about her health and well-being and

4  overworking and so forth.  Because I didn't have any

5  desire or need to accuse her of anything.  Like I say, I

6  had concerns, but I didn't have any kind of conviction

7  that way.  But I basically tried to indicate to her in a

8  nice, subtle, gentle way that I thought she was putting in

9  for too much overtime.  Then she went to Cindy, and

10  without Cindy really knowing the situation or having heard

11  what my concerns were from me, Cheryl petitioned Cindy to

12  allow her to work overtime on the Salvinia project, and

13  Cindy agreed to it.  And then subsequently, I talked to

14  Cindy about it and told her what my concerns were.

15          But as I say, I didn't feel that Cheryl was

16  being penalized.  She was just being held to basically

17  some of the standards of the rest of the employees.  And

18  in fact, there was at least one other employee who I

19  wanted to make sure did not take too many liberties with

20  the overtime -- with overtime claims.  So it was not

21  directed --  The overall effort was not directed strictly

22  towards Cheryl, although Cheryl was the -- probably the

23  prime concern because she was claiming so much more than

24  anybody else.

25          Yeah.  I think actually the next page,

1  694 --

2      Q.    Let me stop you because we're going to get to it.

3  We need to mark it first, sir.

4      A.    All right.

5              (Deposition Exhibit 6 was marked for

6              identification.)

7  BY MR. CONLEY:

8      Q.    Okay.  We are looking at document Bates numbered

9  694 in the right-hand corner.  It has been marked as

10  Exhibit No. 6 to your deposition.  And this is an e-mail

11  dated June 30, 2004, from you to Cindy Hoeft regarding

12  overtime for Cheryl Riley, correct?

13      A.    Right.

14      Q.    If you look at the middle paragraph -- or the

15  second paragraph, you wrote, "Because you have played a

16  major role in the Salvinia program and apparently told her

17  (as I did) that there was no problem with overtime, I'd

18  like you to talk to her and Rex before this weekend so

19  that they have your input to the Salvinia situation and

20  how much overtime is appropriate."  Do you see that?

21      A.    Yes.

22      Q.    Did you tell Cheryl that there was no problem

23  with overtime?

24      A.    Well, I think that I just explained my

25  conversation with Cheryl on overtime.  The other -- the

1    other --  I told Cheryl that I was concerned about the

2    amount of overtime that she was taking.

3        Q.    But at one point --

4        A.    I put it in the context that would be

5    nonoffensive to her.

6              And essentially, Cindy made the decision,

7    and Cindy is the supervisor.  And if she wanted to make

8    that decision, she could.  As I say, when Cindy went ahead

9    and approved Cheryl for overtime, even though I didn't

10   necessarily concur with it, there was no penalization of

11   Cheryl for it or anything else.

12       Q.    But at some point prior to June 4th, 2004, you

13   had communicated to Cheryl Riley that there was no problem

14   with her performing overtime on the Salvinia project,

15   correct?

16       A.    I had --  Initially, when she started on the

17   project, I told her there was no problem.  When it became

18   like -- but at that point in time, I thought it was going

19   to be for a couple of weeks or a month.  When it proceeded

20   into -- well into the second month, then it started

21   becoming problematic.  And I had --  And when it started

22   to become problematic was when I had the discussion with

23   her discouraging her from using so much overtime.  The

24   situation changed.

25              MR. CONLEY:  We're now going to mark the

1   next document, which is numbered 697.

2                   (Deposition Exhibit 7 was marked for

3                   identification.)

4   BY MR. CONLEY:

5       Q.   And document Bates numbered 697 is a series of

6   e-mails between you and Ms. Riley, dated July 1st, 2004,

7   from her to you and then a response from you to her on

8   July 7, 2004.  Is that correct?

9       A.   Correct.

10      Q.   And Ms. Riley wrote that she "spoke with Cindy

11  Hoeft today as you advised."  Do you see that?

12      A.   Yes.

13      Q.   Did you advise Ms. Riley to speak with Ms. Hoeft?

14      A.   I don't recall.

15      Q.   You responded to Ms. Riley that Ms. Hoeft told

16  you that she concurred with Ms. Riley performing overtime

17  at her discretion through the rest of July.  Is that

18  correct?

19      A.   That's correct.  And that's consistent with what

20  I stated before.  Once Cindy made the decision, it was

21  okay.  It was okay.

22      Q.   At that point, were you satisfied that Cheryl

23  wasn't milking the system?

24      A.   Personally, no, not necessarily, no.

25      Q.   Why not?

1       A.   But -- Because I was much closer to the work

2   than Cindy was.

3                But, again, no harm of -- no penalty, no

4   foul.  This was never an issue except to Cheryl.  Nobody

5   ever penalized her or took any action or anything else on

6   this.

7       Q.   Well, is there no harm?  I mean, Rex Wahl

8   tattletales to you that Cheryl is working too much

9   overtime, you go to Cindy Hoeft about it, Cindy Hoeft

10  comes back and says no, she is not, but you still believe

11  that Cheryl Riley is milking the system.  You don't think

12  that there is penalty associated with that?

13      A.   No.

14      Q.   Your boss reviewed it, told you there was no

15  problem with it, but you still had concerns that Cheryl

16  was engaging in some kind of fraud against the government?

17               MS. HIRNEISEN:  Form.

18               THE WITNESS:  Nobody ever accused her of

19  fraud against the government.

20  BY MR. CONLEY:

21      Q.   What is milking the system?

22      A.   Milking is the system is milking the system.  I

23  said no one ever accused her of fraud against the

24  government.  What happens when somebody goes to lunch

25  early and comes back late?  Every time that happens, you

1    don't file suit against them or a complaint.  I mean, this

2    was still early in Cheryl's tenure.  I was waiting to see

3    if things worked out.  But it appears that you feel that I

4    wasn't doing my -- doing diligence when I think what I was

5    doing was the diligence of any manager who has an employee

6    who is working, in my mind, excessive overtime.

7                    And the other thing is you made the

8    statement that Rex Wahl came running to me complaining

9    about this.  I was seeing the time sheets.  It wasn't just

10   Rex's observation.  It was my observation.

11                   MS. HIRNEISEN:  Gentlemen, I just want to

12   let you know we have about five minutes until we have to

13   be out of the room in Norfolk.

14                   MR. CONLEY:  We're going to mark number 699

15   as the next document.

16                   (Deposition Exhibit 8 was marked for

17                   identification.)

18   BY MR. CONLEY:

19       Q.   We've marked what is numbered 699 in lower right

20   hand corner as Exhibit 8 to your deposition, and that's an

21   e-mail from Ms. Riley to you, dated July 12, 2004.  Is

22   that correct?

23       A.   That's correct.

24       Q.   And in this e-mail, Ms. Riley wrote that, "On

25   Friday, you instructed me that I am absolutely not to send

1  differences of opinion and misunderstandings regarding

2  roles and responsibilities, and to avoid or reduce any

3  further tensions that may exist over these issues, I am

4  clarifying that all of Cheryl's work tasks are subject to

5  Rex's oversight and direction until further notice,"

6  correct?

7      A.   Correct.

8      Q.   So you were telling Ms. Riley that everything

9  that she did was subject to Rex Wahl's oversight and

10  direction, correct?

11              MS. HIRNEISEN:   Form.

12              THE WITNESS:   Yes.  This was, I believe,

13  right after I found out that Cheryl had filed the EEO

14  complaint.  At that point in time, the only one I knew

15  that she had filed a complaint against was me.  Cindy, my

16  supervisor, was out of town.  I didn't know the

17  circumstances of the complaint, and so I felt that it

18  was -- and I didn't even know that Rex was involved in the

19  complaint.  So I felt the best thing to do was to remove

20  myself from any managerial oversight of Cheryl until Cindy

21  returned, could apprise me of the situation, and she was

22  fully aware of the situation.  So this was an effort to

23  not create any more accusations and potential problems in

24  the period of time between when I found out about the suit

25  and Cindy returned.

1    on March 27, 2005?

2              MS. HIRNEISEN:  Form.

3              THE WITNESS:  I had -- no.

4         Q.   BY MR. CONLEY:  Were you happy to see her go?

5         A.   That is a personal question.

6         Q.   Very personal, sir.

7         A.   I don't feel compelled to respond to it.

8         Q.   You have to, sir.

9         A.   I have to?

10             MS. HIRNEISEN:  You do, Thayer.  Go ahead.

11             THE WITNESS:  What did you -- Jill?

12             MS. HIRNEISEN:  Yes, sir.

13             THE WITNESS:  Am I compelled to respond to

14   that question?

15             MS. HIRNEISEN:  You are.

16             THE WITNESS:  Is that a closed question or do

17   you want my opinion?

18             MS. HIRNEISEN:  It is a closed question.  It

19   is a "yes" or "no" question, Thayer.

20             THE WITNESS:  The answer is "yes."

21        Q.   BY MR. CONLEY:  Why?

22        A.   Why?  Because, in my opinion, she had made

23   false allegations against me.  She had made questionable

24   and most likely false allegations against other people.

25   She had tried to accuse me of unethical behavior,

```
 1    misadministration of government contracts in addition to
 2    the EEO issues.  She was disruptive, and she did -- she
 3    was a very negative influence on the organization, which
 4    spread out from not only the people that she accused of
 5    these alleged misbehaviors, but in terms of the impact
 6    on the organization as a whole.  So, yes, I was glad to
 7    see her go.
 8              I spent approximately six or nine months
 9    where about 75 percent of my activity was dealing with
10    Cheryl, and that was detrimental to my work efforts as
11    well as everybody else's.  You hire people to have them
12    help you get work done, not to have them keep you from
13    getting work done.  So, yes, I was glad to see her go.
14         Q.   Do you know who, if anyone, replaced
15    Ms. Riley in her position after she was fired?
16         A.   No.  To my recollection, we did not hire
17    anyone to replace that position immediately, but
18    essentially, what we did was, we adjusted the work
19    around to other folks in addition to both contractor
20    personnel and I believe we may have given some of it to
21    some people outside the group who could handle some of
22    the -- or adjusted the work load to make sure we could
23    keep all bases covered, but we did not go out and hire
24    someone immediately upon Cheryl's leaving.
25         Q.   When Cheryl Riley was assigned during that
```