**EXHIBIT "C"**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CHERYL J. RILEY,<br><br>        Plaintiff,<br><br>vs.<br><br>DIRK KEMPTHORNE, SECRETARY,<br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR,<br><br>        Defendant. | No.<br>CV06-2160-PHX-SRB |

DEPOSITION OF CINDY HOEFT

Phoenix, Arizona

November 15, 2007

12:00 o'clock noon

BY:  Jo Ann E. Kramer, CSR, RPR

     Certified Reporter

     Certificate No. 50388



PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

```
 1    Reclamation, Yuma Office.
 2         Q.   And what is your current position?
 3         A.   Resource management office director.
 4         Q.   How long have you been in that position?
 5         A.   Since 2003.
 6         Q.   What was your position prior to director of the
 7    resource management office?
 8         A.   Program management office director.
 9         Q.   Was that also at the Yuma Area Office?
10         A.   Yes.
11         Q.   How long were you in that position?
12         A.   One year.
13         Q.   When did you start with the Department of the
14    Interior?
15         A.   February of 1983.
16         Q.   Do you know a man named Thayer Broili?
17         A.   Yes.
18         Q.   Who is that?
19         A.   He was the environmental group manager that
20    worked for me.  You know, he's no longer in there in Yuma.
21         Q.   Was he the environmental group manager in Yuma
22    between April 2004 and January 2006?
23         A.   Yes.
24         Q.   Do you know where he is now?
25         A.   North Carolina.
```

1  started in the Palo Verde drain area.  It had gone
2  downstream.  It was growing at tremendous rates in the
3  area of the Imperial Dam and kind of clogging their
4  facilities there and they needed to get rid of it.  I
5  mean, manually get rid of it there.  And on the intakes,
6  referring to the wash dam, so it was causing difficulties
7  for operation of the two dams, especially, plus, you know,
8  boating, recreation.  It was a nuisance.
9       Q.   And if it had been left unchecked, would it have
10 gotten worse?
11      A.   Yes.
12      Q.   And what ultimately could have happened?
13      A.   It would just, again, cause considerable
14 additional work, maintenance on the dams downstream and,
15 the various irrigation districts and into Mexico.
16      Q.   When you assigned Ms. Riley to work on the
17 Salvinia project, did you tell her that it was a
18 high-priority project?
19      A.   I'm sure I did.
20      Q.   Did you tell her that she should focus
21 exclusively on the Salvinia project?
22      A.   I don't recall.
23      Q.   Is it possible that you told her that?
24      A.   I -- no.  I don't know that I would have said
25 that.

```
 1   force?
 2       A.   No.
 3       Q.   Did you ever inform Mr. Broili that Salvinia was
 4   the highest priority and that you wanted Ms. Riley working
 5   on nothing else until the NPDES permit was accomplished?
 6       A.   I don't recall.
 7       Q.   Is that possible?
 8       A.   I -- it is possible.  I said it was the
 9   highest-priority project we had going on at the time and
10   it needed to get done, yes.
11       Q.   Do you recall any objections by Mr. Broili about
12   Ms. Riley spending all of her time on the NPDES permit?
13       A.   I don't recall.
14       Q.   Did you ever inform Mr. Broili that he should
15   assign people to assist Ms. Riley with the Salvinia issue?
16       A.   Repeat the question.
17       Q.   Sure.  Did you ever tell Mr. Broili that you
18   wanted him to assign other people to help Cheryl Riley
19   with the Salvinia project and the NPDES permit?
20       A.   I don't recall that specifically.  I probably did
21   tell him that we needed to make sure it gets done and, you
22   know, if he needs to use other resources on getting it
23   done, then that's what we need to do.
24       Q.   Do you recall if he had any response to you?
25       A.   No, I don't recall.
```

1  presented to her at that time?
2      A.   Only a document similar to this that would have
3  been more of a settlement agreement, "This is what we
4  would do," and it would have -- it included permanently
5  assigning her to the HAZMAT Team.
6      Q.   Did the offer to reassign her to the HAZMAT Team
7  include a section that outlined her job title as just a
8  series of Xs?
9      A.   It had Xs in there, yes.  Because, at that
10 particular time, there still was not a position
11 description at a GS-9 level with any kind of -- so that
12 position description would have had to have been
13 developed.
14     Q.   Did Ms. Riley express concerns about moving into
15 a job that was only described by Xs?
16     A.   She did.
17     Q.   And what was your response?
18     A.   That we -- that it would -- until a job -- a
19 position description is classified, and I couldn't tell
20 her anything else.  I mean, I could verbally say it would
21 either say environmental protection specialist or natural
22 resource specialist.  I mean, the intent was to make it a
23 GS-9.  That's what I would have said to her.
24     Q.   Had she signed that document, was it possible
25 that somebody could have made her a GS-1?

1   A.   No.
2   Q.   Why not?
3   A.   I go by my word. It would have been a GS-9. We
4   would have made sure that the position was classified as a
5   GS-9.
6   Q.   But there was no guarantee, based upon the
7   document she was presented, correct?
8   A.   No.
9   Q.   Did, in the discussions with Ms. Riley regarding
10  reassigning her, you ask her to waive all of her prior EEO
11  complaints in return for this reassignment?
12  A.   Yes.
13  Q.   Did you ask her to refrain from making any future
14  EEO complaints in return for this assignment?
15  A.   I don't believe so, no.
16  Q.   Do you know if any agency official above your
17  level approved the offering of the settlement agreement
18  before you presented it to Ms. Riley?
19  A.   I don't recall.
20  Q.   Did you talk about it with Mike Collins?
21  A.   I might have.
22  Q.   How much time did you give Ms. Riley to agree to
23  accept the reassignment and the settlement agreement?
24  A.   I don't know about how much time I gave her. I
25  know that she wanted to at least think about it over

```
 1   night, and she came back the next day and said she
 2   wouldn't accept it.
 3       Q.   During your discussions with Ms. Riley about the
 4   settlement agreement that we've been discussing, was
 5   anyone else present?
 6       A.   I don't recall.
 7       Q.   Where did the discussions take place?
 8       A.   At the Yuma Area Office.  I don't recall if it
 9   was in my office or a conference room.
10       Q.   Did you refuse to allow Ms. Riley time to think
11   about signing the document overnight?
12       A.   Did I refuse?  No.
13       Q.   Did you provide her with a copy of the document
14   you presented to her?
15       A.   I don't believe I did.
16       Q.   Why not?
17       A.   I don't know.
18       Q.   Did Ms. Riley ever request a promotion to GS-11,
19   natural resource specialist, from you?
20       A.   No.
21       Q.   Do you still have a copy of the documents that
22   were presented to Ms. Riley regarding the settlement we've
23   been discussing?
24       A.   I believe I do, yes.
25       Q.   Have you provided that to --
```