EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Cheryl J. Riley,                          )
                                          )
                    Plaintiff,            )
                                          )   No. CV06-2160-PHX-SRB
vs.                                       )
                                          )
Dirk Kempthorne, Secretary,               )
United States Department of the           )
Interior,                                 )
                                          )
                    Defendant.            )
                                          )

DEPOSITION OF CHARLES REX WAHL

Phoenix, Arizona

January 16, 2008

**DISK
ENCLOSED**

Prepared by:
Meri Coash, RMR, CRR
Certified Reporter
Certification No. 50327

(Copy)



PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

Charles Rex Wahl      January 16, 2008

12

1    Q.    Is that true?

2    A.    That's it.

3    Q.    Between --  Strike that.

4          Did you always hold the same position in

10:23:02   5   Yuma at the Bureau of Reclamation?

6    A.    Yes.

7    Q.    And what was that position?

8    A.    I don't recall the exact title.  It was -- it

9    would be easy enough to look that one up.  It was --

10:23:20   10      MS. HIRNEISEN:  Sorry.  I can't help you.

11          THE WITNESS:  Yeah.  I can't help you

12   either.  It's not coming to me, the exact title.  It's

13   something I'll have to look up.

14   BY MR. CONLEY:

10:23:40   15   Q.    Does the phrase "environmental team lead" ring a

16   bell?

17   A.    That wasn't my -- that wasn't the federal

18   classification that I was in.  That was the title I was

19   given shortly after arriving at Yuma.  And that's more a

10:24:00   20   functional description.

21   Q.    What was your grade level when you were in Yuma?

22   A.    GS 12.

23   Q.    And was the job in the Yuma area office for the

24   Bureau of Reclamation your first Federal government job?

_4:23   25   A.    Yes, it was.

1    Q.   Do you know who assigned Ms. Riley those duties

2  and responsibilities?

3    A.   I believe it was Cindy Hoeft.

4    Q.   Was the salvinia project a relatively high

10:51:51  5  priority project for the Yuma area office in the spring of

6  2004?

7    A.   It was relatively -- it was certainly of interest

8  to Cindy.

9    Q.   What makes you say that?

10:52:08  10    A.   She evidenced a lot of interest in it.  I guess I

11  would say a fair amount of time was spent on that topic.

12    Q.   Do you recall if Ms. Riley was given permission

13  to use overtime while performing duties related to the

14  salvinia project?

10:52:41  15    A.   I do.

16    Q.   Was she?

17    A.   I believe she was.

18    Q.   Do you know who authorized her use of overtime

19  related to the salvinia project?

10:52:50  20    A.   It would have been Thayer and perhaps Cindy.

21    Q.   Are you familiar with something entitled the

22  National Pollutant Discharge Elimination System Permit?

23    A.   I am.

24    Q.   What is that?

03:10  25    A.   That's a part of the Clean Water Act.  It's

1   essentially, if you're going to put something in the water

2   of the United States that can act as a pollutant, you need

3   to obtain a permit to do so.

4       Q.   Was such a permit required with respect to the

10:53:33   5   salvinia project?

6       A.   It was.

7       Q.   Was Ms. Riley responsible for performing the work

8   necessary to obtain that permit?

9       A.   She was.

10:53:46   10       Q.   Do you recall an entity described as the salvinia

11   task force?

12       A.   I do.

13       Q.   What was that?

14       A.   It was a group of government agencies that had

10:54:07   15   concerns about salvinia and its proliferation and control.

16       Q.   Was Ms. Riley a member of the salvinia task force

17   in Yuma?

18       A.   She was representing the Bureau of Reclamation

19   Yuma office on that task force.  And Cindy was a member of

10:54:29   20   the --  It had several committees, I believe.  But Cindy

21   Hoeft was also on that task force.

22       Q.   What's your educational background?

23       A.   I have a bachelor of science and master of

24   science in biology.

55:06   25       Q.   Both from the same school?

1    Q.   Was it her first or second day of work?  Do you

2  recall?

3    A.   I don't know about the first or second day.

4    Q.   Do you recall anybody ever referring to Ms. Riley

11:08:28  5  as the salvinia program manager?

6    A.   Yes.  Program manager or project manager, one of

7  the two.

8    Q.   Who referred to her by those terms?

9    A.   I believe Thayer did.  We were kind of given

11:08:53  10  facultative titles for what we were working on at the

11  time.

12    Q.   Are you familiar with something called the

13  integrated pest management program?

14    A.   I am.

11:09:15  15    Q.   What is that?

16    A.   Well, I guess I should say I'm vaguely familiar

17  with it.  It's a -- it's a program to use various means of

18  control on pests, both animal and plant, noxious weedlike

19  things.

11:09:46  20    Q.   Do you recall Ms. Riley ever organizing meetings

21  concerning the use of copper carbonate as an herbicide to

22  control salvinia?

23    A.   I don't know about organizing meetings, but that

24  was one of the control agents for salvinia that we were

10:10  25  proposing to use.  And there were meetings put together to

1    talk about using it.

2         Q.   Did Ms. Riley participate in those meetings?

3         A.   Yes.

4         Q.   Do you recall if she ever briefed senior

11:10:37   5    management at the Yuma area office regarding those

6    meetings?

7         A.   I believe she did, if by senior you mean Cindy

8    Hoeft, for example.

9         Q.   Was there ever a time when Ms. Riley was

11:11:05  10    attempting to discuss the salvinia project with you that

11    you informed her that it was a salvinia-free day?

12         A.   There was.

13         Q.   When was that?

14         A.   I don't recall exactly.

11:11:19  15         Q.   Do you recall the circumstances which led to you

16    saying it was a salvinia-free day?

17         A.   Well, yes.  To -- recall my role was as team

18    leader for a group of people, and every member of the

19    group had several projects, usually, at a time, and there

11:11:44  20    were times when I needed to devote time to what they were

21    doing or what I was doing, because I had several projects

22    as well, and I just couldn't spend a lot of time talking ·

23    about the salvinia project.

24         Q.   Wasn't it true that, as you stated earlier,

.2:13  25    salvinia was a relatively high priority for Cindy Hoeft?

Charles Rex Wahl          January 16, 2008

33

1      A.    It was, but it was among a number of high

2  priorities for the group.  It wasn't the high priority.

3      Q.    Do you recall how many times you informed

4  Ms. Riley that it was a salvinia-free day when she

11:12:51   5  requested to discuss that project with you?

6      A.    I don't know.  It might have been as many as two

7  or three times.

8      Q.    Are you aware that Ms. Riley's Native American?

9      A.    I am now.

11:13:17   10      Q.    When did you become aware?

11      A.    I'm not exactly sure.  I believe there was a

12  point where she told me that she was Native American.

13      Q.    Did you ever hear Thayer Broili state in a

14  meeting words to the effect of "those damn Indians always

11:13:51   15  causing trouble and wanting something for nothing"?

16      A.    I don't recall any statement like that.

17      Q.    Do you recall Mr. Broili referring to Native

18  Americans or Indians in a negative way at any time?

19      A.    No.

11:14:09   20      Q.    Have you ever discussed with anyone the fact that

21  Ms. Riley is Native American?

22      A.    Yes.

23      Q.    Who?

24      A.    My -- my wife, Cherie Wahl.

14:26   25      Q.    Anyone else?

|          |    |    |                                                         |
|----------|----|----|---------------------------------------------------------|
|          | 1  | A. | No.                                                     |
|          | 2  | Q. | What is your wife's maiden name?                         |
|          | 3  | A. | Well, she's had a few.  Jones.                           |
|          | 4  | Q. | Prior to marrying you, what name was she using?         |
| 11:14:57 | 5  | A. | Jones.                                                   |

6  Q. And was she an employee of the Yuma area office

7  at the time you met her?

8  A. She was.

9  Q. Did the discussion which occurred between you and

11:15:15  10  your wife regarding Ms. Riley being Native American occur

11  before or after you were married?

12  A. After we were married.

13  MS. HIRNEISEN:  I want to say something off

14  the record for a second.

11:15:56  15  (An off-the-record discussion ensued.)

16  BY MR. CONLEY:

17  Q. While Ms. Riley was working on the salvinia

18  project, do you recall if she actually worked overtime?

19  A. I -- well, I guess she did.  I didn't see it, but

11:16:55  20  I know she worked overtime.

21  Q. Why wouldn't you have seen it, as her team

22  leader?

23  A. Because I pretty much tried to leave the office

24  when it was time to leave -- you know, time to go, 5:00.

.7:17  25  Q. Did you ever complain to anybody about Ms. Riley

Charles Rex Wahl      January 16, 2008

35

| | |
|---|---|
| 1 | working overtime? |
| 2 | A.   No. |
| 3 | Q.   Did you ever complain to Thayer Broili that |
| 4 | Ms. Riley may be working too much overtime? |
| 11:17:34   5 | A.   No. |
| 6 | Q.   Did you ever express any concerns to Mr. Broili |
| 7 | regarding Ms. Riley's use of overtime? |
| 8 | A.   I did. |
| 9 | Q.   What were those concerns? |
| 11:17:50  10 | A.   That among the staff, she was the only woman that |
| 11 | was using a lot of overtime, and I was just concerned |
| 12 | that, among other things, that can lead to burnout. |
| 13 | Q.   Any other concerns? |
| 14 | A.   I had a concern that we --  I wasn't real sure |
| 11:18:24  15 | exactly what it was she was working on during the |
| 16 | overtime. |
| 17 | Q.   Prior to bringing your concerns to Mr. Broili, |
| 18 | what steps, if any, did you take to determine what |
| 19 | Ms. Riley was working on while she was performing |
| 11:18:54  20 | overtime? |
| 21 | A.   I didn't take any steps. |
| 22 | Q.   Do you know if --  Strike that. |
| 23 | Do you know somebody named Julian de |
| 24 | Santiago? |
| .9:15  25 | A.   Yes, I do. |

Charles Rex Wahl       January 16, 2008

36

1    Q.   Who was that?

2    A.   He was one of the staff at the Yuma office in our

3    group.

4    Q.   Were you his team lead as well?

11:19:22   5    A.   I was.

6    Q.   Do you know if Mr. De Santiago worked overtime

7    while you were --

8    A.   Yes.

9    Q.   -- employed at the Yuma area office?

11:19:32   10   A.   Yes.

11   Q.   Did you ever express any concerns to Mr. Broili

12   regarding Mr. De Santiago's use of overtime?

13   A.   No.

14   Q.   Did you ever express to Mr. Broili that you

11:19:55   15   believed Ms. Riley was cheating on her use of overtime?

16   A.   No.

17   Q.   Did you have that opinion at the time?

18   A.   No.

19   Q.   Did you ever meet with Mr. Broili and Ms. Riley

11:20:15   20   regarding her use of overtime?

21   A.   We may have.

22   Q.   Do you recall --

23   A.   I can't recall a specific, but . . .

24   Q.   Did you ever provide a performance evaluation to

.0:31   25   Julian De Santiago?

1    assurance, I --  It was standard practice in our group to

2    have me review the documents produced by the staff in my

3    group, and it was, you know, for technical content and

4    editorial content, and usually it was a back and forth.

11:23:26  5      Q.   And to your knowledge, you reviewed --

6      A.   I reviewed the draft of the -- what was called

7    the aquifer -- the APAP, aquatic pesticide application

8    plan.

9      Q.   Did you speak to Ms. Riley about concerns you had

11:23:57  10   with her draft of the APAP prior to bringing it to the

11   attention of the individuals you previously described?

12     A.   I did.  There were, I believe, several e-mails

13   commenting about some locational errors and errors of

14   interpretation on the names of certain water bodies.

11:24:29  15              Also, there were -- the team that was

16   working on that project occasionally met, and we talked

17   about these kind of things.

18     Q.   Did you ever assign work to Ms. Riley from

19   May 1st to mid-July 2004 which was unrelated to the

11:25:10  20   salvinia project?

21     A.   Did I ever find work?

22     Q.   Assign work.

23     A.   Assign work unrelated to salvinia?  I likely did.

24     Q.   Do you recall any of those assignments you may

:5:26  25   have given her?

1    BY MR. CONLEY:

2        Q.    And was the method by which she was going to take

3    those samples the grab sampling method?

4        A.    It's pretty generic.

12:00:14  5        Q.    Did you ever order Ms. Riley --  Well, strike

6    that.

7                    Did you ever instruct Ms. Riley to perform

8    pesticide spraying of the Palo Verde irrigation drain?

9        A.    No.

12:00:35  10        Q.    Did you ever instruct Ms. Riley to perform water

11    testing using sulfuric acid?

12        A.    I believe we discussed it, that there was a need

13    to acidify water samples that were taken in this project

14    using sulfuric acid.

12:00:59  15        Q.    Do you know if Ms. Riley at the time had any

16    training in the sampling of water using sulfuric acid?

17        A.    I -- I don't know.

18        Q.    Is it dangerous to test water using sulfuric

19    acid?

12:01:15  20        A.    One would have to use some care.

21        Q.    Would you have to fill out any paperwork prior to

22    performing that kind of testing with sulfuric acid?

23        A.    I imagine you'd have to have a material safety

24    data sheet and a briefing on the safety practices of that

01:46  25    material.

1          MS. HIRNEISEN:  Form.

2          THE WITNESS:  I'm not aware.

3    BY MR. CONLEY:

4      Q.   Was she ever reprimanded for it?  Do you know?

13:03:20   5      A.   Not that I know of.

6      Q.   Do you recall ever e-mailing Julian De Santiago

7    that you were canceling Ms. Riley's participation in a

8    driving tour of the Telegraph Pass construction site with

9    him?

13:04:17  10          MS. HIRNEISEN:  Form.

11          THE WITNESS:  Yes, I do.

12    BY MR. CONLEY:

13      Q.   Why did you e-mail Mr. De Santiago telling him

14    that you were canceling Ms. Riley's participation in that

13:04:31  15    activity?

16      A.   Because that was his project, and I wanted to let

17    him know that she couldn't come along.

18      Q.   Why couldn't she come along?

19      A.   Because she had, in my view, more important

13:04:51  20    things to do.  Workload management, again.

21      Q.   Prior to e-mailing Mr. De Santiago, did you

22    discuss this topic with Ms. Riley?

23      A.   I think she had told me she was going to go.

24      Q.   Did you inform her that you were going to tell

05:11  25    Mr. De Santiago that she wasn't going to go?

Charles Rex Wahl        January 16, 2008

65

1       A.    I don't recall if I did.

2       Q.    Do you recall if you ever, while you were at the

3  Yuma area office, canceled any appointments of Mr. De

4  Santiago without speaking to him about it first?

13:05:50  5       A.    I don't recall any specifics.

6       Q.    Did you ever cancel any of his appointments?

7       A.    Not that I can recall.

8       Q.    After sending the e-mail to Mr. De Santiago

9  stating that Cheryl wasn't going to be allowed to

13:06:13  10  participate in that activity with him, did you engage in a

11  meeting with Thayer Broili and Cheryl Riley regarding that

12  subject?

13       A.    I can't remember.

14       Q.    Did the folks at the --  Strike that.

13:07:10  15             Did the folks on the environmental section

16  at the Yuma area office -- the division that you worked

17  in -- ever get together after work to socialize while you

18  were there?

19       A.    Yes.

13:07:25  20       Q.    What kind of social activities would the group

21  engage in?

22       A.    I don't know about all of them, but occasionally

23  we'd go out and have drinks.

24       Q.    Like a happy hour or something?

J7:47  25       A.    Yeah, things like that.

1      Q.   And who would participate in these happy hours or

2   social activities?

3      A.   It varied.

4      Q.   Would you?

13:07:58   5      A.   I would.

6      Q.   Do you know if Cheryl Riley ever participated in

7   any happy hours?

8      A.   You know, I can't recall if she did.  There may

9   have been -- there may have been some.

13:08:13   10      Q.   Do you recall anybody ever stating that they did

11   not want Ms. Riley to participate in happy hours with the

12   group?

13      A.   No.

14      Q.   Did you ever suggest to anyone that Ms. Riley

13:08:41   15   should not be included in social get-togethers?

16      A.   I don't recall if I did.

17      Q.   Is that something you may have done?

18      A.   It could be possible.

19      Q.   Why would you do something like that?

13:08:57   20      A.   Because of the situation in the workplace.

21      Q.   What was the situation?

22      A.   Among other things, I had been accused by

23   Ms. Riley of unethical conduct and violations of federal

24   contract law.  I should also say that at one point she

J9:36   25   caused the police to come to my house and interview me

1      A.    Because the EEO complaint was within her rights

2  as a federal employee.  In my view, the written complaint

3  regarding contractor issues was libel, and it bothered me

4  greatly.

13:13:42  5      Q.    With respect to Ms. Riley's equal employment

6  opportunity complaints, do you recall when you first

7  learned that she had complained to the EEO representative

8  at the Bureau of Reclamation about you?

9      A.    Seems like it was in late July, but I can't

13:14:28  10  recall exactly when I learned that.

11      Q.    Do you recall how you learned that?

12      A.    I believe Thayer told me.

13      Q.    Do you know the context in which he told you?

14  Was it at a meeting?  Did he call you on the phone?  Do

13:14:47  15  you remember?

16      A.    I don't.  I believe he called me into his office

17  and told me there.

18      Q.    Do you recall if Cindy Hoeft was on vacation at

19  that time?

13:15:01  20      A.    I don't recall.

21      Q.    What did Mr. Broili tell you about Ms. Riley's

22  EEO complaint?

23      A.    He told me that she had complained about a

24  hostile work environment.

15:19  25      Q.    Did he provide any details to you?

1   California certification.   Said certification can be found

2   on the Internet for these companies.

3                    (Deposition Exhibit 7 was marked for

4                    identification.)

13:33:06   5   BY MR. CONLEY:

6        Q.    I've now given you what's been marked as Exhibit

7   No. 7 to your deposition, which is a one-page document,

8   Bates-numbered 923.   And it appears to be some more

9   handwritten notes.   Is this your handwriting?

13:33:20   10        A.    Yes.

11        Q.    There's some dates at the top; July 20th,

12   July 22nd, and July 23rd.   Do you see that?

13        A.    Yes.

14        Q.    What are you describing there with respect to

13:33:31   15   those three dates?

16        A.    I believe that's describing the sequence of

17   Cheryl's complaint about the hostile work environment.

18        Q.    So you wrote that on July 20th it was your

19   understanding that Mike Collins was notified about

13:33:50   20   Cheryl's complaint?

21        A.    Uh-hum.

22        Q.    Is that a yes?

23        A.    Yes.   Sorry.

24        Q.    And Mike Collins was who at the time?

33:59   25        A.    He was the deputy or assistant area manager.

Charles Rex Wahl     January 16, 2008

80

1      Q.    And then apparently two days later Mike Collins

2  relayed the information to Cindy Hoeft.  Is that correct?

3      A.    That's what this note suggests.

4      Q.    And then on the 23rd, it looks like there was a

13:34:17  5  closed-door meeting with Thayer Broili.  Is that correct?

6      A.    Right.

7      Q.    And it says, "Project removed from her to RW,"

8  which is you, correct?

9      A.    I -- I think so.

13:34:33  10     Q.    And "her" would be Cheryl Riley, correct?

11     A.    I'm sorry?

12     Q.    The "her" you're referring to is Cheryl Riley.

13  Is that correct?

14     A.    Right.

13:34:43  15     Q.    And what was the project that was removed from

16  her?

17     A.    I would guess that was the salvinia.

18     Q.    And as a parenthetical underneath that it says,

19  "Did we know she was filing complaint?"  What did you mean

13:35:05  20  by that?

21     A.    You know, I don't know.

22     Q.    The next thing that you wrote appears to be

23  "hostile," and then there's a colon, and it says --  I

24  can't read what it says.  Can you read what it says after

35:46  25  the word "hostile"?

Charles Rex Wahl        January 16, 2008

95

1      A.   No.

2                  (Deposition Exhibit 10 was marked for

3                  identification.)

4    BY MR. CONLEY:

13:58:33   5      Q.   I've handed you what's been marked Exhibit No. 10

6    to your deposition, which is an e-mail from Thayer Broili

7    to you and Cheryl Riley.  It appears to be dated

8    July 23rd, 2004, and has a Bates number of Riley 1171 at

9    the bottom.  Do you see that?

13:58:52  10      A.   Yes.

11      Q.   Do you recall receiving this e-mail?

12      A.   Yes.

13      Q.   Do you recall what events, if any, led up to your

14   receiving this e-mail?

13:59:19  15      A.   Yeah.  The conflicts over the production of the

16   APAP document and getting it out the door to meet our

17   deadline.

18      Q.   And following the receipt of this e-mail --

19   Well, strike that.

14:00:03  20                  Were all of Cheryl's work tasks subject to

21   your oversight and direction?

22      A.   You mean subsequent to this?

23      Q.   Let's say subsequent to.  Subsequent to that,

24   were all of Cheryl's work tasks subject to your oversight

J0:23  25   and direction as described in the e-mail?

Charles Rex Wahl      January 16, 2008

96

1    A.    I would guess they were.  That was our direction,

2  excluding those that are within Thayer's direct area of

3  responsibility.

4    Q.    Prior to this, were all of Cheryl's work tasks

14:00:41  5  subject to your oversight and direction?

6    A.    Most of them were.  There was the case of Cindy

7  giving her direction directly.  Cindy Hoeft.  H -- I

8  always have trouble with that one.

9              MS. HIRNEISEN:  You're not the only one.

14:01:11 10              (Deposition Exhibit 11 was marked for

11              identification.)

12              MR. CONLEY:  The advent of the e-mail age

13  ensures that there are always multiple exhibits to every

14  deposition.

14:01:24 15              THE WITNESS:  You know, I've read -- I saw

16  it on the airline today that white collar workers receive

17  140 e-mails a day.

18              MS. HIRNEISEN:  I don't get that many.

19              THE WITNESS:  I certainly don't.

14:01:37 20  BY MR. CONLEY:

21    Q.    Okay.  We are looking at what's been marked

22  Exhibit No. 11 to your deposition, which is an e-mail from

23  you to Cheryl Riley, dated August 3rd, 2004, and it

24  actually also includes an e-mail from Cheryl to you, same

J1:57 25  day.  And it regards some sort of leave request.  Do you

Charles Rex Wahl        January 16, 2008

117

1          A.    Right.

2          Q.    Would you turn to the second page of this

3     exhibit, Bates-number 944? Is that the attachment?

4          A.    Yes.

14:51:47   5     Q.    It says, "Work for Cheryl October to

6     November 2004," right?

7          A.    Correct.

8          Q.    And there's four items that it appears you

9     anticipated Cheryl would perform work on.  Is that

14:51:59  10     correct?

11         A.    That's right.

12         Q.    The first one, "Draft a CEC for the Water 2025

13    Yuma County Water Users Association grant."  Is that

14    correct?

14:52:21  15     A.    Right.

16         Q.    And it says "Prepare draft by November 5, 2004,"

17    correct?

18         A.    Right.

19         Q.    With a "Final CEC routing by November 10, 2004,"

14:52:26  20     correct?

21         A.    Right.

22         Q.    And the third item says, "Draft a CEC for

23    Geotechnical Investigations for the All American reservoir

24    and inlet channel," correct?

52:48  25        A.    Right.

Charles Rex Wahl        January 16, 2008

118

1    Q.    It says it has to be prepared by November 4,

2  2004?

3    A.    That's correct.

4    Q.    What is a CEC?

14:52:55  5    A.    It's a short form -- it a categorical exclusion

6  under NEPA.  It's a short form document that essentially

7  says this is a activity that falls under a precleared set

8  of conditions, and it thus doesn't need an environmental

9  assessment or an EIS.

14:53:26  10    Q.    Okay.  And then the next page, Bates number 945,

11  as I said, it looks to be the computer properties of the

12  previous document.  And it says, "Author:  rwahl."  Is

13  that correct?

14    A.    That's correct.

14:53:44  15    Q.    So you obviously created this document, correct?

16    A.    Right.

17    Q.    And the final page is Bates-numbered 946.  And

18  that has some handwritten notes on it.  Do you see that?

19    A.    Yes.

14:53:59  20    Q.    And that's your handwriting?

21    A.    Yes.

22    Q.    And it says, "Discussed with Ron October 12,

23  2004."  Is that correct?

24    A.    Right.

54:08  25    Q.    So what did you mean by that?

1    A.   It means that we -- Thayer and I had discussed

2  this with Ron.  Ron Curiel.

3    Q.   You and Thayer Broili discussed the work

4  assignments described on Bates number 944 with Ron Curiel?

14:54:35  5    A.   That's right.

6    Q.   And those were the work assignments for Cheryl

7  Riley between October and November 2004, correct?

8    A.   They were what I was recommending that she could

9  do.

14:54:58  10    Q.   Do you know if Ms. Riley performed those four

11  tasks that you describe in Exhibit No. 17?

12    A.   I recall several of them.

13    Q.   You recall that she performed several of them?

14    A.   Right.

14:55:29  15    Q.   Do you recall her not performing any of them?

16    A.   No.

17    Q.   How do you know that she performed those tasks?

18    A.   In one case, there was -- at least one case there

19  was written -- a written document produced that I

14:55:49  20  reviewed.

21    Q.   And all these tasks appear to be compliance

22  related.  Is that correct?

23    A.   Right.

24    Q.   None of them are hazardous materials related,

56:01  25  correct?

1    A.   You could say that, yes.  Correct.

2    Q.   And ultimately, you were responsible for ensuring

3  that these tasks were performed, correct?

4    A.   Yes.  I guess.  Yeah.

14:56:26  5    Q.   The task described as CEC for Geotechnical

6  Investigations for the all-American reservoir, is that the

7  same as the categorical exclusion for the geotech well

8  drilling?

9    A.   No.

14:57:02  10    Q.   Do you recall a CEC for the geotech well

11  drilling?

12    A.   Are you reading from this document?

13    Q.   No.

14    A.   Okay.  What geotech well drilling are you talking

14:57:16  15  about?

16    Q.   Related to the Pierson's Milkvetch.

17    A.   Okay.  That would be the same.  Yeah, geotech

18  would, I guess, be considered well drilling.  It's not

19  well drilling, but . . .

14:57:38  20    Q.   In any event, the geotech CEC described in

21  Exhibit No. 17 was something related to an endangered

22  plant known as the Pierson's Milkvetch.  Is that correct?

23    A.   Partially correct.  It -- the geotechnical

24  drilling involved finding out about the substrate for the

58:06  25  All American reservoir and inlet channel.  In doing a

Charles Rex Wahl      January 16, 2008

121

1   broad scoping for that project, some of the issues of

2   concern included the Pierson's Milkvetch as that -- in

3   that it may occur in the near area, the project area.

4   There was also a lizard species that was subject to an

14:58:32  5   agreement Reclamation was part of.  That's what item 4

6   refers to, FTHO.

7       Q.   Well, first of all, let me ask you what is the

8   Pierson's Milkvetch?

9       A.   The Pierson's Milkvetch is an astragalus, which

14:58:52  10  is a kind of plant.  I can spell that for you.

11  A-s-t-r-a-g-a-l-u-s, I believe.  I'll have to write that

12  down.

13          But anyway, it's discoverable in terms of --

14  yeah, that's correct.

14:59:15  15      Q.   You shouldn't write on that.

16          MS. HIRNEISEN:  Sorry.  I didn't realize

17  that was the --

18          THE WITNESS:  This is your copy?  This is

19  going to be attached?

14:59:24  20          MS. HIRNEISEN:  Sorry.

21          MR. CONLEY:  We'll just, for the record,

22  state that you wrote the word --

23          THE WITNESS:  Oops.

24          MS. HIRNEISEN:  What word was it, John?

58:51  25          MR. CONLEY:  -- "astragalus" on the second

1  page of Exhibit 17.

2            THE WITNESS:  I'm sorry.  I didn't think

3  these were yours.

4            Back to the plant.  The plant was, at the

14:59:55  5  time of this writing or shortly before that, proposed for

6  listing as federally endangered.  It grows on active sand

7  dunes in that part of California.  And there were active

8  sand dunes near this project.  And it was one of the

9  species we had to consider in our deliberations of

15:00:18  10  environmental impacts on the project, including the

11  geotechnical investigation.

12  BY MR. CONLEY:

13     Q.    And is it also one of the food sources for the

14  endangered desert tortoise?

15:00:29  15     A.    Unlikely, because the desert tortoise wouldn't

16  occur on active sand dunes.  It's a very

17  substrate-specific plant.

18     Q.    But in any event, the Milkvetch itself is --

19     A.    Is federally listed.  And there was designated --

15:00:51  20  there was proposed critical habitat, which was somewhat

21  winnowed down in the process of the public notice, and

22  then there was a published Federal Register notice about

23  the designated critical habitat.

24     Q.    Do you recall if you ever engaged in a

J1:13  25  disagreement with Ms. Riley regarding the geotech CEC and

1    the Pierson's Milkvetch?

2        A.    Yes.

3        Q.    What do you remember about that?

4        A.    I remember that Cheryl sent me an e-mail that

15:01:36   5    described the need -- or said that we needed to consult

6    with Fish and Wildlife Service regarding critical habitat

7    and the possibility that Pierson's Milkvetch occurred in

8    the project area for the geotechnical drilling.

9        Q.    And what was your response, if any?

15:01:55   10       A.    My opinion -- and I responded to Thayer; I didn't

11   respond to Cheryl -- was that we -- that the species did

12   not occur in the project area because the project area was

13   not suitable habitat and that we did, in fact, not have to

14   consult with Fish and Wildlife Service because we had

15:02:21   15   exercised our agency responsibility of assessing whether

16   or not we would impact the species or its critical

17   habitat, and we had concluded with pretty good basis in

18   science that, you know, we were not going to impact it

19   because it wasn't present.

15:02:42   20               There was also --  We had a consultant

21   working on the larger project, which was the All American

22   reservoir project, and he had completed at least one field

23   survey for the plant along the project route and had not

24   found it, nor had he found suitable habitat.  And he was a

J3:03   25   qualified botanist.

1      Q.    Do you recall signing a standard form 71 leave

2  request for Cheryl Riley while you were her team leader?

3      A.    I think I did.

4      Q.    Would that have been when Mr. Broili was out of

15:23:56  5  the office for some reason?

6      A.    Yes, it would have been.

7            And I think I later found out that as

8  acting, I couldn't sign a leave request.

9                 (Deposition Exhibit 19 was marked for

15:24:10  10               identification.)

11  BY MR. CONLEY:

12      Q.    Before I get to the next exhibit, I'll just ask

13  you a couple of questions to close out this train of

14  thought here.

15:24:32  15            You're aware that, as we discussed, Cheryl

16  fell while performing that desert tortoise survey in

17  December 2004, correct?

18      A.    Yes.

19      Q.    Did you know that she had a previous injury prior

15:24:53  20  to that fall?

21      A.    I think I knew that.

22      Q.    How did you know that?

23      A.    I think she had said she had that.

24      Q.    Do you know what kind of injury it was?

25:03  25      A.    Some sort of shoulder injury.

Charles Rex Wahl      January 16, 2008

138

1    Q.    And did you recall her mentioning to you that she

2    was actually scheduled to have shoulder surgery in

3    January 2005?

4    A.    I think so.

15:25:20    5    Q.    Do you recall when you learned that?

6    A.    No.

7    Q.    Did you ever remark to Cheryl that she reminded

8    you of your ex-wife?

9    A.    No.

15:25:41    10    Q.    Have you ever made any comments about female

11    employees' physical appearances -- physical appearance

12    while you were working at the Bureau of Reclamation office

13    in Yuma?

14    A.    I don't know.

15:26:20    15    Q.    Do you recall ever staring at women -- staring at

16    women's breasts while you were an employee of the Yuma

17    area office?  Let me rephrase that.

18          Do you ever recall staring at female

19    employees' breasts during working hours while you were an

15:26:56    20    employee of the Yuma area office?

21    A.    I wouldn't call it staring, but I probably

22    glanced here and there.

23    Q.    How would you define "glance"?

24    A.    Observe.

27:18    25    Q.    Did anyone ever complain to you about that?

1          MR. CONLEY:  I just have one more question.

2    BY MR. CONLEY:

3      Q.    I asked you if there were any females in the

4    environmental group above GS 9, and you stated that there

15:35:06    5    were not, correct?

6      A.    Correct.

7      Q.    Were there any males in the environmental group

8    GS 9 or below?

9      A.    No.

15:35:18    10     Q.    Were all of the males in the environmental group

11    GS 11 or above?

12     A.    The only male in the environmental group that

13    wasn't a GS 12 was a GS 11.

14     Q.    And who was that?

15:35:30    15     A.    That's Julian De Santiago.

16          MR. CONLEY:  That's it.

17          MS. HIRNEISEN:  I have just a few brief

18    follow-up questions.

19

15:35:39    20                    EXAMINATION

21    BY MS. HIRNEISEN:

22     Q.    Mr. Wahl, when you were designated as the team

23    leader, did you receive any pay raise or grade level raise

24    for that designation?

35:50    25     A.    No.