**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cheryl J. Riley, ) | No. CV-06-2160-PHX-SRB |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Dirk Kempthorne, Secretary, United States ) | |
| Department of the Interior, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Pending before the Court is Defendant Dirk Kempthorne's Motion for Summary Judgment (Doc. 25). Defendant asks the Court to grant summary judgment on the entirety of Plaintiff's claims, including claims for gender and race discrimination, hostile work environment, and retaliation, all of which are brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*.

**I.   BACKGROUND**

Plaintiff Cheryl Riley began working at the Yuma Area Office of the Bureau of Reclamation ("BOR"), a subdivision of the Department of the Interior ("DOI"), on April 18, 2004 as an environmental resource specialist, pay grade GS-9. On July 20, 2004, Plaintiff contacted Tess Yiamarelos, an equal employment opportunity ("EEO") counselor, to complain about the conduct of her team leader, Rex Wahl, and her supervisor, Thayer Broili. As a result of the July 20, 2004 EEO contact, Plaintiff and the BOR entered into a Resolution

Agreement on October 7, 2004 (the "Agreement"), which fully settled Plaintiff's claims. The conduct alleged by Plaintiff and resolved by the Agreement included the following:

1. [Plaintiff] was subjected to demeaning, unprofessional behavior (yelling, threatening, intimidating) on the part of Rex Wahl, Team Leader and Thayer Broili, Supervisor. Men in the group are treated differently.
2. [Plaintiff] was publicly criticized or ridiculed by both [Wahl] and [Broili].
3. Assignments involving decision-making and/or status were taken away from [Plaintiff].
4. [Plaintiff's] input was not valued or wanted. Input was solicited from the men in the group.
5. [Plaintiff] was instructed by supervisor to limit email communications within the group and send no email to the Director.
6. On several occasions, [Wahl] denied training or involvement with outside groups to [Plaintiff].

(Def.'s Statement of Facts in Supp. of Mot. for Summ. J. ("DSOF"), Ex. A at 1.)

A form of alternative dispute resolution, the Agreement required that Plaintiff relinquish her formal EEO complaint, and in return the BOR promised to, among other things, transfer her to a new team under the supervision of a different team leader for the stated purpose of providing the parties with a 60-day cooling off period. On December 7, 2004, Plaintiff sent a letter to the DOI alleging that Mr. Wahl had breached the Agreement. (DSOF, Ex. B.) Plaintiff complained that Mr. Wahl failed to keep the Agreement confidential, and that she had not been properly reassigned to permit the 60-day cooling off period to run its course.

In early December 2004 Plaintiff sustained a job-related injury while working in the field. Following her accident, Plaintiff resumed work and remained on the job until December 20, 2004. From that point forward, due to her injury and worker's compensation claim, Plaintiff remained away from her office until she was terminated effective April 29, 2005. Plaintiff first learned of the termination decision in a letter dated March 25, 2005. (DSOF, Ex. D.) That letter stated that Plaintiff's termination was non-disciplinary, and that Plaintiff was entitled to object to the decision either orally or in writing. A second letter was sent to Plaintiff on April 26, 2005. Again Plaintiff was advised that she would be terminated and was further informed of her options should she chose to grieve or appeal the agency's

decision. Plaintiff did not respond to the initial notice, and she did not take advantage of either of the options presented in the final letter.

On January 27, 2005 the DOI issued its final agency decision in response to Plaintiff's allegations of breach of the Agreement. (DSOF, Ex. E.) The DOI concluded that the Agreement had not been breached, and further advised Plaintiff that her allegations of harassment and retaliation relating to conduct that occurred after the date of the Agreement constituted a new complaint. The final agency decision instructed Plaintiff to contact an EEO counselor should she wish to pursue the newly raised issues. That same day, Plaintiff contacted an EEO counselor to begin the complaint process for this second complaint. She also took steps to appeal the DOI's final agency decision regarding the breach of the Agreement. In a decision dated February 4, 2006, the DOI determined that Plaintiff had failed to contact the EEO counselor within the forty-five day period mandated by 29 C.F.R. 1614.105(a)(1), and the agency dismissed Plaintiff's second complaint. (DSOF, Ex. I.) Although the agency decision set forth Plaintiff's appeals rights, she did not elect to pursue this claim further.

Following her removal from the BOR, Plaintiff initiated a third complaint with the agency by writing a letter, dated June 11, 2005, to the BOR's Denver EEO office. (DSOF, Ex. J.) In the letter, Plaintiff alleged that her termination was a retaliatory action taken against her as a result of her prior protected EEO activity. The agency responded by explaining to Plaintiff that she was required to consult with an EEO counselor before filing a complaint. Plaintiff did not subsequently contact an EEO counselor to discuss these allegations of retaliation.

On June 6, 2006 the Equal Employment Opportunity Commission's Office of Federal Operations ("OFO") issued its ruling on Plaintiff's appeal of the breach of the Agreement. (DSOF, Ex. F.) The OFO reversed the DOI's decision, held that the BOR had breached the Agreement, and reinstated the claim at the point at which processing had ceased. The OFO also noted that Plaintiff's allegations concerning harassment and retaliation that occurred during and after the 60-day cooling off period constitute separate claims of discrimination,

1  and OFO advised Plaintiff to contact an EEO counselor if she wished to pursue the additional
2  claims. Following the OFO's remand, Plaintiff's original claim was reinstated and Plaintiff
3  then filed her formal complaint with the agency on July 14, 2006. On August 23, 2006 the
4  agency responded to Plaintiff's formal complaint and explained that it was accepting the
5  following claims for investigation:

> Whether you were subjected to a hostile work environment from May 21, 2004 through July 30, 2004 when:
> Claim 1: you were subjected to demeaning, unprofessional behavior (yelling, threatening, intimidating) on the part of your Team Lead and Supervisor.
> Claim 2: your Team Lead and Supervisor publicly criticized you in front of others and ridiculed your ability to get work done.
> Claim 3: when your Supervisor limited your e-mail communications.
> Claim 4: the RMO Director held a meeting with your Team Lead and Supervisor regarding your EEO complaint.

(DSOF, Ex. G.) Unhappy with the breadth of the claims accepted for investigation by the agency, Plaintiff protested in writing to the agency on August 31, 2006, arguing that all of the alleged instances of discrimination, harassment, and retaliation should be included in the formal complaint. The agency responded by clarifying the issues accepted in the August 23, 2006 letter, but refused to expand the issues to the extent requested by Plaintiff. (DSOF, Ex. H.)

On September 18, 2006, Plaintiff filed this suit alleging race and gender discrimination, hostile work environment, and retaliation. Plaintiff argues that she should be able to present all of the allegedly improper conduct that occurred beginning shortly after the start of her employment and running through her final day in the office, approximately nine months later. Defendant counters that Plaintiff failed to exhaust her administrative remedies with respect to the second and third complaints, and, thus, she should not be permitted to bring those complaints before this Court. With respect to the first complaint, Defendant argues that Plaintiff is limited to discussing those instance of conduct that occurred before her entry into the Agreement, and that Plaintiff has failed to come forth with evidence sufficient to generate a material issue of fact as to any of her claims.

**II.     LEGAL STANDARDS AND ANALYSIS**

### A. Scope of the First Formal Complaint

In its June 6, 2006 decision, after determining that the BOR had breached the Agreement, the OFO ordered that "the agency shall reinstate the captioned complaint at the point at which processing ceased." (DSOF, Ex. F at 4.) Processing ceased on October 7, 2004, prior to the filing of a formal complaint. Plaintiff promptly filed a formal complaint on July 14, 2006, Docket Number WBR-06-028, to which the BOR responded that "[w]e have accepted the following claims of discrimination for *investigation*." (DSOF, Ex. G.) 29 C.F.R. § 1614.106(d) provides that "[a] complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." Approximately eight days after the BOR acknowledged receipt of Plaintiff's formal complaint, Plaintiff attempted to amend the issues accepted for review by the agency by including allegations relating to conduct that occurred after the date of the Agreement. Plaintiff's attempt to include these additional circumstances was largely rejected by the BOR. It is undisputed that the investigation period was still ongoing at the time that Plaintiff attempted to amend her complaint.

The plain language of the regulation permits Plaintiff to amend her complaint to include "issues or claims like or related to those raised in the complaint." 29 C.F.R. § 1614.106(d). The issues that Plaintiff sought to add were directly related to the type of behavior alleged in the complaint. Moreover, the claims that Plaintiff sought to add involved many of the same individuals, and the alleged conduct was, according to Plaintiff, targeted at her due to her gender, her race, or her decision to use the EEO complaint process. This conduct is clearly "like or related" to the claims that were accepted for investigation.

Defendant argues that the use of the permissive term "may" in § 1614.106(d) precludes the reading that Plaintiff advances. (Reply to Pl.'s Am. Resp. to Def.'s Mot. for Summ. J. ("Reply") at 3.) The Court disagrees. The term "may," as used in the regulation, is not intended to provide discretion to the agency, but instead vests discretion with the complainant. Section 1614.106(d) begins with the language, "[a] complainant may amend a complaint at any time," a phrase squarely addressed to the complainant, not the agency.

The regulation is clear: it is the complainant's choice whether to amend, but should she choose to do so, nothing in the regulation gives the agency the authority to reject her amendment so long as the "issues or claims are like or related" and the amendment is requested before the conclusion of the investigation.

Here, it cannot be reasonably contested that Plaintiff attempted to amend her complaint at a time when § 1614.106(d) explicitly permitted her to do so. Thus, the agency should have accepted for investigation all alleged incidents that occurred during the time of Plaintiff's BOR employment. The BOR's decision to reject these claims as untimely was made in error. This Court will consider all of the factual circumstances presented up to and including Plaintiff's termination.

Both Parties devoted substantial argument in the briefing of Defendant's Motion to the issue of whether the second and third complaints were properly exhausted prior to bringing this suit. Because the Court has determined that it will consider all factual circumstances and related complaints as part of WBR-06-028, the Court will not address Defendant's exhaustion argument.

### B. Motion for Summary Judgment

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under Rule 56, summary judgment is properly granted when: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party

may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

### 1. Gender and Race Discrimination

Title VII of the Civil Rights Act of 1964 states that "[it] shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where no direct evidence of discrimination is present, courts apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). The plaintiff has the initial burden to establish a prima facie case, which requires that the plaintiff offer evidence that: "'(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably.'" *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140 (9th Cir. 2001) (*quoting Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998)). The burden of production "then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000). The plaintiff may then show that "the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Defendant argues that Plaintiff cannot establish a prima facie case of race or gender discrimination because she has not offered evidence that she suffered an adverse employment

action or that similarly situated individuals were treated more favorably.[1] As discussed below, Plaintiff has failed to establish that similarly situated employees were treated more favorably. The Court does not reach the remaining elements of Plaintiff's prima facie case.

With regard to the gender discrimination allegations, Plaintiff argues that "Wahl did not record or criticize the movements or actions of any males. Plaintiff observed that Wahl never treated any males in the environmental group or in any other groups in this manner, or made any complaints to management about any males." (Pl.'s Am. Resp. to Def.'s Mot. for Summ. J. ("Resp.") at 8.) This bare allegation is insufficient to support Plaintiff's prima facie case. To begin with, Plaintiff does not identify who these "males" are, which makes it difficult for the Court to determine whether the "males" were in fact similarly situated. Nonetheless, the Court can reasonably infer that the "males" were Julian DeSantiago and Ron Curiel, who were the only two men mentioned in the portion of Plaintiff's Statement of Facts cited in this section of her Response. According to an office organizational chart prepared by Plaintiff during the EEO process, Mr. DeSantiago was a GS-11.4 with ten years of experience and Mr. Curiel was a GS-12.6 team leader with nine months on the job. (Reply, Ex. 2.) Mr. DeSantiago's decade of experience, and Mr. Curiel's substantially higher rate of pay and management position demonstrate that neither of these two individuals were similarly situated. Furthermore, the type of disparate treatment claimed by Plaintiff in her Response—recording and criticizing her movements and reporting her activities to management—cannot be reasonably compared to the way Mr. Wahl treated either Mr. Curiel or Mr. DeSantiago. Mr. Wahl and Mr. Curiel were both team leaders and Mr. Curiel was compensated at a full grade level higher than Mr. Wahl. Thus, Mr. Wahl was not in a position to direct Mr. Curiel's work, or to track his time or movements. Mr. DeSantiago's high rate of pay, GS-11.4, was only two steps from Mr. Wahl's pay rate, GS-11.6, and additionally Mr. DeSantiago's tenure at the BOR was substantially longer than all of the

---

[1] While not the focus of its analysis, Defendant also contends that Plaintiff failed to establish the remaining elements of her prima facie case.

other employees on Ms. Riley's chart. Comparing the treatment of these two men with the manner in which Plaintiff, a new employee in the Yuma office, was treated does not suggest that male employees were treated more favorably.

In her Response, Plaintiff presents additional instances where male employees were allegedly given favorable treatment. These include the male employees' ability "to speak freely at meetings" and "to take leave without having to fill out a request form." (Resp. at 9.) Again, these allegations are rendered insufficient by the fact that only Mr. Curiel and Mr. DeSantiago are offered in comparison, and neither of them is similarly situated.

Plaintiff's allegations of racial discrimination suffer deficiencies similar to those affecting her gender claims. The fourth element of a prima facie case requires that a plaintiff claiming discrimination present evidence that similarly situated employees were treated more favorably. Plaintiff's allegations of racial discrimination are more appropriately termed allegations of hostile work environment, and they are addressed below as such. However, here, it is necessary to show favorable or unfavorable treatment, and Plaintiff has failed to do this. Comparing her experience with the experience of others in her office, Plaintiff argues, "[t]here is no evidence that . . . similar racist remarks [were made] about any non-Native American employee . . . . [Plaintiff] was singled out and subject to . . . racial slurs [and] excluded from conversations, ignored and glared at by her managers and subject to greater scrutiny than other employees." (Resp. at 8.) Nowhere does Plaintiff point to a similarly situated employee who was treated more favorably. Excluding the alleged oral and written slurs and the glaring, which are addressed in the hostile work environment discussion below, Plaintiff's allegations are limited to a claim of greater scrutiny. Indeed, it is appropriate for a lower salaried employee with less experience to have his or her work scrutinized to a higher degree than someone more senior by way of experience or pay grade. For this very reason, it is essential that Plaintiff come forth with evidence that she was treated less favorably than a *similarly situated* fellow employee. Taking the facts in the light most favorable to Plaintiff, she has failed to establish the fourth element of her prima facie case

on either her gender or race discrimination claims and, thus, no genuine issue of material fact remains and Defendant is entitled to judgment as a matter of law.

### 2. Hostile Work Environment

To succeed on a hostile work environment claim under Title VII, Plaintiff must establish a prima facie case consisting of the following elements: "(1) she was 'subjected to verbal or physical conduct' because of her race [or gender], (2) 'the conduct was unwelcome,' and (3) 'the conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment.'" *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (quoting *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002)).

It is beyond dispute that Plaintiff has presented evidence sufficient to satisfy the first and second elements of her prima facie case. The only question that remains is whether Plaintiff has alleged conduct "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Id.* In support of her claim, Plaintiff alleges a number of instances of verbal harassment including: (1) at a staff meeting, Plaintiff overheard Mr. Broili say "[t]hose damn Indians, always causing trouble and wanting something for nuthin!" He then slammed papers on a desk while staring at Plaintiff; (2) Mr. Wahl, in an email exchange with Plaintiff, used the phrase "so many chiefs, just one Indian" and, when asked to clarify, Mr. Wahl stated: "if the shoe fits"; (3) Mr. Wahl made a statement to the effect of, "women, like my ex-wife, don't belong in some career fields"; (4) Mr. Wahl leered at Plaintiff's breasts on occasion, and made unspecified sexist comments; (5) At a meeting, Plaintiff heard Mr. Wahl say "Jackie looks good in that sweater, but it would look even better tighter and . . . lower (sounded like), followed by a loud Ha!"; and (6) Beginning around October 8, 2004, Mr. Wahl made grunting noises when walking by Plaintiff's cubicle. (Resp. at 7-9; Pl.'s Separate Statement of Facts in Supp. of her Resp. to Def.'s Mot. for Summ. J. ("PSOF"), ¶¶ 59, 95.)

The Ninth Circuit has issued a number of decisions that are illustrative of the type of conduct that rises to the level of actionable harassment. In *Manatt*, the plaintiff, a Chinese-

American woman, was repeatedly forced to endure jokes directed at her racial background. 339 F.3d at 795-96. On one occasion, Manatt was insulted for mispronouncing Lima, and then further belittled by her co-worker who proceeded to call a second co-worker in the company's Peru office for the purpose of humiliating Manatt. *Id*. The employee jeered that Manatt's mispronunciation was "because she's a China woman." *Id*. at 796. On another occasion, Manatt overheard some fellow employees using the terms "China men" and "rickshaw," and when they saw her approach, they "pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians." *Id*. at 795. Additionally, Manatt was told by a coworker, "I've had the worst kind of trouble with your countrymen," and she heard co-workers laugh when referring to those "communists from Beijing." *Id*.

Although the court found the alleged conduct of Manatt's supervisor and co-workers to be "offensive and inappropriate," it ultimately concluded that the behavior "did not so pollute the workplace that it altered the conditions of her employment." *Id*. at 798-99 (citing *Vasquez v. County of L.A.*, 349 F.3d 634, 643 (9th Cir. 2003) (finding no hostile environment discrimination where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of the plaintiff on several occasions and directly called the plaintiff "Medea"); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031, 1036-37 (9th Cir. 1990) (affirming the district court's conclusion that no hostile work environment existed where evidence suggested that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on the plaintiffs because they were Latino). *Compare Kang*, 296 F.3d at 817 (finding that a Korean plaintiff suffered national origin harassment where the employer verbally and physically abused the plaintiff because of his race); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee was

called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999) (finding a hostile work environment where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl" and where he humiliated the employee in public by drawing a pair of breasts on an easel while the employee was making a presentation and then told the assembled group that "this is your training bra session," and where the employee received vulgar notes and was patted on the buttocks and told she was "putting on weight down there"), *abrogated on other grounds in Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Draper v. Coeur Rochester*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where the plaintiff's supervisor described his sexual fantasies to her and indicated his wish to have sex with her, commented on her "ass," called her "gorgeous" and "beautiful" rather than using her name, and asked over a loudspeaker if she needed help changing her clothes); *Ellison v. Brady*, 924 F.2d 872, 873-74 (9th Cir. 1991) (reversing summary judgment and finding prima facie case of hostile work environment where the plaintiff was sent disturbing love letters by a co-worker who expressed his desire to have sex with her and wrote that he enjoyed "watching you" and "experiencing you," and referred to their relationship as "striking off such intense sparks" even though the plaintiff had made it clear that she was not interested in him).

Viewing the evidence in this case in the light most favorable to Plaintiff, Mr. Broili and Mr. Wahl's alleged behavior, while offensive and inappropriate, does not rise to the level of actionable conduct. Two of the alleged comments were made during meetings and were not directed specifically at Plaintiff. Mr. Wahl's email, while far from the most appropriate way to communicate his message, is a somewhat common phrase used to describe a situation where too many people are giving orders and not enough workers are available to complete the tasks. Perhaps the most offensive conduct alleged is Mr. Wahl's leering and grunting. Still, the alleged leering and grunting was no worse than Manatt's experience, where she was exposed to co-workers who contorted their faces to mock Asian facial features, and a supervisor who made derogatory racial comments.

The Court does not condone the conduct allegedly perpetrated by Mr. Wahl and Mr. Broili.  Had these actions transpired repeatedly over a long period of time, or occurred with great frequency over a short span of time, Plaintiff may have had a viable claim because "'the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000) (quoting *Ellison*, 924 F.2d at 878).  Plaintiff was only on the job with the BOR from April until December of 2004.  At most, the unwelcome incidents occurred over a seven month period.[2]  Plaintiff does not allege that she was subjected to daily harassing conduct, but instead points to a number of isolated incidents.  Put plainly, the severity of incidents necessary to sustain a hostile work environment claim stemming from such a short period of employment are simply not present in this case.

As the Supreme Court has repeatedly warned, Title VII may not be used as a "general civility code" for the workplace. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Accordingly, "'simple teasing,' [citation omitted], offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id*.  The conduct in this case amounts to offhand comments and isolated incidents, none of which are so serious as to alter Plaintiff's working conditions. While Plaintiff may have held a subjective belief that her working conditions had been altered, the objective evidence is insufficient to support that conclusion. *See Id*. at 787 ("a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive").  As a matter of law, the conduct alleged was not "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment." *Manatt*, 339 F.3d at 798.

### 3.     **Retaliation**

---

[2] The alleged discrimination and harassment did not begin until May 25, 2004. (PSOF, ¶ 41.)

- 13 -

"In order to make out a prima facie case of retaliation, a plaintiff must show that (1) she was engaging in protected activity, (2) the employer subjected her to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." *Bergene*, 272 F.3d at 1140 (citing *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 755 (9th Cir. 1997)). If Plaintiff successfully establishes a prima facie case, then "'the burden shifts to [Defendant] to articulate a legitimate, non-discriminatory reason for the adverse employment action.'" *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003) (quoting *Manatt*, 339 F.3d at 800). "If [Defendant] articulates such a reason, [Plaintiff] 'bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.'" *Id.* (quoting *Manatt*, 339 F.3d at 800).

Plaintiff has the burden of proof to demonstrate pretext, which can be established through two separate avenues. *Id.* One option permits Plaintiff to establish her case "directly by persuading the court that a discriminatory reason more likely motivated the employer." *Burdine*, 450 U.S. at 256; *Stegall*, 350 F.3d at 1066. In the alternative, Plaintiff may proceed "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

An adverse employment action includes any "employment decision 'reasonably likely to deter employees from engaging in protected activity.'" *Manatt*, 339 F.3d at 800 n.9 (quoting *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000)). To be considered adverse, the employment decision need not be objectively adverse, however, "it is not entirely subjective as the conduct must be 'reasonably likely' to deter the protected activity." *Vasquez*, 349 F.3d at 646. Typically, adverse employment action "takes the form of discharge, demotion, [or] failure to promote." *Kortan*, 217 F.3d at 1113. Although less common, some additional adverse actions include stripping an employee of work responsibilities or doling out different, more-burdensome work. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Transfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under this section.").

Plaintiff argues that she was retaliated against on four separate occasions, each constituting an adverse employment decision. The alleged adverse employment decisions are as follows: (1) upon learning of her EEO activity, Mr. Broili ordered Plaintiff to turn over her electronic files, he removed her from her assigned project and discretionary duties, and he placed her under the oversight of the team leader, Mr. Wahl; (2) Mr. Wahl continued to supervise Plaintiff during the 60-day cooling off period, which included an order to perform a field assignment that resulted in Plaintiff's accidental injury; (3) Mr. Wahl punched the back of Plaintiff's chair at a holiday party and called her a "bitch"; and (4) Mr. Broili terminated Plaintiff for engaging in protected activity. (Resp. at 12.) Only actions number (1) and (4) present a real question for the Court.

The second alleged circumstance, Mr. Wahl's continued supervision of Plaintiff, may have been in violation of the Agreement, but this does not automatically equate to an adverse action. The only adverse consequence that Plaintiff suffered as a result of this interaction was additional exposure to Mr. Wahl, who she found to be offensive. Plaintiff's work under Mr. Wahl's direction, which likely would have resumed following the 60-day cooling off period, would not dissuade a reasonable employee from engaging in protected activity. Moreover, there is no evidence that additional interaction with Mr. Wahl deterred Plaintiff from engaging in protected activity or that such an outcome was likely. Thus, whether viewed through a subjective or objective lens, Defendant's actions in allowing Mr. Wahl to continue to contact Plaintiff in violation of the Agreement was not an adverse employment decision. Likewise, punching the back of Plaintiff's chair and calling her a vulgar name would not discourage a normal employee from engaging in protected activity, and the evidence in this case does not suggest that Plaintiff would have been dissuaded by these actions. Both Plaintiff and a reasonable employee, to the extent that they differ, would be rightfully upset by such immature conduct, but there is no reasonable likelihood that Mr. Wahl's actions would "deter employees from engaging in protected activity." *Vasquez*, 349 F.3d at 646.

At first glance, it appears that Plaintiff has alleged sufficient facts to support her prima facie case under the circumstances set forth in action (1). Had Plaintiff really been stripped of her discretionary responsibilities, ordered to turn over files, placed under the supervision of a new team leader, and removed from her assigned project, then she would be in a situation similar to that described in *Yartzoff*. 809 F.2d at 1376. However, the evidence simply does not support Plaintiff's version of the facts. Plaintiff claims that she was placed under the supervision of Mr. Wahl as a retaliatory measure, yet, the organizational chart shows that Plaintiff, as a member of Mr. Wahl's team, was already under his supervision. (*See* Reply, Ex. 2.) Plaintiff also claims that she was removed from her project, ordered to turn over her files, and forced to surrender her discretionary duties. In support of this, Plaintiff cites to paragraphs 70 through 76 of her Statement of Facts. (Resp. at 12.) Those cited averments have little or no relevance to the argument that Plaintiff's Response contends they support. Furthermore, a July 23, 2004 email from Mr. Broili to Plaintiff states, "I am clarifying that all of Cheryl's work tasks are subject to Rex's oversight and direction until further notice." (Reply at 8, Ex. 7.) Nowhere in that email is there any mention of a shift in duties, reduction in discretionary responsibilities, or any other action that could be reasonably construed as adverse to Plaintiff's employment interests.

Termination is an adverse employment decision, thus, Plaintiff has unquestionably satisfied the first two requirements of her prima facie case. The only remaining question is whether Plaintiff can establish a causal link between her protected activity and the adverse employment decision sufficient to complete her prima facie case. The Court need not address this question because even if a causal link is assumed, Plaintiff has failed to rebut Defendant's legitimate, non-discriminatory reason for the employment action.

Defendant, in its Motion, acknowledges that it is responsible for rebutting Plaintiff's prima facie case, and offers the following as a legitimate, non-discriminatory reason for the employment action: "[t]he Agency removed Plaintiff from her position because she was still unable to return to work four months after her on-the-job injury, and there was no indication whatsoever that she would ever be able to perform the essential functions of her position.

Indeed, Plaintiff now claims that she is permanently disabled and cannot work in any occupation." (Def.'s Mot. for Summ. J. at 15.) For her part, Plaintiff has offered no direct evidence "that a discriminatory reason more likely motivated the employer." *Burdine*, 450 U.S. at 256. Nor has she argued or come forth with facts to suggest "that the employer's proffered explanation is unworthy of credence." *Id*. Not only does Plaintiff's Response fail to challenge the legitimate, non-discriminatory reason proffered by Defendant in its Motion, Plaintiff admits that she cannot work as a result of her December 2005 injury and she continues to receive worker's compensation benefits for that injury. (*See* PSOF, Ex. C, Dep. of Cheryl J. Riley at 37:17-38:10.) Furthermore, Plaintiff conceded in the Complaint that her "injuries ultimately caused [her] to be fired from the BOR." (Compl. ¶ 27.)

The *McDonnell Douglas* burden-shifting scheme is not novel; on the contrary, no precedent is more entrenched in Title VII case law. It is Plaintiff's burden to rebut Defendant's legitimate, non-discriminatory reason, and she has failed to meet this burden. For that reason, Plaintiff's retaliation claim must fail. *See Manatt*, 339 F.3d at 801 (holding that "[b]ecause Manatt failed to introduce any direct or specific and substantial circumstantial evidence of pretext, summary judgment for the Bank must be affirmed.").

**IT IS ORDERED** granting Defendant Dirk Kempthorne's Motion for Summary Judgment (Doc. 25).

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Defendant in this matter.

DATED this 3rd day of June, 2008.

_____
Susan R. Bolton
United States District Judge